**No. 2024-1755**

---

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

ASG SOLUTIONS CORP., dba American Systems Group,
*Plaintiff-Appellant*

v.

UNITED STATES,
*Defendant-Appellee*

---

## APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
## CASE NO. 1:23-cv-01029-RAH

Honorable Richard A. Hertling, Judge

---

## BRIEF OF PLAINTIFF-APPELLANT
## ASG SOLUTIONS CORPORATION DBA AMERICAN SYSTEMS GROUP

---

FINCH, THORNTON & BAIRD, LLP
David S. Demian
4747 Executive Drive, Suite 700
San Diego, California 92121
(858) 737-3100
ddemian@ftblaw.com
*Attorneys for Plaintiff-Appellant ASG Solutions Corporation*
*DBA American Systems Group*

Date:  June 26, 2024

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellant/Plaintiff ASG Solutions Corporation DBA American Systems Group ("ASG") certifies the following:

1.      The full name of every party represented by me is:  ASG Solutions Corporation DBA American Systems Group.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: NONE

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: NONE

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear and have not already entered an appearance in this court are: NONE

5.      There is a Notice of Proposed Debarment dated May 15, 2024, (*see* FAR 9.4) ("NPD") issued against ASG and its founder Mr. Ritobrata Banerjee, by the United States of America, acting by and through the Department of Defense, Department of the Navy, Office Of General Counsel, that will be directly affected by the Federal Circuit's decision in this appeal.  There are no other cases pending in any court or agency that will directly affect or be directly affected by the Federal Circuit's decision in this appeal.

6.     All information required by Federal Rule of Appellate Procedure

26.l(b) and ( c) that identifies organizational victims in criminal cases and debtors

and trustees in bankruptcy cases:  NONE

# <u>TABLE OF CONTENTS</u>

Page

CERTIFICATE OF INTEREST ...................................................................... i

STATEMENT OF RELATED CASES ............................................................ ix

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES ..................................................................... 2

STATEMENT OF THE CASE ......................................................................... 4

SUMMARY OF THE ARGUMENT ................................................................ 9

ARGUMENT .................................................................................................... 12

I.      Standard of Review ............................................................................... 12

II.     The Trial Court Erred When It Held That
        Staffing Supply May Be The Central Purpose
        Of A Services Contract Procured Under FAR Part 37.101 ........................ 13

III.    The Trial Court Erred When It Concluded The Contract,
        As Interpreted And Administered By Navy, Is Not An
        Unlawful Personal Services Contract Under FAR 37.104 ........................ 19

IV.     The Trial Court Erred When It Interpreted The Contract As
        Permitting Labor Hour Deductions Under H.8 Resulting In A Level
        Of Effort Agreement Unlawfully Entered In Violation Of FAR 16.2 ....... 23

V.      The Trial Court Erred As A Matter of Law When
        It Concluded ASG's Contract Interpretation Is Not
        Reasonable And Navy's Interpretation Is Reasonable ............................. 25

        A.     Summary of Interpretation Argument ............................................. 25

        B.     Discussion of Task Order .............................................................. 28

VI.     The Trial Court Erred When It Held T4D
        Justified Under 52.249-8(a)(1)(i) through (iii) ........................................ 45

VII.    The Trial Court Erred When It Held Navy
        Had Not Abandoned Its Discretion Under FAR 49.402-3
        When It Issued T4D As Pretext To Rid Itself Of ASG ............................. 49

VIII.   Trial Court Erred When It Granted Summary Judgment
        In Favor Of Navy On ASG's Third Cause of Action For
        Breach Of The Covenant Of Good Faith And Fair Dealing ...................... 55

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............................ 58

iii

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*5860 Chi. Ridge, LLC v. United States*
    104 Fed. Cl. 740 (2012) ...................................................................47

*A-Transp. Nw. Co. v. United States*
    36 F.3d 1576 (Fed. Cir. 1994) ........................................................13

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)...................................................................12, 13

*Anderson v. United States*
    23 F.4th 1357 (Fed. Cir. 2022) .......................................................12

*Barron Bancshares, Inc. v. United States*
    366 F.3d 1360 (Fed. Cir. 2004) ......................................................13

*Beta Sys. Inc. v. United States*
    838 F.2d 1179 (Fed. Cir. 1988) ......................................................27

*Cray Research, Inv. V. United States*
    44 Fed. Cl. 327 (1999) ...................................................................26

*Darwin Construction Co. v. United States*
    811 F.2d 593 (Fed. Cir. 1987) ........................................................50

*DOT v. Eagle Peack Rock & Paving, Inc.*
    69 F.4th 1367 (Fed. Cir. 2023) .......................................................50

*Dow Chem. Co. v. United States*
    226 F.3d 1334 (Fed. Cir. 2000) ......................................................18

*In re ENDMARK Corp.*
    B-278139 (Comp. Gen. Dec. 31, 1997)......................................22, 23

*Kelso v. Kirk Bros. Mech. Contrs.*
    16 F.3d 1173 (Fed. Cir. 1994) ........................................................47

*Lewis-Nicholson, Inc. v. United States*
    213 Ct. Cl. 192, 550 F.2d 26 (1977)................................................55

iv

*Li v. Affordable Art Co.*
  2014 WL 11862796 (N.D. Ga. 2014) ................................................................51

*Nuclear Research Corp. v. United States*
  814 F.2d 647 (Fed. Cir. 1987) ........................................................................50

*Omni Corp. v. United States*
  41 Fed. Cl. 585 (1998) ................................................................42, 43, 46

*SEC v. Franklin*
  348 F.Supp.2d. 1159 (S.D. Cal. 2004)...............................................................52

*Seh Ahn Lee v. United States*
  895 F.3d 1363 (Fed. Cir. 2018) ........................................................................21

*Sturm v. United States*
  421 F.2d 723 (Ct. Cl. 1970) ........................................................................26

*Tolan v. Cotton*
  *572 U.S. 650* (2014)........................................................................12

*United States v. Amdahl Corp.*
  786 F.2d 387 (Fed. Cir. 1986) ........................................................................18

*United States v. Ford Motor Company*
  463 F.3d 1267 (Fed. Cir. 2006) ........................................................................47

*United States v. Shah*
  125 F.Supp.3d. 570 (E.D.N.C. 2015) ................................................................52

## Statutes

10 U.S.C. 3401 ........................................................................13

10 U.S.C. 3405(e) ........................................................................14, 15, 18, 31

10 U.S.C. section 3401 ........................................................................13

10 U.S.C. section 3403(b)........................................................................13

10 U.S.C. section 3405 ........................................................................13

10 U.S.C. section 3405(a) ........................................................................14, 15, 31

v

10 U.S.C. section 3406 ...................................................................13

28 U.S.C. section 1295(a)(3) ............................................................2

28 U.S.C. section 1491(a)(1) ............................................................2

28 U.S.C. section 1491(a)(2) ............................................................2

28 U.S.C. section 2107(b)(l) .............................................................2

28 U.S.C. section 2522 .....................................................................2

31 U.S.C. section 1105(g) ...............................................................14

41 U.S.C. section 7101 ......................................................................1

41 U.S.C. section 7103 ......................................................................1

41 U.S.C. section 7104(b)(1) ............................................................1

41 U.S.C. section 7104(b)(3) ............................................................1

**Other Authorities**

FAR 2.101 ..........................................................................14, 15, 31

FAR 9.4 ........................................................................... viii, 11

FAR 9.402(b) ..................................................................................11

FAR 15.204-1 ...................................................................................4

FAR 16.2 .................................................................3, 23, 24, 25

FAR 16.3 .........................................................................................24

FAR 16.201 .....................................................................................32

FAR 16.201(b) ...............................................................................24

FAR 16.202 .....................................................................................41

FAR 37.101 .............................................3, 13, 14, 19, 23, 28

FAR 37.104 ...............................................3, 19, 23, 40

FAR 37.104(a) ...............................................................................19

FAR 37.104(c) ...............................................................................19

FAR 37.104(d) ...............................................................20, 21, 22

FAR 37.104(d)(6)(i) .......................................................................21

FAR 37.604 ....................................................................................39

FAR 46.4 ........................................................................................39

FAR 49.402-3 .................................................................................49

FAR 49.402-3(d) ............................................................................46

FAR 49.402-3(f) ...............................................................................3

FAR 49.403-3(f) .............................................................................49

FAR 52.215-8 ...................................................................................8

FAR 52.246-4 .................................................................................25

FAR 52.246-4(e) ............................................................................24

FAR 52.246-4(e)(2) ........................................................................41

FAR 52.249-8(a)(1)(i) .....................................................................46

FAR 52.249-8(a)(1)(ii) ....................................................................46

FAR 52.249-8(a)(1)(iii) ...................................................................47

FAR 52.249.8(a)(2) .........................................................................46

FAR 249-8(a)(1)(iii) ........................................................................46

FAR Part 37 ....................................................................................29

FAR Part 37.101 ........................................................................9, 13

Merriam-Websters Collegiate Dictionary (10th Ed. 1993) ......................14

**Court Rules**

Federal Circuit Rule 47.5 ........................................................................ix

Federal Rule of Evidence 803 ...................................................................51

Federal Rule of Evidence 803(6) ..............................................................51

## **STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule ("Fed. Cir. R.") 47.5, Appellant states that: (a) no other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court and (b) there is no case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal, excepting only the Notice of Proposed Debarment dated May 15, 2024,  (*see* FAR 9.4) ("NPD") issued against Appellant  and its founder Mr. Ritobrata Banerjee, by the United States of America, acting by and through the Department of Defense, Department of the Navy, Office Of General Counsel.  *See* concurrently filed Request For Judicial Notice ("RJN").  The NPD has no case number.  The suspending and debarring official is Ms. Allison McDade, Assistant General Counsel (Acquisition Integrity).  Finch, Thornton & Baird, LLP has appeared for Appellant in the debarment.

# JURISDICTIONAL STATEMENT

Appellant/Plaintiff ASG Solutions Corporation DBA American Systems Group ("ASG") and Respondent/Defendant the United States of America, acting by and through the Department of Navy ("Navy") entered a task order dated September 28, 2022, N6945022F3005 for Naval Air Station ("NAS") Jacksonville ("Contract").  Appx2958-2992.  The Contract was procured under Seaport NxG (https://www.seaport.navy.mil/) and Contract No. N0017819D7175 effective January 2, 2019 ("Seaport NxG Contract").  Appx518-568.  On April 4, 2023, Navy issued a termination for default ("T4D") of the Contract.  Appx4556-4562. In pursuit of payments from Navy under the Contract, ASG submitted three certified claims under the Contract Disputes Act of 1978, 41 U.S.C. § 7101 *et. seq.* (each a "CDA Claim") dated January 9, 2023, March 8, 2023, and May 4, 2023, respectively.  Appx2024-2027; Appx2258-2262; Appx2754-2757.  These CDA Claims were rejected by final decisions of the Contracting Officer in letters dated December 1, 2023, and June 28, 2023.  Appx2223-2257; Appx2752-2753; Appx2887-2888.  These CDA Claims were all submitted within the six-year time period established by 41 U.S.C. § 7103.  ASG timely filed its complaint against Navy on July 3, 2023, in the United States Court of Federal Claims ("Trial Court"), within the twelve-month period established by 41 U.S.C. §§ 7104(b)(1) and (3), appealing the decision of Navy to T4D, and seeking to convert to termination for

1

convenience ("T4C"), payment under the Contract as set forth in the CDA Claims, and such other equitable relief as the court deems appropriate. Appx78-114. Pursuant to the Tucker Act, the Trial Court may "render judgment upon any claim against the United States founded upon any express or implied contract with the United States. 28 U.S.C. § 1491(a)(1). The Trial Court has jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under the CDA, including a dispute concerning termination of a contract. 28 U.S.C. § 1491(a)(2). As such, the Trial Court had jurisdiction in this case and jurisdiction was not at issue in the Trial Court.

Pursuant to 28 U.S.C. § 1295(a)(3), this Court has jurisdiction to entertain an appeal from the final judgment entered by the Trial Court on March 29, 2024. Appx 1. The Trial Court's judgment denied ASG's motion for summary judgment ("ASG MSJ"), granted Navy's motion for summary judgment ("Navy MSJ"), and thus disposed of all of the parties' claims. ASG timely filed its Notice of Appeal of said judgment on April 25, 2024, in accordance with 28 U.S.C. § 2522 within the 60-day period established by 28 U.S.C. § 2107(b)(l). Appx77.

## STATEMENT OF THE ISSUES

1.    Whether the Trial Court's interpretation of the Contract that staffing supply is the primary purpose of the Contract renders the Contract an unlawful

services contract (*see generally*, FAR 37.101) such that the Contract must be converted from T4D to T4C to avoid manifest injustice.

2.      Whether the Trial Court's interpretation of the Contract that staffing supply is the primary purpose of the Contract renders the Contract an unlawful personal services contract (*see generally,* FAR 37.104) such that the Contract must be converted from T4D to T4C to avoid manifest injustice.

3.      Whether the Trial Court's interpretation of the Contract renders the Contract an unlawful Time & Materials ("T&M") / Labor Hour ("LH") / Level of Effort ("LOE") contract (*see generally,* FAR 16.2) such that the Contract must be converted from T4D to T4C to avoid manifest injustice.

4.      Whether the only reasonable interpretation of the Contract was that it required the supply of 20 professionals per Attachment 2, it required the delivery of resumes for these 20 professionals per Attachment 2 within 5 days of award, it empowered Navy to control hiring by approval and rejection of resumes, and it authorized Navy to deduct from payments such that payment is made per hour of work.

5.      Whether T4D is justified under 52.249-8(a)(i) through (iii) despite all services being performed per the Performance Work Statement ("PWS").

6.      Whether Navy abandoned its discretion under FAR 49.402-3(f) in bad faith as a pretext to rid itself of ASG and Mr. Banerjee.

7.     Whether Navy breached the covenant of good faith and fair dealing.

## STATEMENT OF THE CASE

The Contract is a performance based non-personal service firm-fixed-price ("FFP") task order procured pursuant to the Solicitation ("RFP"), as finally amended August 18, 2022.  Appx2958-2992; Appx3120-3172.  The Contract calls for performing technical support advisory and assistance services for NAS Jacksonville's Engineering and Design Division ("DC4") of the Design and Construction Business Line ("DCBL") as described in the PWS.  Appx2959; Appx2966-2970.[1]

The RFP required the evaluation of price and the following non cost/price factors: Factor 1 – Management Plan; Factor 2 – Staffing Approach; and Factor 3 – Past Performance. Appx3160.  The evaluation criteria is of offeror's "understanding of how to effectively recruit, retain, and replace (if necessary) qualified personnel…utilizing best industry practices."  Appx3160-3161.  The Factor 2 - Staffing Approach required submission of a completed copy of "Attachment 4" to "illustrate the proposed team configuration to meet the requirements of the PWS."  Appx3162.  Per the evaluation criteria, offerors that

---

[1] The Contract is divided into four parts per the FAR 15.204-1 Uniform contract format: (I) Sections A-H comprise the "Schedule; (II) Section I the "Contract Clauses"; (III) Section J the List of Documents; and (IV) Sections K-M the Representations and Instructions.  Appx2958-2992.

listed 20 personnel would be rated higher than offerors that listed less than 20

personnel, offerors that listed personnel with more DOD experience would be rated

higher, and so-on.  Appx3162.  ASG, utilizing its network of potential hires listed

20.  Appx2999; Appx4608-4609.

 "Attachment 4" became Attachment 2 to Section J of the Contract.

Appx2992.  Disputes arose immediately following award.  Appx4621-4622.  Navy

told ASG that it must supply 20 professionals that matched Attachment 2.

Appx4610-4611, Appx4621-4622.  Navy asserted the right to unilaterally reject

resumes.  Appx3688 ("I alone have the authority to give the "Green Light"…for

acceptance of proposed personnel.").  Navy refused to provide any indication of

the work to actually be performed and refused to issue work tasks under the PWS

to ASG.  Appx4624.  ASG disputed Navy's interpretations of the Contract.

Appx4621-4624.  Nevertheless, ASG at all times during the term of the Contract in

good faith attempted to comply with Navy's interpretations and demands.

Appx4612-4617.

Navy issued a letter of concern dated November 1, 2022 ("LOC").

Appx3414-3415.  The LOC demands resumes for 20 professionals per Attachment

2.  It did not ask ASG to perform tasks and contains no information on tasks.  ASG

responded by letter dated November 14, 2022.  Appx3416-Appx3420.  Navy did

not respond to the ASG letter of November 14, 2022.  Instead, Navy issued a cure

notice letter dated December 5, 2022, ("Cure Notice") reiterating the LOC
demands. Appx3483-Appx3484. The Cure Notice did not ask ASG to perform
tasks and contains no information on tasks. The Cure Notice complains
disingenuously: "No one has shown up to work at Naval Air Station Jacksonville."
Appx3484. Navy was solely responsible for delay in onboarding as it had (a)
refused to allow access to ASG personnel; (b) refused to issue task order requests
for ASG to perform; and (c) failed to pay ASG. Appx4623. ASG responded by
letter dated December 14, 2022, reiterating its rights under the Contract but also
affirming it would try to meet Navy's demands. Appx3485-3497. On December
22, 2022, Navy acknowledged ASG's response and admitted that through no fault
of ASG, ASG's employees had <u>not</u> <u>been</u> onboarded by Navy and therefore could
not report to NAS Jacksonville. Appx1056. It also conceded "Navy understands
the market conditions impacting the availability of personnel, and looks forward to
ASG's continued efforts in performing satisfactorily or better under this task
order".

On January 5, 2023, Navy issued the first task for ASG to perform with
ASG personnel finally being allowed to come on site the same day. Appx4625.
ASG performed this task without any performance concerns. Appx4625. In fact,
ASG performed every task it was assigned during the 186 days prior to T4D.
Appx4625.

On January 20, 2022, Navy issued a show cause letter ("Show Cause").

Appx3628-3629. The Show Cause reiterated the LOC and Cure Notice demands.

It did not ask ASG to perform tasks and contains no information on tasks. ASG

requested a meeting, and ASG (Ritobrata Banerjee and Captain Hugh Marcy, PE,

CEC USN Retd) and Navy met on February 1, 2023, at NAS Jacksonville (the

"Cats and Dogs Meeting"). Appx4625-4627. Head of Contracts (HOC) Renee

Comfort, Public Works Contracts Division Director Rebecca Jones (Via

Telephone), KO Iselin, COR Szilagyi, and Small Business Advocate John

Bazylewicz, were present for Navy. Appx4626-4627. Navy did not offer to

modify the Contract. It did not ask ASG to perform tasks and provided no

information on tasks. At the meeting ASG asked Navy what the 20 individuals

demanded by Navy to be per Attachment 2 would do if they were onboarded.

Head of Contracts Ms. Rene Comfort's answer was "They could just be sitting

around, doing nothing. Just give us 20 per [Attachment 2] and you are fine." Mr.

Banerjee pointed out the provisions of the PWS in terms of staffing and the right of

the contractor to choose the precise labor mix, and KO Iselin stated:

> [Attachment 2] provided in Section J overrides Section C and
> who cares about Section C? There could be "cats and dogs" in
> Section C and I don't care.

Appx4626-4627. Navy thus conceded its insistence on Attachment 2 conflicted

with the PWS and made the PWS meaningless, despite the fact the PWS overides

Section J per FAR 52.215-8.  All Navy wanted was 20 professionals per Attachment 2.  Appx4626-4627.  ASG by letter dated February 10, 2023, provided a timely and complete response to the Show Cause.  Appx3630-3642.  ASG proposed ADR to negotiate a resolution.  Appx3641.  On April 4, 2023, even as ASG was onboarding personnel (Matthew Hamman), Navy issued T4D.  Appx4613-4615.

ASG has never defaulted on a federal contract and has received performance ratings of satisfactory or better for decades.  Appx79.  Despite ASG's performance of all tasks, Navy did not make a single payment to ASG until the time of T4D, at which time it submitted a partial payment to ASG.  Appx513-515; Appx2023.  ASG timely submitted the CDA Claims which were rejected by Navy.  Appx110; Appx2024-2027; Appx2258-2262; Appx2754-2757; Appx2223-2257; Appx2752-2753; Appx2887-2888.

Following T4D, ASG filed the Complaint on July 3, 2023.  Appx78-114.  Navy filed its Answer September 29, 2023.  Appx419-452.  On December 22, 2023, ASG filed its MSJ requesting judgment on its first cause of action to convert T4D to T4C and on its second cause of action for breach of contract seeking payment.  Appx453-503.  On February 12, 2024, Navy filed its cross-motion for MSJ.  Appx2893-2950.  On February 26, 2024, ASG filed is Response.  Appx4571-4607.  On March 7, 2024, Navy filed its Reply.  Appx4654-4679.  On

March 12, 2024, oral argument was heard.  Appx34-35, Appx59.  On March 29,

2024, the Trial Court entered its memorandum opinion denying the ASG MSJ and

granting the Navy MSJ.  Appx3-28.  On March 29, 2024, judgment was entered.

Appx1.  ASG filed its notice of appeal on April 25, 2024.  Appx77.

## SUMMARY OF THE ARGUMENT

While Navy claims the primary purpose of the Contract is the supply of 20

professionals per Attachment 2, ASG claims the Contract is a services contract

under FAR Part 37.101 for which, as a matter of law and per the Contract, the

primary purpose is the performance of tasks per the PWS.  ASG contends that

while the Contract anticipates that ASG will utilize a team of up to 20 personnel

per Attachment 2, the failure to do so is not a basis for T4D unless the tasks it has

been asked to perform under the PWS are not performed.

Navy contends 20 resumes per Attachment 2 were due October 3, 2022 and

ASG's failure to submit them by that deadline is basis for T4D.  Navy claims it has

unchecked power to control hiring by accepting or rejecting resumes and

requesting replacements; ASG contends the resumes must be submitted but they

are not subject to Navy control.  ASG contends Navy's intepretations necessarily

lead to a contract that is unlawful under statute and FARs 37.101, 37.104 and 16.2.

Thus, ASG came to this Contract with the intention of hiring 20

professionals per Attachment 2 that would be fully engaged performing tasks

issued under the PWS by Navy.  ASG read the task order as containing a clear and detailed statement of the work to be performed in the PWS and as permitting ASG to employ less than 20 professionals, and professionals with credentials different from those listed in Attachment 2, so long as the tasks were performed in accordance with the PWS.  Appx4608-4609, Appx4617-4620.  ASG's understanding is consistent with the task order and the law.

This contract interpretation dispute is virtually unchanged since it arose.  Upon receipt of the Cure Notice ASG intitiated a conciliatory call and was told by Navy lawyer Javier Gonzales that ASG must comply or Navy would, as the "800 pound gorrilla" with infinite legal resources, crush ASG.  Appx3631.  With no option but to try to perform while preserving legal rights, ASG laid out essentially the same contract intepretation in its December 14, 2022 letter at issue in this appeal.  *See* Appx3485-3497.  In sum, ASG contends the success or failure of ASG's performance must be judged on the quality of the services actually delivered.  Because ASG performed all the services it was asked to deliver, T4D is not justified.

On information and belief, Navy's contracting agents took great offense to ASG's assertions that their intepretation of the Contract was unlawful and unauthorized.  In response, Navy wields this contract interpretation dispute as a sword to execute ASG and its founder Ritobrata Banerjee.  Navy did not pay ASG

10

during the 186 day term of performance (despite ASG performing all tasks issued), did not propose a modification to the contract, either bilateral or unilateral, refused to engage in ADR prior to T4D or after T4D, litigated through judgment, and than proceeded with a manifestly unjust NPD placing ASG and Mr. Banerjee on the "Exclusions List" at SAM.GOV.  The NPD against ASG and Mr. Banerjee under FAR 9.4 is based solely on the alleged "willful failure" to perform this Contract. *See* RJN.  Mr. Banerjee and ASG are now punitively barred (contrary to common sense and FAR 9.402(b)) from all contracting activities pending the final debarment decision by Navy.  This, despite the fact that Mr. Banerjee has worked in Federal contracting for over 20 years and, since 2002, ASG has successfully performed over 125 task orders/contracts valued at over 100 million dollars working on Federal Government projects (obligated funding $75 Million). Appx79.  In fact, not once, until meeting up with NAVFAC, has Mr. Banerjee or ASG worked on a contract with the Government and received even a cure notice let alone T4D.  Appx79.  By performing ethically, diligently and above the standard of care, ASG and Mr. Banerjee have consistently earned satisfactory and above performance ratings for decades.  Appx79.  The stakes for Plaintiff and Mr. Banerjee are at their highest.  Navy's actions have caused a manifest injustice and ASG's only hope of survival is to prevail in this Court.

11

The Trial Court erred when it adopted Navy's contract interpretation. ASG requests this Court reverse the Judgment of the Trial Court denying ASG's MSJ and granting Navy's MSJ, and either grant ASG's MSJ or remand for further proceedings in the Trial Court.

## **ARGUMENT**

### I. **Standard of Review**

This Court "review[s] a grant of summary judgment by the Court of Federal Claims *de novo*," affirming only "where the movant shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *Anderson v. United States*, 23 F.4th 1357, 1361 (Fed. Cir. 2022) (citations omitted). The Court "view[s] the facts supported by evidence, as well as all inferences drawn therefrom, in the light most favorable to the non-moving party." *Id*. (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). On appeal, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton, 572 U.S. 650*, 651 (2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate only if "the evidence ... is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). To survive summary judgment, the non-moving party need only "submit sufficient evidence upon which a reasonable trier of fact could find in its

favor." *A-Transp. Nw. Co. v. United States*, 36 F.3d 1576, 1585 (Fed. Cir. 1994)

(citing *Anderson*, 477 U.S. at 252-55 and *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986)).  "If [it] does so, there is a genuine issue of fact that requires a

trial," and the Court must deny summary judgment. *Anderson*, 477 U.S. at 257.

Contract interpretation is a question of law that the Court reviews *de novo.  Barron*

*Bancshares, Inc. v. United States*, 366 F.3d 1360, 1368 (Fed. Cir. 2004).

## II.   The Trial Court Erred When It Held That Staffing Supply May Be The Central Purpose Of A Services Contract Procured Under FAR Part 37.101

Navy claims it may issue a FAR 37.101 performance-based services task

order in which the performance of tasks is incidental to the primary purpose of

staffing supply.  ASG asserts that such a Contract is unlawful and void.  Tasks to

be performed must be the primary purpose of a performance-based services

contract.  Manpower may be a component of a services contract, but manpower

cannot, as a matter of law, be completely severed from the primary purpose of

performing clearly stated tasks such that manpower is the central purpose of the

task order.

The Contract is a task order under the Seaport NxG Contract and authorized

under 10 U.S.C. §§ 3401, 3405, 3403(b) and 3406.  10 U.S.C. 3401 defines task

order contract as a contract for services "…that provides for the issuance of orders

for the **performance of tasks** during the period of the contract." *Bolding added*.

13

10 U.S.C. § 3405(a) adopts the definition for "advisory and assistance services"

under 31 U.S.C. 1105(g) which states: "'advisory and assistance services' means

the following services when provided by nongovernmental sources: (i)

management and professional support services. (ii) Studies, analyses, and

evaluations. (iii) Engineering and technical services."  FAR 2.101 provides in key

part as follows:

> [Advisory and assistance services] outputs may take the form of information, advice, opinions, alternatives, analyses, evaluations, recommendations, training and the day-to-day aid of support personnel needed for the successful performance of ongoing Federal operations… i.e., contractual services that provide assistance, advice or training for the efficient and effective management and operation of organizations, activities (including management and support services for R&D activities), or systems.

FAR 2.101.  FAR 37.101 defines a services contract as "a contract that directly

engages the time and effort of a contractor whose primary purpose is to **perform**

**an identifiable task** rather than to furnish an end item of supply."  Bold added.

Last, 10 U.S.C. 3405(e) mandates: "A task or delivery order **shall include** a

statement of work that clearly specifies **all tasks to be performed** or property to

be delivered under the order."  Bold added.

   An advisory and assistance services contract must procure the performance

of tasks.  "Tasks" is undefined by the FAR.  Websters defines a task as "a usually

assigned piece of work often to be finished within a certain time."  (*Task*,

Merriam-Websters Collegiate Dictionary (10th Ed. 1993).)  The work to be

finished under a task order for advisory and assistance services is controlled by the definition at 10 U.S.C. § 3405(a) and FAR 2.101, which describes the output items in terms of tangible results from working – "information, advice, opinions, alternatives, analyses, evaluations, recommendations, training and the day-to-day aid of support personnel."

Employing a staff of 20 professionals with experience per Attachment 2 is not the performance of a task under the statutory scheme (particularly where, as here, it is not stated clearly in the PWS as required by 10 U.S.C. 3405(e)). 20 such individuals, by their mere existence, do not provide Navy with professional support services nor provide Navy with information, advice, opinions or any other measurable output as defined under the FAR and required by the authorizing statutes.

The Trial Court erred when it (i) interpreted the PWS as "perfunctory" (Appx16) and (ii) held the Contract's purpose is supply of staff and that supply of staff is a service. Appx3. The Court's error as to purpose was at the core of the ruling. Appx3 ("the defendant's interpretation…makes sense given the task order's purpose."); Appx16 ("Overall, the defendant's interpretation…is most consistent with [the Contract's] purpose."); Appx19 ("…the Navy thought by placing the requirement for a team of 20 professionals in Section A.2, it was highlighting the primary purpose of the task order…"); Appx20 ( "…the

15

defendant's reading…is the reasonable interpretation, given the task order's purpose."); Appx20 ("a team of 20 professionals [is] a central requirement of the task order."); and Appx20 ("The plaintiff's interpretation does not produce a reading of the task order that gives meaning to all of its parts to effect the Navy's purpose: to have ASG provide a team of 20 professionals….").

The Trial Court's reliance on a purpose contrary to the very nature of a "services contract" is reversible error.  First, failing to supply staff, standing alone and without any reference to the performance of tasks, cannot be a failure to "perform the services" and to make progress that justified ASG's T4D under 52.249-8(a)(1), as discussed below.  Second, separating staffing supply from performance of tasks renders the task order an unauthorized and unlawful contract.

The Trial Court's interpretation takes the contract beyond the boundaries of a permissible manpower requirement in connection with tasks.  In this respect, a manpower provision is not *per se* unlawful in a services contract.  The Government may impose requirements in a contract in addition to the primary purpose requirement.  However, the Trial Court assigning manpower as the **sole purpose** of the task order with no consideration of the services results in an unlawful contract.  To contrast, a proper manpower requirement may be clearly set forth in the PWS provided it is linked to performance objectives of the identified tasks.  For example, suppose the Government desired to procure lawn mowing services for

16

two separate lawns to be mowed concurrently.  A manpower requirement of two is proper in that case, if clearly stated in the PWS and linked to the performance outcome of concurrent mowing of the lawns.  Manpower tied to the performance of a task is proper[2].  A contract with language calling for two laborers without reference to any tasks, but that the laborers could simply be sitting around and do nothing, is not authorized.  Here, Navy asserts the PWS could say "cats and dogs" and it does not matter.  Appx4626-4627.  The Trial Court correctly noted the PWS should be the "heart of the contract" (Appx16) and then found it, due to the "ineffective" drafting of the Government (Appx19), to be "perfunctory."  Appx16.  This is clear error.  The PWS and the tasks it describes cannot as a matter of law be perfunctory.

The consequence of Navy failing to comply with statutory requirements renders the contract a nullity.

The government has the power to act only through its agents whose authority and manner of exercise thereof is rigidly prescribed and limited by statute, regulation, and judicial and administrative

---

[2] Although such a requirement is strongly discouraged in the DOD Guidebook for Performance-Based Services Acquisition ("PBSA") ("DOD Guidebook") as it infringes on the "how" of performance and the goal of the Government benefiting from innovative solutions of the private sector.  Appx823 ("Since performance-based acquisition methodologies are results-oriented, agencies should not focus on contractor-proposed labor mixes after contract award, **as long as the desired outcome is achieved** in accordance with the stated performance standards and any other requirements in the contract.")  Bold added.  As the DOD Guidebook is fundamental to ASG's understanding of this Contract ASG respectfully cites to the entire text in the Appendix to facilitate consideration.  Appx808-866.

> determinations. Failure to follow the applicable rules negates the agent's authority to enter into a contract binding on the government. To permit otherwise would be to nullify those very statutes, regulations, and determinations -- a result clearly contrary to the public interest.

*United States v. Amdahl Corp.,* 786 F.2d 387, 392 (Fed. Cir. 1986) (citations omitted). This nullity compels conversion by rescission of this contract into T4C. *Id. at* 394. "Rescission has the effect of voiding a contract from its inception, *i.e.*, as if it never existed. It is an equitable doctrine which is grounded on mutual mistake, fraud, or illegality in the formation of a contract." *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1345 (Fed. Cir. 2000) (citations omitted). Here, the illegality of the resulting contract compels this remedy. Such a finding is the only equitable result where ASG is the innocent contractor and Navy's drafting (indisputably, at minimum, in violation of 10 U.S.C. 3405(e)) has caused this dispute which is the only negative performance rating blemish in ASG's 20+ year history. The Trial Court correctly identified the Navy's role in creating this dispute calling its drafting "ineffective" (Appx19). In this context of an equitable resolution, ASG does not claim entitlement to any remuneration of the full FFP as a result of the illegality of this Contract. ASG asks this Court rescind the Contract such that T4D becomes T4C. ASG can than protect itself against debarment and ASG's and Mr. Banerjee's exemplary record and reputation can be restored.

18

### III.   The Trial Court Erred When It Concluded The Contract, As Interpreted And Administered By Navy, Is Not An Unlawful Personal Services Contract Under FAR 37.104

The Trial Court erred when it held that a contract for the supply of 20 personnel per Attachment 2, all effectively chosen by Navy exercising powers of resume approval, does not result in an unlawful personal services contract ("PSC") issued without authority under the Seaport NxG Contract and FARs 37.0, 37.101, 37.102, 37.103, 37.104, 37.504, and 37.6.  FAR 37.104(a) provides in key part that the Government should obtain its direct hires via the civil service laws.  Per FAR 37.104(c) an improper PSC arises when as a result of "…(i) the contract's terms or (ii) the manner of its administration during performance, contractor personnel are subject to the relatively continuous supervision and **control** of a Government officer or employee…."  Bold added.  A nonpersonal services contract ("NPSC") per FAR 37.101 means "a contract under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and **control** usually prevailing in relationships between the Government and its employees".  Bold added.

Here, Navy seized "control" of hiring of personnel by insisting on the supply of professionals per Attachment 2 and asserting that the word "acceptance" in G.6 gave it the final say on hiring, and per G.6 Navy also gave itself the right to fire employees by "request[ing] replacements" based on its evaluation of individuals.

19

Appx2999; Appx2981.  FAR 37.104(d) lays out six factors of a PSC including

whether the contract is to be performed on site, whether the principal tools and

equipment are furnished by the Government, whether the services are applied

directly to the integral effort of agencies, whether comparable services in the same

or similar agencies are performed by civil service personnel, whether the need for

the services can be expected to last for more than one year, and whether the

inherent nature of the service or the manner in which it is provided reasonably

require government direction or supervision.  ASG contends that all six are in play

with this Contract.  It is undisputed that 5 of 6 apply and the burden rests on Navy

to insert protective measures.  Appx3032.  In fact, post award, ASG learned the

motive of Navy was to indirectly hire professionals via ASG precisely because it

could not hire them itself via the Civil Service laws.  Appx4628.  In fact, Navy's

Mr. Guthrie asked ASG to send candidates his way that did not meet Attachment 2

so Navy could hire them.  Appx4611.  Navy's Mr. Szilagyi describes the contract

requirement as being for "DCBL Contract Designers" rather than what the

procurement solicited: DCBL "Advisory and Assistance Services."  Appx3031;

Appx2959.  Unbeknownst to ASG, a services contractor bidding on a PBSA, Navy

saw the "designers" as belonging to DCBL, not ASG.

The Trial Court's decision minimizes the first five factors and cites to the

Federal Circuit's observation in *Seh Ahn Lee v. United States,* 895 F.3d 1363, 1371

(Fed. Cir. 2018) that the factors are "far from definitive."  However, in *Seh Ahn Lee,* the plaintiff alleged only the first two factors were implicated – working at government sites and using government equipment.  *Ibid.  Seh Ahn Lee* is distinguishable on the facts.  Obviously 2 versus 5 is markedly different.  Further, in *Seh Ahn Lee*, an individual worked for many years as an NPSC at Voice of America and years later and post-performance sought back-pay and benefits of a PSC.  *Id.* at 1365.  Here, the dispute is not retrospective.  Last, unlike in *Seh Ahn Lee*, the reliance on contract provisions purporting to assign daily supervision to the contractor is illusory in this case.  The ultimate control of employees is derived from the power to hire and fire.  Here, the Navy claims this right exclusively under resume "acceptance" and "requests for replacement"  Appx2981.

The Trial Court erred in analyzing this task order under FAR 37.104(d), at least in part, by failing to address the consequences flowing from finding the supply of 20 professionals per Attachment 2 is the primary purpose and function of ASG under the Contract.  When Navy took control of resume approvals it directly supervised and **controlled** the performance of the contract as to staffing in order to protect the Government's interest and to retain control of the functions (ie. the hiring of personnel).  *See* FAR 37.104(d)(6)(i) and (ii).  Thus, six of six of the factors under FAR 37.104(d) are met.  ASG is unaware of any case law addressing similar facts.

21

By controlling who is hired and divorcing staffing from the tasks, Navy neutered the protective measures in the PWS that otherwise would have afforded ASG the power of an NPSC.  Navy's exercise of control was so invasive as to pursue interviews.  Appx3195.  Notably, Navy's control has no relationship to the performance of tasks, so the "supervision" left to ASG in the PWS is non-existent in any event.  By insisting on Attachment 2 regardless of the actual work to be performed under the PWS, Navy made this a PSC.

The Trial Court excuses Navy's outsized role in controlling performance under this Contract via resumes by characterizing it as falling within the Government's discretionary right to determine its needs and the best way to meet them.  Appx23.  As there is no case precedent, the Trial Court reaches into Comptroller General decisions for guidance, citing to *In re ENDMARK Corp.,* B-278139 (Comp. Gen. Dec. 31, 1997).  In *ENDMARK*, the protestor argued that the solicitation unduly restricted competition when it included a subfactor of the past performance evaluation criteria related to key personnel.  *Id.* at 2.  The Comptroller General rejected the protest finding in key part that "[a]n agency's discretion in determining its needs extends to determining whether key personnel need to have experience with work of the specific nature **to be performed under the solicitation**."  *Id.* at 8, bold added.  While *ENDMARK* is of limited value as the facts are completely different, its focus on experience requirements that relate to

the work to be performed is telling.  This supports ASG's argument.  Navy

insisting on professional licenses and DOD experience when these attributes have

zero relationship to the performance of tasks described in the PWS, or in any other

Section of the Schedule (Sections A through H), is evidence of Navy taking over

the performance of the function and rendering this an unlawful PSC.  Appx4619-

4620.

In analyzing employee versus independent contractor classifications, the IRS

has emphasized that directing "which workers to hire and assist with work" is a

factor that shows "behavioral control" and an employee relationship.  *See* IRS Tax

Topic No. 762)  The logic of the IRS  is sound and translates to this situation.

As with the violation of FAR 37.101, the consequence of the unlawful FAR

37.104 contract must be to render the contract a nullity such that the T4D is

converted to T4C.

## IV.    The Trial Court Erred When It Interpreted The Contract As Permitting Labor Hour Deductions Under H.8 Resulting In A Level Of Effort Agreement Unlawfully Entered In Violation Of FAR 16.2

One of the consequences of interpreting the Contract as calling for supply of

20 professionals per Attachment 2 is that Section H.8 entitles Navy – regardless of

the quality of the services delivered in accordance with the PWS – to assess "daily

unit price" deductions if staffing is below 20 professionals per Attachment 2

utilizing hourly rate data in Attachment 1.  Appx2988; Appx3020-3022.  This

interpretation conflicts with the fact that CLIN 1000 in Section B of the Contract describes services "in accordance with PWS" and lists only unit pricing of a monthly total FFP.  Appx2961.  There is no harmony in the Trial Court's interpretation.  Moreover, this interpretation is unreconcilable with the limitations of the underlying Seaport NxG Contract, which only authorizes either FAR 16.2 FFP or FAR 16.3 Cost Type contracts, and the provisions of FAR 16.2 that forbid Navy from entering such a contract.  Appx4622-4623; Appx713-714, Appx717, Appx729, Appx744, Appx748-749; *See* FAR 16.201(b) and 16.202.  Simply put, if it looks like a duck and quacks like a duck, it is in fact a duck.  Navy is not authorized to sidestep the lack of authority to procure a T&M/LH /LOE contract by establishing a FFP for a lump sum obligation (see CLIN 1000) and then under the guise of a FAR 52.246-4(e) "deficient performance analysis" enter deductions based on hourly unit prices tied solely to manpower and not to specific tasks not delivered per PWS.  The Trial Court erred when it condoned this scheme.  The result of this interpretation is a task order that us unlawful at its inception.  Again, the only equitable result is rescission and conversion of T4D to T4C.

**V.    The Trial Court Erred As A Matter of Law When
It Concluded ASG's Contract Interpretation Is Not
Reasonable And Navy's Interpretation Is Reasonable**

### A.    Summary of Interpretation Argument

ASG's interpretation is reasonable because it is consistent with the

Contract's statutory and clearly stated purpose to provide for the performance of

tasks as a services contract must do, is consistent with an NPSC in which the

contractor controls the "how" of performance, does not establish an unauthorized

LOE contract under FAR 16.2, gives meaning to the anticipated workload expected

of 20 professionals but subject to change by offeror under A.2, follows the plain

language of CLIN 1000 which provides a FFP unit price monthly based on services

per the PWS, adheres to the plain language of F.4 and G.6 which provides for

resume submissions and nothing more, is consistent with the quality assurance

provisions in G.5 and H.8's provisions addressing deficiencies in services under

FAR 52.246-4, and is consistent with Attachment 2 which sets an expectation as to

a standard of performance that ASG will meet if required in connection with

performance of services under the PWS.  Appx2958-2992.  If Attachment 2 is

construed to be inconsistent with ASG's right to control who to hire and how many

to hire as per A.2 and the PWS, the order of precedence clause 52.215-8 applies

and A.2 and the PWS govern.  Appx2999; Appx541.  The Trial Court erred when it rejected ASG's interpretation.[3]

Navy's interpretation is not reasonable as it renders the PWS "perfunctory" and distorts the plain language of A.2 and Attachment 2 to create an unlawful staffing supply contract priced by the hour.  The resulting contract is absurd as ASG is required to perform any and all PWS tasks with a fixed-in-stone team on Attachment 2.

If this Court finds both readings reasonable the consequence is latent ambiguity.  The resolution of this ambiguity should be in favor of ASG's interpretation.  First, the Navy interpretation adopted by the Trial Court renders the task order unlawful, as discussed above.  *See Cray Research, Inv. V. United States,* 44 Fed. Cl. 327, 333 (1999) (quoting *Hobbs v. McLean*, 117 U.S. 567, 576 (1886) |("…a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted.")  Second, it subverts the primary purpose of a "services contract."

Third, the ambiguity should be resolved in favor of ASG based on the doctrine of *contra proferentem.  Sturm v. United States*, 421 F.2d 723, 727 (Ct. Cl.

---

[3] The Trial Court rejected ASG's interpretation by the narrowest of margins.  The Trial Court found ASG " had presented a possible reading of the task order." Appx28.  At oral argument, the Trial Court commented that "…both sides have presented reasonable, both plausible and reasonable alternative readings of the contract."  App56.

1970) ("[*Contra proferentem]* puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy; it pushes the drafters toward improving contractual forms; and it saves contractors from hidden traps not of their own making.")

Fourth, to resolve ambiguity this Court must at minimum remand to the Trial Court for further proceedings to gather extrinsic evidence as to the facts and circumstances surrounding the formation and performance to determine the intent of the parties.  See *Beta Sys. Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988).  As in *Beta*, the parties have presented conflicting evidence as to their intentions at formation.  *Ibid*; Appx4608, Appx4612, Appx4619; Appx3324.  The Trial Court erred in this respect when it construed ASG's words in an email dated October 3, 2022, as belying the sworn testimony of ASG as to its understanding of this Contract at formation.  Appx18.  ASG implores this Court for the opportunity for Mr. Banerjee to take the stand and provide testimony under oath as to exactly how ASG prepared its proposal, what information that proposal was based on, the custom and trade usage in the federal services contractor industry, and his understanding of every aspect of the formation, interpretation and performance of this Contract.  Depriving Mr. Banerjee of this opportunity while entering a judgment of T4D that is the cornerstone of debarment would be tragically unjust.

27

**B.    Discussion of Task Order**

Section A.2 is titled "Service Requirements."  It is not titled "manpower

requirements."  The first paragraph of Section A.2 is in sync with FAR 37.101 and

states:

> The outcomes to be achieved are technical support services … The contractor's team provides expert advice and assistance services in…architecture, civil engineering, structural engineering, mechanical engineering, electrical engineering, fire protection engineering, and cost engineering…Specific technical support services for each position will be stated in their respective Performance Work Statements (PWS).

Appx2959.  The fourth paragraph of A.2 states:

> Specific tasks and services to be performed is stated in the Performance Work Statement (PWS).  The outcomes for this acquisition are consistent with the Federal Acquisition Regulation (FAR) 37.101 definition of service contracts.

Appx2959.  Section A.2 goes on to provide:

> This task order is for professional support services to NAVFAC SE in the form of advisory and assistance services. This task order ***does not*** require architect-engineer (A-E) services as defined in the Brooks Act (40 USC 1102) and Federal Acquisition Regulation (FAR) Part 2 and 36. The contractor will not be approving any final work or making final decisions on any professional matter. The tasks do not have to be performed by A-E professionals. Neither the professionals nor the contractor will be assuming any A-E liability for the work performed. **The outcome of this acquisition is a standard service contract as defined in FAR Part 37, and in the case of a conflict in this PWS between FAR Part 37 and any other part of the FAR, Part 37 will prevail.**

Appx2959, bold added.  FAR Part 37 *controls* in event of conflicts.  This is the

central *purpose and intention* of the parties.  The Contract's outcome is services

28

*delivered per the PWS.*  References of this type to the PWS are consistent

throughout the Contract.  Appx2889-2892.

The Contract does not contain language of a promise to supply 20

professionals per Attachment 2.  Attachment 2 lists individuals' profiles as

examples only for evaluation purposes.  Appx2958-2992; Appx2999.  The Trial

Court incorrectly relies on the single sentence in A.2, which states: "The staff of

twenty (20) professionals is base/minimum level of service."  Appx16.  A careful

review of this sentence's meaning is critical.  Ultimately, the existence of ASG and

the livelihood and reputation of Mr. Banerjee, the subject of NPD based solely on

this dispute, depend on how these eleven words are interpreted by this Court.

The "base/minimum level of service" sentence must be read in the context of

the entire Contract, and in particular the paragraph in which it sits, which states:

> At the time of initial contract award, the Government **anticipates** a
> staff of four (4) Architects, four (4) Mechanical Engineers, four (4)
> Electrical Engineers, two (2) Civil Engineers, two (2) Structural
> Engineers, one (1) Fire Protection Engineer, one (1) Cost Engineer,
> and two (2) Supervisors. **However, this is subject to change based
> upon the successful offeror's technical approach**. The staff of
> twenty (20) professionals is base/minimum level of service.  See
> Section H for additional information regarding optional increased
> levels of service.

Appx2959, bold added.  ASG's interpretation follows the plain language.  The

Government *anticipates* a staff of 20 with a specific breakdown of roles, but the

quantity of personnel anticipated in total and for each area of expertise is *subject to*

29

*change by the offeror.*  The Trial Court suggests ASG's right to make a change

means it can choose from among the 20 professionals per Attachment 2.  Appx22.

This analysis is flawed.  First, if the tasks per the PWS call for work necessitating

6 architects rather than 4 ASG will fail to perform.  Appx479-480.  ASG must have

the ability to hire and fire to perform the tasks per the PWS.  By fixing the team in

stone with no tasks pending, ASG loses control over performance.

Second, the Trial Court's analysis is not faithful to the language of A.2.  The

word "this" refers to the *anticipated* team of 20 with the specific number of experts

described in the preceding sentence.  What is "subject to change" is the aggregate

total of 20 and the number of professionals in each of the disciplines described.

The team is **not** "fixed in stone."  The driver of the change is the "offeror's

technical approach."  The Trial Court's only comment on this sentence is "I'm not

sure I have any idea what that means."  Appx46.  "Technical approach" is not

defined or used again in the Contract.  Appx2958-2991.  ASG contends its

technical approach is what it was hired to provide to benefit the mission of

performing tasks per the PWS - the "heart" of the contract as a matter of law (10

U.S.C. 3405(e)).[4]

---

[4] See also the DOD PBSA Guidebook detailing the policy goals of PBSA
contracting including at Appx813-814 and Appx823.  Navy's departure from these
principles is inexcusable.

ASG contends "base/minimum level of services" communicates simply that the FFP is based on up to 20 professionals, which sets the baseline for price evaluation purposes and for REA/Optional CLINs under Section H.7. Appx2987; Appx3161. The reference to services in this phrase, rather than manpower, is significant – a significance not addressed by the Trial Court. Thus, the sentence might have been written without reference to the services to be performed by simply stating: "Contractor must staff a minimum of 20 professionals at all times" or even "base/minimum level of manpower."[5] Instead, the reference to "services" must be read to refer to the "advisory and assistance services," defined at 10 U.S.C. § 3405(a) and FAR 2.101 that are the outcome of this acquisition. Appx2959. As discussed above, the statutory and regulatory scheme mandates the task order be issued for the performance of tasks. Again, ASG's understanding is that hiring personnel is simply **not** the performance of a task. The language is best construed as providing a barometer for the volume of tasks the contractor must be prepared to perform. That is to say, quite literally, the contractor must be prepared to deliver for its FFP the volume of services and tasks per the PWS that requires employment of 20 professionals working full-time, all in accord with the PWS.

---

[5] The Trial Court chastised Navy at oral argument noting it could have been done by a "second-grader." Appx54.

ASG's interpretation of A.2 is simple, direct, and harmonizes *all* of A.2 with the remainder of the Contract as well as the true purpose of "services." In the absence of the tasks to perform, the A.2 baseline is the only logical means for a contractor to compute a FAR 16.201 FFP. There is no other rational basis to "anticipate" staffing load or need. In contrast, Navy ignores the "services" reference point, the right of offeror to make changes, and the word "anticipates" in A.2 and amplifies "base/minimum" to mean the contractor must at all times employ 20 professionals that meet or exceed Attachment 2. But there is no reference to Attachment 2. This reading also divests the Contractor of the control of performance of tasks by fixing the team in stone. Doing so renders the PWS, and the numerous references to the PWS, at best egregiously misleading and at worst meaningless. Appx2889-2892.

Section B states what "supplies/services" are to be performed and for what price. Appx2961. CLIN 1000 provides in the column for "supplies/services:" "Base Requirement for Base Period – DCBL Technical Support Services at NAS Jacksonville, FL **in accordance with PWS** (Fund Type – TBD)." Appx2961, bold added. The Trial Court provides no explanation for replacing "in accordance with PWS" with "supply 20 professionals per Attachment 2." The monthly price is $281,870.00. Appx2961. Notably absent: hourly CLIN pricing, "Attachment 2,"

32

productive hour requirements, or any of the hallmarks of unit pricing of labor. Appx2961-2965.

Section C (PWS) is titled "Supported Organization and Scope of Work." Appx2966. It does not mention or incorporate Attachment 2 and does not call for a "team of 20." Appx2966-2970. The PWS requires the contractor to perform an **unlimited** number of yet to be determined tasks across a wide range of projects across seven technical disciplines. Appx2966-2968. The appropriate staffing for a wide net of projects depends on the actual work. Appx2966-2968. There is no limit to what Navy may order. Appx2966-2968 (*See* C 2.1 to C.2.9). From runways to dry docks, to medical facilities to child development centers, the variety of tasks and potential disciplines implicated is staggering. Appx2966 (C.1). The need to change staffing based on the work is fundamental to delivering quality services. The PWS provides the contractor controls these personnel selections: "**The contractor chooses the precise labor and staffing mix to meet the PWS.**" Appx2966, bold added.

The unchecked authority of Navy to issue tasks unsuited to the hypothetical team of Attachment 2 and set up the contractor for failure is a patently unreasonable side-effect of the Trial Court's interpretation. After all, Section C.2.9 provides in key part: "The contractor is responsible for ensuring the accuracy, timeliness and completion of **all tasks under this PWS**. The contractor provides

**all** material, equipment**,** labor**,** and supervision necessary to ensure adequate performance."  Appx2967-2968, bold added.  There is no excuse for the contractor based on Attachment 2 or any other reason.

Section C.2.9 also provides: "The contract provides interdisciplinary technical support "as needed."  Appx2967.  "As needed" reiterates there is no limit to the type and volume of tasks Navy may demand and ASG must deliver.  To do so, ASG must determine the labor mix and team selection based on the tasks issued by Navy.  Section 2.9 also provides the contractor "supervises its team to ensure **compliance with the PWS**."  Appx2969, bold added.  Performance is measured by "compliance with the PWS"—not "supply 20 people."  To successfully perform it is incumbent on the contractor to evaluate the tasks it is being asked to perform and to employ the best personnel for those tasks.  This is the fundamental bargain.  Navy can assign a TBD variety of unknown services tasks and benefits from the contractor's innovations and staffing methods.  The contractor takes the risk of the FFP but gains the flexibility to control its staffing to try to earn profit.

The Trial Court gleans the PWS to support its preferred interpretation that the PWS contains an obligation to deliver 20 professionals per Attachment 2.  *See* Appx16-17.  As there is no such language in the PWS, the Trial Court cites a sentence fragment out of context.  Appx16-17.  The cited sentence of the PWS states in full:

>The contractor performs workload management, re-assigns projects when needed, and monitors completion schedules. The contractor reviews and provides feedback of work performed in a weekly status report including a list of (a) active projects for each FTE; (b) project status including completion percentage; and (c) projects completed to date.

Appx2968. The Trials Court speciously points to "FTE" to support its view of an emphasis on personnel. However, the focus **is on projects – not people**. The full citation supports ASG's contention. The PWS measures performance on production – not on number of personnel. In sum, the Trial Court's PWS analysis ignores the true performance risks facing the contractor in a performance-based services contract – namely the failure to deliver the services outputs.

Section F.4 of the Contract lists eight separate deliverables. Appx2975. Notably absent is "deliver 20 professionals per Attachment 2." Appx2974-2975. The first seven of these deliverables are all dependent on tasks actually issued by Navy under the PWS ("Design Drawings & Specifications," "Request for Proposals," "Design Review Comments," "Quantity takeoffs for Cost Estimates," "Construction Cost Estimates," "Project Status report for Assigned Projects," "Work Schedule.") Appx2975. Until Navy issues a request to work on such items in connection with an actual task, there is nothing to deliver. The Trial Court glosses over these seven categories, again ignoring the performance risks faced by ASG if it does not control the hiring and makeup of the professionals that must deliver the work, and focuses on the eighth deliverable, which provides: "Resume

for each position proposed in accordance with the Contractor's proposal **and the PWS**." Appx2975, bold added.  ASG understands F.4 to mean resumes are required for tasks to be performed under the PWS.  While "Contractor's proposal" appears to be at least an indirect link to Attachment 2, these words must be reconciled with the conjunctive language "and the PWS."  Read together, the provision confirms ASG's contention that the goal is the services of the PWS and accordingly resumes must conform to the PWS objectives first and foremost.  Again, if the tasks issued under the PWS shift, ASG must be able to adapt and therefore so too must the resumes shift.

The Trial Court's emphasis on the phrase "within five days of award of task order" is mistaken because it ignores the role of the PWS and leads to an absurd result.  Mandating resumes of committed employees within 5 days of award, regardless of PWS tasks, is simply impossible.  Appx4611-4612.  No contractor, let alone a small business, bidding a services contract has in full time employment (with no work to perform), at a cost of at least $200,000/month plus Fringe Benefit Costs and associated Overhead, 20 full time professionals waiting to relocate to NAS Jacksonville with no- tasks to perform.  Appx4612.  The interpretation renders the PWS reference in this deliverable meaningless – "Cats and Dogs."

The Trial Court erred when it reasoned ASG's interpretation of F.4 is impracticable and implausible (Appx20) because the contract onboarding process

could take up to two months and waiting for tasks to issue before hiring personnel would have a negative impact on the Navy receiving services. Appx20. First, there is no evidence that the Navy had any tasks which needed performance within any time frame at all, let alone any tasks which had to be performed by someone within five days of contract award. This points out the glaring absence of any actual tasks the Navy wanted performed. Second, the Trial Court's determination that delay in onboarding would cause a delay in services that makes performance impracticable to the Navy is pure speculation. Third, ironically, it is the Trial Court's interpretation that leads to an impracticable and implausible result – that a small business contractor employed, at time of bidding, 20 elite professionals committed to move to NAS Jacksonville with no work to perform, even before the Navy awarded the contract, which alone could have taken several months. ASG's is the only reasonable interpretation in the real world. Resumes must relate to expertise needed for tasks.

In the alternative, the case must be remanded to gather extrinsic evidence to resolve this latent ambiguity as to timing. The Contract is silent on both the Navy's timing for issuing tasks to ASG and the Contractor's timing to onboard professionals on-site. Where there is an ambiguity, and even where there is no ambiguity, the Court should look to custom and trade usage in services contracts of this type to carry out the parties' intentions. *See W.G. Cornell Co. v. United* States,

37

376 F.2d 299, 311-312 (Ct. Cl. 1967).  The Trial Court blames ASG for retaining

four employees who reported to NAS Jacksonville (Appx25) without considering

the custom and usage in the industry as to the sequence of issuing tasks and

retaining professionals.  Without any evidentiary basis on this custom and usage,

the Trial Court essentially determined that ASG's onboarding and resume

submission necessarily precedes the Navy's issuance of tasks.  The only evidence

presented on custom and usage was from Mr. Banerjee, a 20+ year contractor, who

testified "his understanding of the Contract at time of bidding and award was, and

is now, that there is no requirement for 20 full-time equivalents in the absence of

tasks orders issued under the PWS…"  Appx4612.  He explained, "[h]that hiring

personnel with no task orders to perform is very difficult if not objectively

impossible.  Highly skilled professionals cannot be recruited effectively without

actual work to do."  Appx4611.  If ASG's testimony is deemed incomplete,

remanding to gather extrinsic evidence is proper.

Section G.5 sets forth the Quality Assurance Surveillance Plan (QASP) and

ties performance measures to the PWS.  Appx2979-2981.  Absent is any mention

of supplying 20 professionals per Attachment 2.  Appx2979-2981.  QA

surveillance is mandatory under FAR 37.604, in accord with FAR 46.4.  The DOD

PBSA Guidebook explains QA as the "functions performed by the government to

determine whether a contractor has fulfilled the contract obligations pertaining to

quality and quantity." Appx828. The absence of a requirement for 20 is glaring in light of Navy's ultimate determination of a material deficiency of performance by ASG under the related 52.246-4 contract clause and H.8, discussed below. Appx2988. The QA plan here covers delivering on tasks for content, quality, timeliness and accuracy. Appx2979; *see also* Appx2891-2892. The personnel requirements are to meet what is stated in the "task PWS"—no mention of 20 professionals per Attachment 2. Appx2979. The table of performance measurements refer to the PWS nine separate times. Appx2979-2980.

The Trial Court cites to QA provisions regarding "personnel" in G.5.2 along with the G.6 provisions as to resume submissions, which address quality control of the expertise of the professionals utilized by the contractor. Appx2979-2981. As these provisions are all tethered to the PWS and the performance of services under the PWS, they all support and are consistent with ASG's interpretation. Appx2979-2981. The Trial Court minimizes the role of the PWS, calling it "perfunctory" in these assessments in a manner that results in the PWS being eradicated from the Contract – "Cats and Dogs." Notably, there is no right to reject resumes in G.6. Appx2981. G.6 is broken into "submission" and "substitution." "Submission" lacks language of approval/rejection and the absence is made all the more notable as the section on "substitution" clearly provides for power to "approve or disapprove." Because of the absence, Navy points to the

39

word "acceptance" in the final sentence.  ASG contends the "acceptance" right is

limited to confirming the information required to be provided (items 1 to 7) are

complete.  This gives meaning to the section and avoids the conflict with the PWS

and the limits of FAR 37.104, and the recommendations of the DOD PBSA

Guidebook, and the entire statutory scheme, discussed above.  The role of the

submission is the Navy has information on what professionals are performing and

can assess services actually performed with the knowledge of the expertise of the

individual performing the work.  If the Government desired power to approve and

reject resumes it needed to say so.

Section H.8 titled "Schedule of Deductions" provides:

> If at any time there is a vacancy within the Contractor's team (i.e. all twenty (20) positions are not filled), the Government will be entitled to immediate replacement (within 5 days of loss of personnel), or to a unit price reduction in payment, **in accordance with FAR 52.246-4** until the qualified technical expert(s) is in place. The daily unit price will determined by the Unit Price per Month proposed in the Optional Levels of Service CLIN, as applicable.

Appx2988, bold added.  This clause must be interpreted in the context of 52.246-4

and the QASP at G.5.  The language referring to a team of 20 in H.8 is moored to

the analysis of 52.246-4 as H.8 directs.  FAR 52.246-4(e)(2) provides for a

reduction in the contract price to reflect the reduced the value of services

performed per the PWS.  For example, suppose NAVFAC issued 5 tasks as follows

simultaneously:

    a.      Prepare DD 1391 for a sewage treatment plant.

    b.      Prepare a A-E services scope of work for a Reverse Osmosis Plant.

    c.      Review Contractors Design Submittal for Accompanied Housing Complex.

    d.      Prepare IGE for a proposed MILCON project to construct an Aircraft Hangar.

    e.      Assist in answering pre-proposal enquiries for a MILCON project to Construct a bridge.

All these services require multi-disciplinary expertise including Civil, Architectural, Structural, Mechanical, Electrical & Cyber Security.  As long as ASG completes all the above timely, NAVFAC can have no concern as to how many FTE's worked the task.  NAVFAC can review the quality of work and if rework is required ASG is bound to provide it at no additional cost.  If ASG failed to deliver the services on time, then Navy is completely justified in reducing the invoice to reflect the services delivered in accordance with FAR 52.246-4(e)(2). ("Reduce the contract price to reflect the reduced value of the services performed… When the defects in services cannot be corrected by reperformance".) This was ASG's understanding of the Contract being a performance-based NPSC subject to FARs 37.101, 37.6, and FAR 16.202.  This was conveyed to Navy on multiple occasions leading to Navy's labeling of ASG as "argumentative" and "combative."  Appx4750; Appx4736.

       Section J, Attachment 2, is a form created by Navy and mandated under the RFP.  Appx2999; Appx3162, Appx3172.  The RFP utilizes a fictional targeted

team as a baseline for evaluation of price and technical proposals.  Appx3162.

Attachment 2 utilizes the word "example" for every one of the profiles listed.

Appx2999.  It is a hypothetical exercise that provides a basis for calculating an

FFP.  Appx4620-4621; Appx506-507.  The case at hand is nearly identical to the

case before the Court in *Omni Corp. v. United States,* 41 Fed. Cl. 585 (1998).  In

*Omni,* the contractor was awarded a FFP services contract by the United States for

operation and maintenance of two locks and dams. *Id*. at 586-587. *Omni* had

submitted a proposal with a manpower solution that at all times included the

staffing of an equipment mechanic at each lock and dam.  *Id*. at 587-588.  During

performance Omni did not maintain this manpower and the United States alleged a

deficiency and withheld payment.  *Id*. at 589.  The Court granted *Omni's* motion

for summary judgment, finding that the withholding of monies under the contract

was not justified.  *Id.* at 595.  In reaching this holding, the Court interpreted the

FFP services contract and found that the contractor had been retained to perform

services, not to supply manpower.  *Ibid.*  The Court found that the proposal which

had specified manpower was not a requirement of the contract.  *Ibid*.  The same is

true here.

      The solicitation in *Omni* at Section M informed offerors that "… in the

evaluation of proposal's technical capability manpower is the most important

factor." *Id.* at 587.  Similarly, Section M in this RFP provided for higher ratings for

offerors if the hypothetical team had a certain composition, including as to licenses and DOD experience, and if it matched the Government's.  Appx3118.  While the RFP states the team must be composed of 20, it contradicts this statement by providing that offerors who proposed less than 20 professional experts to fulfill PWS requirements **may be rated lower** – thus indicating that an offeror could win award with an Attachment 2 with less than 20 professionals.  Appx3118, bold added.  Section M provided that offers failing to demonstrate a **capability** of 20 professional experts "may be rated lower."  Appx3118.  The bottom line is there is no clear manpower requirement in the RFP or Contract.  ASG has always understood this hypothetical team to be subject to change based on the services per A.2 and the PWS.  The exact same result that occurred in *Omni* should be found here.  A binding manpower requirement is not read into a performance based nonpersonal services FFP contract based on evaluation criteria and a proposed hypothetical solution, where it is completely absent from the PWS – mandated by law to be the "heart" of the Contract.

By fixing the personnel in stone in Attachment 2 without reference to PWS tasks, and by empowering the obstacle of Navy approvals of resumes, ASG is deprived of the express right granted under the PWS to "[choose] the precise labor and staffing mix to meet the PWS" and to "[supervise] its own team to ensure compliance with this PWS."  Appx2966-2968.  The Court's interpretation of

Attachment 2 conflicts with the PWS right to select labor, and the "subject to change" and "anticipates" language in A.2.  Moreover, as discussed above, will the Navy excuse deficiencies in performance if Attachment 2 is satisfied?  Not likely. Last but not least, as argued in the Trial Court, if there is a conflict, the 52.215-8 Order of Precedence requires that ASG have power to select its personnel per A.2 and the PWS rather than the conflicting Section J, Attachment 2.  Appx541; Appx495-496.[6]  The consequence is that ASG cannot be found in material breach for failing to supply personnel or resumes that match Attachment 2.  Further, Navy's exercise of resume control and its insistence on Attachment 2 interfered with and stopped ASG from delivering a team of 20.  Appx4610-4611.  Thus, any failure to provide 20, if indeed it is a requirement, is excused and the Trial Court erred in concluding the T4D was justified .

ASG has presented a reasonable interpretation of the Contract.  Navy's interpretation is not reasonable, as it is rife with conflicts and inconsistencies.  The Judgment should be reversed, and based on the evidence ASG presented, judgment should be entered for ASG converting the T4D to T4C (first cause of action) and

_____

[6] The Trial Court statement that no party suggested a conflict triggering 52.215-8 is mistaken.  Appx16.  Both parties recognize the unavoidable conflict of Navy's interpretation.  ASG asserted this argument in its MSJ.  Appx495-496.  Navy admitted this conflict and asserted, incorrectly, Attachment 2 controlled over the PWS in its December 22, 2022, email and again at the "Cats and Dogs" meeting. Appx1056; Appx4618-4620.

awarding ASG payment in accordance with its CDA Claims.  Appx2023.

However, if this Court finds a latent ambiguity that cannot be resolved through

mechanical application of 52.215-8 and the doctrine of *contra proferentem*, ASG

requests the matter be remanded for further proceedings to address the disputed

extrinsic evidence as to facts and circumstances at time of contract formation and

as to custom and usage in the industry.

### VI.    The Trial Court Erred When It Held T4D Justified Under 52.249-8(a)(1)(i) through (iii)

The Trial Court erred when it held T4D justified under this services contract

where all tasks were performed and based solely on ASG's failure to either (a)

supply 20 professionals per Attachment 2; or (b) submit 20 resumes per

Attachment 2.  Navy fails to meet its heavy burden of showing that the

performance of the Contract is objectively endangered based on the type of

"tangible and direct evidence" necessary to such a finding.  *See McDonnell XII,*

*323 F. 3d at 1016* (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759

(Fed. Cir. 1987).

Manpower, standing alone, and without any reference to the performance of

tasks, cannot be a failure to "perform the services" or to make progress that

justifies ASG's T4D under 52.249-8(a)(1)(i) or (ii).  A services contract is, as the

plain language says, for the performance of services.  *See, generally, Omni Corp.*

41 Fed. Cl. at 595.  ("Defendant fails to assert any services, relevant to the facts of

this litigation, in which there existed a deficiency in plaintiff's performance. *Arguendo*, assuming the contract required the staffing of equipment mechanics, defendant failed to prove it suffered damages as a result.")  The Trial Court erred by concluding a manpower requirement is a "required service" for the purposes of FAR 52.249-8(a)(1)(i) and (ii).  The alleged breaches of ASG, even assuming the manpower interpretation applies, must be analyzed as "other provisions" under FAR 249-8(a)(1)(iii) for the purposes of T4D.

Moreover, a default under FAR 52.249-8(a)(1)(ii) may be justified only if, after notice to cure, the contractor fails to "Make progress, so as to endanger performance of [the] contract."  *See* FAR 52.249.8(a)(2); FAR 49.402-3(d). Again, manpower shortfalls and resume submissions could only endanger performance if they lead to deficient services.  Here ASG performed per the PWS and QASP all tasks it was asked to perform.  Appx4625.  The only evidence of withheld tasks was presented via conclusory statements on March 7, 2024 in the affidavit of Douglas Szyilagyi.  Appx4746-4748.  As it did in the Trial Court, ASG objects to consideration of this testimony under *United States v. Ford Motor Company*, 463 F.3d 1267, 1277 (Fed. Cir. 2006) ("It is unfair to consider an argument to which the government has been given no opportunity to respond.") Appx36-37.  ASG request the opportunity to cross-examinge Mr. Szilagyi as to the skeleton of tasks he admits Navy never asked ASG to perform.  Regardless, the

46

testimony does not change the reality that ASG had personnel in place to perform in every discipline requested in the PWS and was not asked to do so. Appx3496-3497; Appx4613, Appx4628. ASG was deprived of the cure opportunity required by law.

Under FAR 52.249-8(a)(1)(iii), T4D is only appropriate if the Government provides the cure notice required and meets its burden of proving a material breach. *5860 Chi. Ridge, LLC v. United States*, 104 Fed. Cl. 740, 756 (2012)(Citations Omitted); *See Also,* John Cibinic, Jr., James F. Nagle, and Ralph C. Nash, Jr., Administration of Government Contracts 820 (5th Ed. 2016). A default will never stand if it is a mere technicality as it is here. *Kelso v. Kirk Bros. Mech. Contrs.*, 16 F.3d 1173, 1176 (Fed. Cir. 1994). T4D under this catch-all provision is not supported here because: (1) there is no evidence of material harm; (2) Even if Navy withheld tasks that caused harm, ASG was not afforded its notice and opportunity to cure; (3) ASG was precluded from performing based on Navy's insistence on Attachment 2 and its death-grip on hiring; and (4) hiring per Attachment 2 was commercially not possible.

At the "Cats and Dogs" meeting, Navy admitted, while refusing to provide task information, that Navy would have the 20 professionals sitting around doing nothing. Appx4621-4622. Navy's evidence does not include a substantive assessment by the contracting officer of tasks withheld or any analysis of the

contract's objectives and the impacts, if any, of delayed submissions of resumes and staffing on these objectives.  The LOC, Cure Notice and Show Cause all assert the deficiency of ASG was failure to furnish 20 personnel per Attachment 2 and the failure to submit resumes, and nothing about tasks.  Appx3414-3415; Appx3483-3484; Appx3628-3629.  To be effective a cure notice must specify the services required to be performed and provide an opportunity to perform those services.  If the Navy gave ASG tasks to perform and ASG completed those tasks with the team it had, even if a team of four, there would be no basis for default.  The Navy conveniently claims it could not issue tasks because ASG did not have a team of 20.  But, the team ASG <u>did</u> have was capable and was never given the opportunity to perform the tasks the Navy claims it did not issue.  Appx3433-3438; Appx3496-3497; Appx3631-3632; Appx4616.  In short, because there is no harm and there was no opportunity to cure there is no basis for T4D.

The Trial Court's failure to acknowledge either the conflict between Attachment 2 and the PWS or the fact that Navy's assertion of control over hiring decisions of ASG precluded ASG from staffing 20 and performing tasks was error.  ASG presented facts that it would have furnished 20 professionals had Navy allowed resumes and personnel that did not perfectly match Attachment 2.  Appx4610.  Thus, the Trial Court erroneously condemns ASG: "Rather than hire a team of 20 in response to either notice, ASG continued to insist that it was not

48

required to do so." Appx26.  Any breach is excused by the refusal of Navy to allow ASG to hire other than per Attachment 2, and Navy's failure to ask ASG to perform tasks and cure.  ASG was not permitted to do so and non-performance is excused.  Default under 52.249-8(a)(1) is not justified.

## VII.   The Trial Court Erred When It Held Navy Had Not Abandoned Its Discretion Under FAR 49.402-3 When It Issued T4D As Pretext To Rid Itself Of ASG

The Trial Court erred when it found that "the evidence is sufficient to demonstrate the contracting officer considered the [49.402-3(f) factors] and the contracting officer's analysis…does not reflect an abuse of discretion]; and (2) "…even without the analysis of the FAR 49.403-3(f) [sic] factors, the termination for default would not be an abuse of the Navy's discretion because ASG failed to perform the contract."  Appx28.

Reasonable discretion must be exercised by the Government prior to imposing the drastic sanction of T4D to make sure it is in the best interest of the Government. *Nuclear Research Corp. v. United States,* 814 F.2d 647, 649 (Fed. Cir. 1987) (citing to *Darwin Construction Co. v. United States*, 811 F.2d 593 (Fed. Cir. 1987)).  In cases where this discretion is abdicated, the Government acts in bad faith, the decision is not fair and reasonable, or the decision is arbitrary and capricious, such that there is no evidence of a nexus between a contract performance and the decision to T4D, the T4D will be set aside. *See Darwin*

*Construction Co.,* 811 F.2d at 596-598.  Following this rule, the Court in *Darwin*

reversed the ASBCA's affirmance of T4D despite the objective merits of the

termination under the contract because the motive for termination was to get rid of

the contractor rather than a contract objective.  In sum, the government is not

permitted to use default as a pretext for terminating a contract for reasons unrelated

to performance.  *See DOT v. Eagle Peack Rock & Paving, Inc.,*69 F.4th 1367, 1377.

(Fed. Cir. 2023).

Here, there is no nexus of T4D to the task performance objective of this

contract.  ASG has presented evidence that the motivation of Navy at time of

termination was to rid itself of Mr. Banerjee and ASG.  Appx99-110.  This is now

amplified by the harsh and punitive step of the NPD, which places ASG and Mr.

Banerjee on the excluded list, denying any extensions of options under existing

contracts and threatening permanent debarment.  *See* RJN.  This despite the fact

that ASG has over 20 years of excellent performance evidenced by CPARS with

satisfactory or better ratings.  Appx79.  At oral argument the Trial Court found

ASG to be a contractor with "a history of providing excellent service to federal

agencies" and repeatedly lamented the government's ineffective drafting of this

Contract.  Appx57-58;

Nor is there evidence of Navy exercising discretion contemporaneous with

the decision to T4D.  Appx4564-4570; Appx4749-4751 (Declarations of

Contracting Officer Iselin do not contain any evidence of discretion being

exercised).  In this respect, the Trial Court erred when it overruled ASG's

objection as to the admissibility of the alleged termination memorandum

("Memorandum") presented with Navy's reply brief on the eve of oral argument.

Appx27; Appx36-37; Appx4732-4744.  Hearsay is inadmissible unless the

statement is not hearsay or falls into one of the hearsay exceptions of Federal Rule

of Evidence 803.  Navy completely failed to lay foundation for the Memorandum's

admissibility as a business record under FRE 803(6).  Navy failed to present any

affidavit from a qualified witness or custodian of records attesting that the

Memorandum was made at or near the time of the record by someone with

knowledge and that it was kept in the ordinary course of the Navy's business.  *See*

*Li v. Affordable Art Co.*, 2014 WL 11862796 (N.D. Ga. 2014) (financial invoices

were inadmissible and could not be used to support a summary judmgent motion

because moving party failed to lay foundation that invoices were "made at or near

the time by somone with knowledge"); *United States v. Shah,* 125 F.Supp.3d. 570

(E.D.N.C. 2015) (without a the foundation of a qualified witness that the document

was made by a person with knowledge, such documents are inadmissible; the

"knowledge" requirement ensures trustworthiness in the records of a regularly

conducted business activity); *SEC v. Franklin*, 348 F.Supp.2d. 1159 (S.D. Cal.

2004) (hearsay objections to exhibits sustained where SEC has not satisfied the

business records exception because it had not laid the proper foundation for the exhibits).

The Trial Court erred when it relied on this Memorandum to find the contracting officer conducted an analysis related to the contract and T4D on the purported date of the Memorandum.  For example, the Trial Court's holding presumes the Memorandum was signed and dated by the Contracting Officer on March 17, 2023.  Appx27-28.  However, the Trial Court's presumption and holding are in error, as Navy failed to provide an affidavit by any qualified witness to establish the Memorandum was a business record made at or near the time by someone with knowledge, or that it was even kept in the ordinary course of Navy's business.  The affidavits of KO Iselin and Mr. Szilagyi do not lay foundation for this document.  Appx4564-4570; Appx4749-4751; Appx4745-4748.  Nor do they contain any admissible evidence establishing Navy considered any of the 49.402-3(f) factors contemporaneous with T4D.  Appx4564-4570; Appx4749-4751; Appx4745-4748.  The complete absence of any affidavit by a qualified witness attesting to the Memoranum's authenticity is critical here, as the document on its face is unreliable.

The Memorandum is of questionable origin for the following reasons: (1) it is not accompanied by any transmitting email(s); (2) it does not comply with Navy policy mandated by the Department of the Navy's Correspondence Manual 5216.5

("Correspondence Manual")

(https://www.secnav.navy.mil/doni/SECNAV%20Manuals1/5216.5%20%20CH-1.pdf) for all correspondences "within or outside the DoD" as set forth at chapter seven of the Correspondence Manual, including by failing to contain consecutive paginations, standard subject identification code, the orginator's code with serial numbers, the date, and other requirements all as set forth in the Correspondence Manual (see samples at pages 7-16 to 7-17 of the Correspondence Manual); (3) the contracting officer's digital signature violates Navy policy as it is missing the date and time of signing, unlike any other digital signature in the record (Appx3629; Appx3484; Appx272); (4) the copy quality shows grey marks unlike other digitally signed documents (Appx3629; Appx3484; Appx272); (5) the signature page is a stand-alone page separate from the contents of the Memornadum; (6) there are no page numbers contrary to Navy policy; and (7) it references the **wrong** contract number.

The Navy had ample time to present admissible evidence of consideration of the 49.402-3(f) factors as the issue was raised in the Complaint and argued in ASG's MSJ at length.  Appx80, Appx108-110; Appx500-503.  It did not do so until the eve of oral argument, when it clearly felt threatened that ASG's arguments in ASG's February 26, 2024, Response Brief had merit.  Appx4578-4581, Appx4600-4604.  ASG objected to the admissibility of this Memorandum at

oral argument.  Appx36-37.  The Trial Court erred in relying on the inadmissible Memorandum in granting the Navy MSJ.  Appx27-28.  ASG requests this Court to reverse theTrial Court's decision and, at minimum, remand the matter so ASG can conduct discovery as to the authenticity of the Memorandum.

There is no legal precedent for the Government to completely abdicate discretion and disclaim any consideration of <u>all</u> the factors to justify a T4D.  Navy presents no evidence it considered the availability of the services from other sources ((f)(3)), the urgency of the need for the services and the period of time required to obtain them from other sources versus the time to obtain them from ASG ((f)(4)), the degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts ((f)(5)), or the effect of a termination for default on the conractor's ability to liquidate guaranteed loans, progress payments, or advance payments ((f)(6)).  Navy's complete abandonment of any consideration of the impact of the T4D on the Government, on ASG, and on the actual performance of services sought, along with the complete failure to consider any alternative to T4D, is particularly shocking here, where there is no evidence of material harm to the Government.  The Trial Court's judgment should be reversed, and ASG's motion requesting conversion of T4D to a T4C should be granted.

## VIII. The Trial Court Erred When It Granted Summary Judgment In Favor Of Navy On ASG's Third Cause of Action For Breach Of The Covenant Of Good Faith And Fair Dealing

Navy breached the covenant of good faith and fair dealing and utilized T4D as a pretext to rid itself of Mr. Banerjee and ASG. There is an "…implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance. Indeed, not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform." *Lewis-Nicholson, Inc. v. United States*, 213 Ct. Cl. 192, 204, 550 F.2d 26, 32 (1977) (Citations omitted). As Mr. Banerjee testified: "Until January 5, 2023, NAVFAC (a) refused to allow access to ASG personnel; (b) refused to issue task order requests for ASG to perform; and (c) refused to pay ASG as required by the Contract." Appx4624. Further, the Navy used Mr. Banerjee's assertion that Navy had procured a contract in violation of FARs 37.101, 37.104, and 16.2 as the impetus to end ASG as a government contractor by going straight from a T4D to NPD. During a December 8, 2022 conciliatory call initiated by ASG to seek resolution, Mr. Gonzales told ASG it must perform or Navy would, as the "800 pound gorrilla" with infinite legal resources, crush ASG. Appx3631. KO Iselin caused Navy not to pay ASG, refused to issue tasks, delayed

resume approvals, lied about resume approval delays, and admitted his motivation was that ASG was "combative" and "argumentative" as a reason for termination. Appx4750; Appx4736.

The Navy's insistence that resumes meet Attachment 2, regardless of tasks issued, and imposing approval/rejection rights on ASG's resumes interfered with ASG's performance. Appx4610-4611. DOD experience and professional licenses are not required to perform services per the PWS. Appx4610-4611. The Contract prohibits performance of architect-engineer services. Appx2959. Navy's Doug Sylagzi stated the tasks to be performed by the contractor are not inherently governmental and do not require specific knowledge or skills, and the contractor and personnel will only be in a support role. Appx3031. Nevertheless, Navy insisted on certifications, professional licenses, and DOD experience per Attachment 2. Appx4610-4611. At the "Cats and Dogs" meeting, Navy simply demanded ASG perform the impossible task of supplying 20 full time equivalents with no tasks to perform. Appx511-512. ASG was unable to simply "manufacture" 20 full time equivalents the Navy demanded within 10 days, while the Navy obstructed ASG's efforts to do so by refusing to issue tasks which would require 20 professionals to perform. Appx102-103; Appx4611-4612.

Navy's refusal to issue tasks improperly interfered with ASG's performance, breaching the covenant of good faith and fair dealing. Navy further hindered ASG

by overreaching on resume approvals.  For example, Navy admittedly rejected the Fire Protection resume submitted in October 2022 because NAVFAC summarily ASG's (without an interview, without discussing his work experience, and without any contractual authority to approve/reject), the proposed hire, Mr. Morgan, claiming he did not have sufficient fire protection experience.  Appx4615-4616. The Navy's rejection of Mr. Morgan is baffling, as Mr. Morgan had sufficient experience, including a professional engineering license in fire protection, to perform on PWS tasks.  Appx4615-4616; Appx4629-4633.

KO Iselin lied on October 17, 2022, when he claimed he had not received a resume submission.  On October 17, 2022, at 2:20 a.m., emailed KO Iselin to follow up on the delay in responding to ASG's October 7, 2022 resume submission for Virginia Fallon.  Appx3295.  KO Iselin feigned not receiving that resume and responded in part: "I do not know who you submitted the resume to, but it wasn't the KO as required by the Contract."  Appx3295 (citing to F.4).  In fact, KO Iselin had received a copy of the Fallon resume on October 11, 2022, from his COR Szilagyi.  Appx3198.  This petty lie demonstrates the Navy's goal was not to have tasks performed, but to eliminate ASG from government contracting as evidenced by the NPD.  Navy's breaches of the covenant of good faith and fair dealing excuse ASG from any alleged nonperformance and compel conversion of T4D to T4C.

57

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

After decades of successful projects as a federal contractor, ASG and its founder Mr. Banerjee are on the brink of ruin. The T4D judgment combined with the NPD and resulting exclusion of ASG and Mr. Banerjee will destory the livelihood of ASG and Mr. Banerjee by September 2024 as practically all ASG's current tasks expire. The cause for this devastation is an innocent mutual mistake as to the interpretation of a services contract. ASG could do nothing when confronted with the LOC demanding ASG deliver in the way Navy wanted but try to deliver. It could not. ASG's understanding of the services contract as in fact being a services contract is the only reasonable intepretation of this Contract. The Trial Court erred by adopting the Navy interpretation that results in an unlawful contract. At minimum, the latent ambiguities in this Contract can only be resolved via further factual exposition of extrinsic evidence as to the formation and custom and usage as applied to this Contract. ASG requests this Court reverse the decision of the Trial Court granting summary judgment to Navy, and grant ASG's motion for summary judgment to convert T4D to T4C, or in the alternative remand for further proceedings.

DATE:  June 26, 2024           Respectfully submitted,

FINCH, THORNTON & BAIRD, LLP

By:*/s/ David S. Demian*
        DAVID S. DEMIAN
Attorneys for Plaintiff-Appellant ASG
Solutions Corporation DBA American
Systems Group
4747 Executive Drive, Suite 700
San Diego, California 92121
Telephone:  (858) 737-3100
Facsimile:  (858) 737-3101
Email:  ddemian@ftblaw.com

# ADDENDUM

## TABLE TO ADDENDUM

| Description | Appx. No. |
|---|---|
| Judgment | Appx1 |
| Order | Appx2 |
| Memorandum of Opinion | Appx3-28 |
| 10 U.S.C. § 3401 Task and Delivery Order Contracts: Definitions | Add1 |
| 10 U.S.C. § 3403 Task and Delivery Order Contracts: General Authority | Add1-4 |
| 10 U.S.C. § 3405 Task order contracts: advisory and assistance services | Add4-6 |
| 10 U.S.C. § 3406 Task and Delivery Order Contracts: Orders | Add6-9 |
| 10 U.S.C. § 3801 | Add9 |
| 31 U.S.C. § 1105 Budget contents and submission to Congress | Add10 |
| 40 U.S.C. § 1102 Definitions | Add11 |
| 2.101 Definitions | Add12 |
| 15.204-1 Uniform Contract Format | Add12-14 |
| 16.0 Scope of Part | Add14 |
| 16.2 Fixed-Price Contracts | Add14 |
| 16.201 General | Add14 |
| 16.202 Firm-Fixed-Price Contracts | Add15 |
| 16.202-1 Description | Add15 |
| 16.202-2 Application | Add15 |
| 16.203-1 Description | Add16 |
| 16.203-2 Application | Add16 |
| 16.203-3 Limitations | Add17 |
| 16.203-4 Contract Clauses | Add17-20 |
| 16.204 Fixed-price incentive contracts | Add20 |
| 16.205-1 Description | Add20 |
| 16.205-2 Application | Add20-21 |
| 16.205-3 Limitations | Add21 |
| 16.205-4 Contract clause | Add21 |
| 16.206-1 Description | Add21 |
| 16.206-2 Application | Add21-22 |
| 16.206-3 Limitations | Add22 |

| Description | Appx. No. |
|---|---|
| 16.206-4 Contract clause | Add22 |
| 16.207-1 Description | Add22 |
| 16.207-2 Application | Add23 |
| 16.207-3 Limitations | Add23 |
| 16.3 Cost-Reimbursement Contracts | Add23 |
| 16.304 Cost-Plus-Incentive-Fee Contracts | Add23 |
| 16.305 Cost-Plus-Award-Fee Contracts | Add23 |
| 16.306 Cost-Plus-Fixed-Fee Contracts | Add24-25 |
| 16.600 Scope | Add25 |
| 32.009-1 General | Add25-26 |
| 36.000 Scope of Part | Add26 |
| 37.000 Scope of Part | Add27 |
| 37.1 Service Contracts-General | Add27 |
| 37.101 Definitions | Add27-28 |
| 37.102 Policy | Add28-30 |
| 37.103 Contracting Officer Responsibility | Add30-31 |
| 37.104 Personal Services Contracts | Add31-32 |
| 37.105 Competition in service contracting | Add33 |
| 37.106 Funding and term of service contracts | Add33 |
| 37.107 Service Contract Labor Standards | Add33 |
| 37.504 Contracting Officials' Responsibilities | Add34 |
| 37.600 Scope of Subpart | Add34 |
| 37.601 General | Add34 |
| 37.602 Performance Work Statement | Add34-35 |
| 37.603 Performance standards | Add35 |
| 37.604 Quality assurance surveillance plans | Add35 |
| 49.402-3 Procedure for Default | Add36-37 |
| 52.215-8 Order of Precedence-Uniform Contract Format | Add37-38 |
| 52.232-1 Payments | Add38 |
| 52.232-25 Prompt Payment | Add38-45 |
| 52.246-4 Inspection of Services-Fixed-Price | Add46 |
| 52.249-8 Default (Fixed-Price Supply and Service) | Add47 |
| Rule 56 Summary Judgment | Add48 |

# In the United States Court of Federal Claims

**No. 23-1029 C**
**Filed: March 29, 2024**

```
*************************************
ASG SOLUTIONS CORPORATION,      *
                  Plaintiff,    *                JUDGMENT
                                *
        v.                      *
                                *
THE UNITED STATES               *
                  Defendant.    *
*************************************
```

Pursuant to the court's Memorandum Opinion and separate Order, both filed March 29, 2024, denying plaintiff's motion for judgment on the pleadings and motion for summary judgment, and granting defendant's motion for summary judgment,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of the defendant. No costs.

Lisa L. Reyes
Clerk of Court

By:    s/ Ashley Reams
Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Effective December 1, 2023, the appeals fee is $605.00.

**Appx1**

# In the United States Court of Federal Claims

No. 23-1029C
Filed: March 29, 2024

---

**ASG SOLUTIONS CORPORATION,**

        *Plaintiff,*

**v.**

**UNITED STATES,**

        *Defendant.*

---

**ORDER**

    For the reasons provided in the Memorandum Opinion filed concurrently with this Order, the plaintiff's motions for judgment on the pleadings (ECF 15) and for summary judgment (ECF 17) are **DENIED**. The defendant's motion for summary judgment (ECF 23) is **GRANTED**.

    The Clerk is **DIRECTED** to enter judgment in accordance with this Order. No costs are awarded.

    It is so **ORDERED**.

                                s/ Richard A. Hertling

                                **Richard A. Hertling**
                                **Judge**

# In the United States Court of Federal Claims

No. 23-1029
Filed: March 29, 2024
FOR PUBLICATION

---

**ASG SOLUTIONS CORPORATION DBA AMERICAN SYSTEMS GROUP,**

*Plaintiff*,

**v.**

**UNITED STATES,**

*Defendant.*

---

*David S. Demian*, Finch, Thornton, & Baird LLP, San Diego, CA, for the plaintiff.

*Sheryl L. Floyd*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION

***HERTLING*, Judge**

The plaintiff, ASG Solutions Corp., dba American Systems Group ("ASG"), was awarded an Indefinite Delivery Indefinite Quantity ("IDIQ") task order by the defendant, acting through the United States Department of the Navy ("Navy"), to provide engineering and program-management support services to the Naval Facilities Engineering Systems Command Southeast ("NAVFAC SE") to support the operations of the Design and Construction Business Line ("DCBL") at Naval Air Station ("NAS") Jacksonville in Jacksonville, Florida. Ultimately, the Navy terminated ASG's task order for default. ASG filed claims with the contracting officer and, after those claims were largely rejected, filed this action under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7101 *et seq*. The plaintiff alleges that the termination for default was in error and that the Navy breached the contract and the covenant of good faith and fair dealing. The plaintiff has moved for judgment on the pleadings and for summary judgment. The defendant has cross-moved for summary judgment.

The defendant's interpretation of the task order as requiring the contractor to assemble a 20-person, multidisciplinary team of professionals aligns with the plain language of the task order, reads all its provisions in harmony, and makes sense given the task order's purpose. This reading does not render the task order a personal services contract in violation of Federal Acquisition Regulation ("FAR") 37.104 because the task order made clear that, throughout performance, the contractor retained control of its team.

Given that the task order requires a 20-person team, the evidence submitted by the parties demonstrates that the plaintiff failed to perform the contract, and termination for default was justified under FAR 52.249-8 and 49.402-3(f). The plaintiff's motions for judgment on the pleadings and summary judgment are denied, and the defendant's motion for summary judgment is granted.

## I.    FACTUAL BACKGROUND

ASG is a provider of professional-support services for federal agencies. In 2019, the Navy awarded ASG, along with more than 2,400 other entities, the Seaport Next Generation Multiple Award, IDIQ Contract, No. N0017819D7175 ("Seaport NxG Contract"). (ECF 23 at 3.) Under the Seaport NxG Contract, various Navy commands procure a variety of professional-support services, including for technical fields such as architecture and engineering.

### A.    Solicitation and Task Order

On August 25, 2022, ASG submitted a proposal in response to a solicitation for task order No. N6945022F3005 under the Seaport NxG Contract.[1] (ECF 23 at 15; 23-2 at 67.) Under the task order, the contractor would provide technical-support services at NAS Jacksonville for NAVFAC SE's DCBL. The task order was to begin in October 2023. (ECF 23-2 at 70.) The Navy apparently opted to proceed with the solicitation when it found itself unable to fill vacancies in the ranks of its own DCBL workforce.

Sections A through J of the solicitation mirror the content of the task order ultimately awarded to ASG. Section A.2 describes the service requirements under the task order. (ECF 17-3 at 95.) Offerors were to assemble a "team" to "provide expert advice and assistance services" on various NAVFAC SE-supported projects. (*Id.*) With respect to this team, Section A.2 of the solicitation noted that:

> [a]t the time of initial contract award, the Government anticipates a staff of four (4) Architects, four (4) Mechanical Engineers, four (4) Electrical Engineers, two (2) Civil Engineers, two (2) Structural Engineers, one (1) Fire Protection Engineer, one (1) Cost Engineer, and two (2) Supervisors.

(*Id.*)

---

[1] ASG is a party to two agreements involved in this matter. First, it is a member of the Seaport NxG contract. Second, pursuant to that contract, it was awarded the NAVFAC SE task order at Jacksonville NAS. The parties sometimes refer to this latter contract as the "Jacksonville contract," but this opinion will refer to it as the "task order," or the "Jacksonville task order." The assignments issued to ASG by the Navy pursuant to the Jacksonville task order will be referred to as "sub-task orders" or "assignments" rather than "tasks" or "task orders" to avoid confusion.

Section A.2 identified this "anticipated staff" of 20 professionals as the "base/minimum" level of service required under the task order. (*Id.*)

Section B provided a list of supplies and services to be provided under the task order for which offerors were to provide pricing. (*Id.* at 98.) The first line item is the "base requirement," which is "[t]echnical [s]upport [s]ervices at NAS Jacksonville in accordance with [the performance work statement]." (*Id.*) The "quantity" and "unit" columns provide that the Navy will acquire these services for 12 months. (*Id.*) The second line item required offerors to provide pricing for an additional, "[o]ptional" level of service, through which NAVFAC SE could "award additional architectural and engineering technical expert support services." (*Id.*) This item also stated a quantity and unit of 12 months. (*Id.*)

Section C of the solicitation included the performance work statement ("PWS"). (ECF 17-3 at 103.) The PWS required the awardee to provide, manage, and supervise a team of facilities technical experts to "help[ ] NAVFAC SE achieve its mission and ensure compliance with the Department of Defense (DoD) Unified Facilities Criteria" and other applicable standards related to the "design, construction, sustainment, and demolition" of naval facilities. (*Id.*) The PWS noted that the contractor would "choose[ ] the precise labor and staffing mix to meet the PWS," as long as the team possessed the requisite expert knowledge and experience. (*Id.*) The PWS was silent about the size and composition of the team and failed to reiterate the obligation specified in Section A.2 regarding the "base/minimum" level of service under the task order.

Section F.4 of the solicitation outlined the deliverables due under the task order. (*Id.* at 111-12.) Among the deliverables specified in Section F.4, the awardee would be required, within five days of receiving the task-order award, to provide resumes to the contracting officer for each team member proposed by offerors to perform work under the task order. (*Id.* at 112.) Each resume had to be "in accordance with [the offeror's] proposal and the PWS." (*Id.*)

Section G.5 of the solicitation outlined the task order's quality-assurance plan and detailed NAVFAC SE's review of contractor personnel. (*Id.* at 118.) In relevant part, the quality-assurance plan explained that the contracting officer's representative would review and approve prospective contractor personnel to ensure that they met the required qualifications, including certification and licensure, whenever personnel were added to the task order.[2] (*Id.* at 118.) Section G.6 reiterated this requirement by confirming that the awardee would submit to the Navy the resumes of all proposed employees working on the task order "in accordance with Section F.4." (*Id.*) The awardee would have to demonstrate that its personnel held "certificates, licenses, physical requirements or other expertise required to fulfill the requirements of the [PWS]." (*Id.*) In submitting the resume of each prospective employee, the awardee also had to

---

[2] The solicitation was amended twice. The final version of the solicitation included an amendment intended to strengthen the resume requirements. The summary of changes accompanying the final solicitation explained that Section G was amended, in part, to "clarify resume certification." (ECF 17-3 at 95.)

3

"certify that . . . the qualified individual[ ] has agreed to accept the position upon acceptance by the [g]overnment." (*Id.*)

Section H.8 of the solicitation provided for deductions to the firm, fixed price the Navy had to pay the awardee in the event the awardee did not maintain a team of 20 employees. Specifically, Section H.8 provided that if, "at any time there [was] a vacancy within the [c]ontractor's team (i.e. all twenty (20) positions are not filled)," the contractor had to provide a replacement within five days. (*Id.* at 124.) If the contractor failed to provide a replacement to restore the team to a complement of 20 members within five days, NAVFAC SE would subject the contractor to a "unit price reduction in payment in accordance with FAR 52.246-4 until the qualified technical expert(s) [was] in place."[3] (*Id.*)

Section J of the solicitation included various attachments that offerors had to submit with their proposals. (*Id.* at 128.) Attachment 4 provided a worksheet for offerors to demonstrate the qualifications of the team they would provide under the task order. (*Id.*)

In Section M of the solicitation, NAVFAC SE outlined three factors it would use to evaluate proposals. (*Id.* at 134.) The second factor, Staffing Approach, required offerors to propose a team of 20 professionals to accomplish the work required under the task order. (*Id.* at 136.) The solicitation noted:

> The non-price proposal presented by the offeror to whom the award is made will be incorporated into the task order at time of award. Post-award, the offeror will be held to any proposed licenses certifications, qualifications, expertise, etc. of the technical support personnel that exceed the minimum requirements of the solicitation and/or PWS.

(*Id.*)

Section M also specified that each team member "must possess an education level suitable to meet the requirements of the PWS." Section M noted that offerors proposing teams with education, training, or seniority beyond the minimum requirements "may be rated higher." (*Id.*).

During the Navy's development of the solicitation, a NAVFAC SE contracting official had analyzed whether the task order would constitute a personal services contract, because the task order required offerors to propose teams of qualified personnel to assist the Navy in performing its functions. (ECF 23-2 at 76.) FAR 37.104 forbids agencies from awarding personal services contracts unless they are authorized by law to do so. The Navy contracting

---

[3] FAR 52.246-4 governs fixed-price service contracts. Section (e) provides that if the services provided do not conform with the contract's requirements, the government may "reduce the contract price to reflect the reduced value of the services to be performed." FAR 52.246-4(e)(2).

4

official determined and certified that the task order would not result in an impermissible personal services contract because the awardee, rather than the Navy, would control and manage its own employees working on the task order. (*Id.*)

To reflect this determination, Section C.8 of the solicitation incorporated a "Non-Personal Service Statement." In this provision, the Navy certified that all contractor personnel would be "controlled, directed and supervised at all times by management personnel of the contractor. . . . The [g]overnment will control access to the facility and will perform the inspection and acceptance of the completed work." (ECF 17-3 at 107.) Thus, under the task order, the Navy would assign projects to the contractor; the contractor was then responsible for tasking out the assignment to its personnel, who would be supervised exclusively by the contractor in the performance of their tasks.

As part of its proposal, ASG submitted in Attachment 4 of Section J a proposed 20-member team consisting entirely of senior-level, accredited professionals with advanced degrees. Although the list included the specific qualifications of the individuals, it did not include the name of any of the individuals proposed. (*Id.* at 71.) ASG accompanied its proposed team with the proposed cost associated with employing each team member. (ECF 23-2 at 64.) When NAVFAC SE incorporated Attachment 4 into the final contract as the solicitation provided, this list of costs also became ASG's monthly rate: $281,870.00. (ECF 17 at 30; ECF 17-3 at 57.)

On September 15, 2022, the contracting officer contacted ASG about its proposal, requesting that ASG "confirm that [it] underst[ood] the technical experts submitted after award must meet the additional requirements proposed" in ASG's Attachment 4. (ECF 17-3 at 539.) ASG responded simply, "[y]es." (*Id.*)

On September 28, 2022, ASG was awarded the task order, which incorporated the provisions of the solicitation outlined above, except for Section M, which described the award-evaluation criteria. Attachment 4 of Section J of the solicitation was incorporated into the task order as Attachment 2 to Section J.

The task order does not contain an order of precedence clause to resolve disputes in the event of conflicting provisions. The Seaport NxG contract does, however, incorporate by reference FAR 52.215-8, which provides the order of precedence in the Uniform Contract Format. FAR 52.215-8 provides that inconsistencies between provisions shall be resolved by giving precedence to: (a) the schedule; (b) representations and other instructions; (c) contract clauses; (d) other documents, exhibits, and attachments; and (e) the specifications, in that order.

**B.    ASG's Performance of the Task Order**

Problems arose almost immediately. After being awarded the task order, ASG struggled to assemble its team of professionals. On October 3, 2022, the date by which, under Section F.4 of the task order, ASG had to submit resumes for its 20 team members, ASG submitted only two resumes. (ECF 23 at 19.) ASG's owner and president emailed the contracting officer's representative that day noting that "so far I have been able to obtain 2 of the 20 have [sic] signed

5

**Appx7**

[letters of intent]." (ECF 17-3 at 392.) After identifying the two individuals, ASG's president continued "I will continue this process till all 20 are filled." (ECF 23 at 393.)

Between October 6, 2022, and November 9, 2022, ASG submitted eight additional resumes. (*Id.* at 19-23.) Of the 10 resumes submitted by November 9, 2022, four were rejected by NAVFAC SE because the professionals lacked required licenses or possessed inadequate experience in comparison to the senior-level team members proposed by ASG on Attachment 2 of the contract. (*Id.*) Six resumes were accepted, but four of these six professionals declined ASG's offer, did not report to work, or quickly resigned. (*Id.*) As of November 9, 2022, ASG only had two professionals available to work under the task order. (*Id.* at 23.)

Email communications between ASG and NAVFAC SE revealed growing disagreement between the parties pertaining to the submitted resumes and the qualifications necessary for ASG's team members. ASG asserted that because the task order was not a personal services contract, it was free to hire personnel that it believed could deliver services consistent with the requirements of the PWS. (ECF 23-2 at 260.) It asserted that NAVFAC SE's failure to issue assignments for ASG contractors to complete under the task order prevented ASG from assembling an appropriate team; ASG could not recruit employees unless it knew what type of work they would need to do. (*Id.* at 477-81.) NAVFAC SE, in turn, explained to ASG that its employees had to meet the experience levels described in Attachment 2 to the task order (Attachment 4 of ASG's proposal) and insisted that it had the right to reject resumes of proposed ASG employees who did not reflect the qualifications for prospective employees initially offered by ASG in its proposal. (*Id.* at 259.)

On November 1, 2022, the contracting officer sent ASG a letter of concern, notifying ASG that it was failing to meet the minimum staffing requirement identified in Section A.2 of the task order by failing to provide a staff of at least 20 professionals. (*Id.* at 458-459.) The letter expressed further concern that ASG was not meeting the requirement of Section F.4 by failing to deliver adequate and timely resumes. (*Id.*)

On November 17, 2022, counsel for ASG responded to the letter of concern. (ECF 23-2 at 460-64.) ASG asserted that it was not required to maintain a staff of 20 professionals under the task order and that, pursuant to Section C, the PWS, ASG retained the authority to choose the precise labor and staffing mix to perform under the task order. (*Id.*)

Between November 18 and November 20, 2022, ASG submitted four additional resumes to NAVFAC SE. (ECF 23 24-25.) NAVFAC SE rejected one resume because the proposed employee lacked the credentials described in Attachment 2. (*Id.* at 25.) NAVFAC SE accepted the other three resumes, but ASG successfully retained only one of these professionals. (*Id.* at 24-25.)

On December 5, 2022, NAVFAC SE issued a cure notice to ASG. NAVFAC SE asserted that ASG's inability to meet its obligations under Attachment 2 endangered performance of the task order and could justify termination for default. (ECF 23-2 at 527-28.) Specifically, NAVFAC SE noted that ASG had submitted only nine resumes that met the level of employee qualifications required under Attachment 2. (*Id.*) NAVFAC SE informed ASG that unless it

6

cured this failure within 10 calendar days, NAVFAC SE could terminate the task order for default under FAR 52.249-8. (*Id.*)

On December 14, 2022, ASG responded to the cure notice and asserted that it was not required to provide 20 professionals to meet its obligations under the task order because Attachment 2 was not a contractual obligation. (*Id.* at 532-34.) ASG further responded that because the Navy had not provided to ASG any then-pending specific assignments to perform under the task order, ASG was not yet obligated to provide a team of professionals. (*Id.* at 531-32.) ASG reasoned that because it was to choose the precise labor and staffing mix to perform assignments under the task order, it could not put together an appropriate team until NAVFAC SE gave it specific assignments to fulfill. (*Id.* at 530.)

On January 13, 2023, ASG provided an additional resume, which NAVFAC SE accepted. (ECF 23 at 26.) On January 20, 2023, ASG provided two more resumes. (*Id.* at 27-28.) NAVFAC SE accepted one and rejected the other based on lack of experience. Finally, on March 10, 2023, ASG submitted an additional resume, and NAVFAC SE accepted it. (*Id.* at 28.) Of this group of three prospective employees whose resumes NAVFAC SE accepted, ASG retained two professionals. (*Id.*)

On January 20, 2023, NAVFAC SE issued ASG a show cause notice based on ASG's failure to comply with its obligations to propose team members meeting the qualifications of the team members proposed in Attachment 2. (ECF 23-2 at 672.) The notice referenced a meeting held at NAS Jacksonville on January 5, 2023, at which ASG's president allegedly acknowledged that ASG "cannot meet Attachment 4." (*Id.*) This statement, the notice explained, constituted an anticipatory repudiation and abandonment of ASG's contractual obligations. (*Id.*) The notice provided ASG the opportunity to explain why its "failure to perform arose from causes beyond [its] control" and without fault of or negligence by ASG. (*Id.*)

On February 10, 2023, ASG responded to NAVFAC SE's show cause notice. (*Id.* at 674-86.) ASG continued to assert that it had no obligation to provide 20 professionals under the task order. Rather, ASG insisted that it was only obligated to provide professionals once NAVFAC SE issued specific assignments for work under the task order. (*Id.* at 675.) ASG disputed the notice's characterization of ASG president's statement at the January 5, 2023 meeting as a repudiation or abandonment of the contract. (*Id.* at 676.) Instead, ASG explained that its president had attended the January 5th meeting to ensure that the onboarding of ASG's employees would proceed smoothly. (*Id.* at 680.) Regarding the shortage of resumes it had provided by that date, ASG asserted that post-pandemic labor-market conditions beyond its control prevented it from providing a team of 20 professionals. (*Id.* at 674.) ASG also explained that it was unable to perform because the Navy had not yet paid ASG's monthly invoices, as required by the task order. At that point, ASG had provided services for a few minor assignments under the task order. (*Id.* at 675-76.)

On April 4, 2023, NAVFAC SE issued a final decision terminating the task order for default. (*Id.* at 1600-1605.) In its decision, the contracting officer identified that ASG was required as a minimum level of service under the task order to provide the Navy with a team of 20 professionals, and ASG had failed to supply such a team. (*Id.* at 1600.) NAVFAC SE

7

justified its decision to terminate for default on ASG having provided at the halfway point of the task order a team of only five of the 20 required professionals. (*Id.* at 1602.) NAVFAC SE asserted that ASG's position that unforeseen labor-market conditions prevented it from recruiting professionals was unavailing, because ASG either knew or should have known of post-pandemic labor-market conditions prior to submitting its proposal. (*Id.* at 1603.)

### C.   Payment Invoices and CDA Claims

ASG submitted six monthly invoices to NAVFAC SE during performance of the task order. (ECF 17-3 at 1492-1501.) The invoices were for "Base Requirement for Base Period" services provided between October 2022 and April 2023. (*Id.*) Each invoice was for the full monthly amount stated in the task order, $281,870.00 (aside from the last invoice which did not cover a full, month-long period). (*Id.*) The amounts invoiced were the same as the estimated, monthly cost of employing the 20-person team ASG had provided in Attachment 4 to its proposal, included in the task order as Attachment 2.

ASG submitted three certified claims to the contracting officer seeking payments for the full amounts of its fixed monthly prices, in accordance with its monthly invoices. On January 9, 2023, ASG submitted its first certified claim, seeking the combined amount of its October and November 2022 invoices. (*Id.* at 1509-12.) It submitted a second claim on March 8, 2023, seeking the combined amount of its December 2022, January 2023, and February 2023 invoices. (*Id.* at 1743.) On April 18, 2023, the contracting officer notified ASG that he had not made a final decision on the claim submitted in January 2023 but would do so by June 30, 2023. (*Id.* at 1699.) The contracting officer noted that the task order had been terminated for default on April 4, 2023, and NAVFAC SE's re-procurement with another contractor could result in liability for ASG. (*Id.*) On May 4, 2023, ASG submitted a third claim which sought the combined total of its invoices from March 2023 to April 5, 2023. (*Id.* at 2239-41.)

The contracting officer issued the first decision on any of ASG's claims in a June 28, 2023 decision which addressed the March and May claims. The decision on the March claim explained that ASG had already been paid $156,396.80 for services rendered, and the contracting officer denied the rest of the claim. (*Id.* at 2238.) The decision on the May claim explained that ASG had been paid $77,812.85 for services rendered, and the contracting officer denied the remainder. (*Id.* at 2373.) In both cases, the contracting officer justified the partial payments on Section H.8 of the task order, which provides for a deduction in pay "if there is a vacancy within the [c]ontractor's team." (*Id.* at 2372; *see also* 2237.) The contracting officer did not correspond further with ASG about its original January claim until August 18, 2023, when the contracting officer informed ASG that it could expect a final decision by December 15, 2023. (*Id.* at 1700.) This decision arrived on December 1, 2023, when the contracting officer denied the claim in its

8

**Appx10**

entirety because ASG had "failed to deliver the 20 [facilities technical experts] required by the task order."[4]  (*Id.* at 1741.)

## II.    PROCEDURAL HISTORY

After NAVFAC SE terminated ASG's contract for default, ASG filed this suit in July 2023.  (ECF 1.)  The complaint alleges first that NAVFAC SE improperly terminated the task order for default.  (ECF 1 at 34.)  The termination, the complaint alleges, entitles ASG to damages or, in the alternative, a conversion to a termination for convenience.  (*Id.* at 35.)  Second, the complaint alleges that NAVFAC SE breached the Jacksonville task order by failing to pay ASG under the firm fixed-price contract.  (*Id.*)  Third, it alleges that NAVFAC SE breached the implied covenant of good faith and fair dealing by hindering ASG's performance of the task order.  (*Id.*)  In support of this third claim, the complaint alleges that NAVFAC SE's failure to approve resumes in a timely manner, issue assignments for ASG to perform, inform ASG of upcoming assignments, provide site access to ASG personnel, and require ASG to provide a team of 20 professionals at all times prevented ASG from performing.  (*Id.* at 36.)

The plaintiff moved for judgment on the pleadings in November 2023 (ECF 15), and for summary judgment in December 2023 (ECF 17).  The defendant responded to the motion for judgment on the pleadings and cross-moved for summary judgment in February 2024.  (ECF 23.)  Both parties responded to the cross-motions.  (ECF 24; ECF 25.)  Oral argument was held on March 12, 2024.  At the close of oral argument, the parties were encouraged to try to settle the case and were allowed two weeks within which to do so; any settlement discussions that may have taken place apparently failed.

## III.    JURISDICTION

The Tucker Act, 28 U.S.C. § 1491(a), vests in the Court of Federal Claims jurisdiction over claims for money damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

---

[4] The decision also addresses a July 18, 2023, claim for "anticipatory lost profits."  (ECF 17-3 at 1709.)  No copy of this claim appears among the records submitted by either party.  In any event, the contracting officer denied the claim.  (*Id.*)

The Court of Federal Claims has jurisdiction over claims for breach of contract founded upon an express contract with the United States. *Hercules Inc. v. United States*, 516 U.S. 417, 422 (1996). Here, the plaintiff's claim is founded on an express contract with a federal agency.

ASG's claims are founded on the CDA. 41 U.S.C. § 7104(b)(1). The court may hear a claim under the CDA only if that claim has been "submitted to the relevant contracting officer," and the contracting officer has "issued a final decision on that claim." *K-Con Bldg. Systems, Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015). A claim submitted to a contracting officer must provide a "'clear and unequivocal statement that gives the contract officer adequate notice of the basis and amount of the claim.'" *Id.* (quoting *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987)).

ASG submitted its claims to the contracting officer in January, March, and May 2023, and the contracting officer has issued final decisions on those claims. The defendant does not dispute that jurisdiction under the CDA over ASG's claims is appropriate.

## IV.    STANDARDS OF REVIEW

The plaintiff has moved for judgment on the pleadings pursuant to Rule 12(c) of the Rules of the Court of Federal Claims ("RCFC"). To decide a motion for judgment on the pleadings, a court "assumes that all of the nonmovant's allegations are true and indulges all reasonable inferences in favor of the nonmoving party." *Gummer v. United States*, 40 Fed. Cl. 812, 814 (1998). Judgment on the pleadings "is appropriate where there are no material facts in dispute and the party is entitled to judgment as a matter of law." *Forest Laboratories, Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007).

Both parties have also cross-moved for summary judgment. Under RCFC 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are inappropriate at the summary-judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party," and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248-50. Contract interpretation involves questions of law and is therefore "generally amenable to summary judgment." *Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019).

## V.    DISCUSSION

The parties offer conflicting and inconsistent interpretations of the task order.

The plaintiff argues that the terms of the PWS control; when other provisions of the task order conflict with the PWS, the plaintiff argues the terms of the PWS should prevail. Under the PWS, ASG chooses the labor mix required to meet the assignments given by the Navy. Thus, until the Navy gives ASG an assignment to perform, ASG need not provide any team members because it cannot know what the right mix of professional skills would be to perform an

10

assignment until it receives one. ASG argues that a reading of the task order requiring ASG to provide and maintain a specific number of team members would convert the task order into either a personal services contract, which is prohibited by FAR 37.104, or a time and materials contract, which must comply with FAR 16.601 to be valid. ASG therefore argues that its reading is the only legally permissible one.

The defendant argues the opposite. The Navy asserts that it was indeed procuring a team of 20 professionals, and the various provisions of the task order make that clear. The Navy argues that its reading of the task order is the only one that gives effect to all the task order's terms, including the requirement that the contractor supply a team of 20 professionals or face a reduction in payment if its team endures a vacancy among the 20 positions for more than five days. The defendant argues that because the contractor would maintain total control over its employees by assigning work and supervising team members without interference by the Navy, the contract contains safeguards adequate to avoid a prohibited personal services contract.

ASG also argues that even if the Navy's interpretation of the contract is correct, the Navy failed to terminate the contract for default in the manner required by FAR 52.249-8 and FAR 49.402-3(f).

**A.    Contract Interpretation**

The central issue of contract interpretation in this case is whether the task order requires the contractor to compose and maintain a team of 20 professionals to assist NAVFAC SE in performing the work of the DCBL and whether these professionals had to meet the qualifications described in Attachment 4 of ASG's proposal, incorporated into the task order as Attachment 2.

Contract interpretation must "begin with the plain language" of the contract. *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993). In reading that language, a court should "interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citing *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993)). Interpretations should "effectuate [the] spirit and purpose" of the contract. *Hercules*, 292 F.3d at 1381. Although a contract is ambiguous if it is "susceptible to more than one reasonable meaning," *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004), the fact that each party can advance conflicting interpretations of a contract does not on its own render the contract ambiguous. *Metric Constrs., Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999).

This task order is a "standard service contract as defined in FAR Part 37." (ECF 17-3 at 55.) A service contract under the FAR is "a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply." FAR 37.101. Examples of service contracts provided in the FAR include "advisory and assistance services." *Id*.

11

**Appx13**

### 1.    The plaintiff's interpretation

The plaintiff argues that the task order's PWS "empowers ASG to determine the make-up of its team" in response to assignments from NAVFAC SE. (ECF 17 at 25.)  According to the plaintiff, the task order is a service contract whose "'primary purpose'" is the performance by ASG of identifiable tasks as assigned. (*Id.* at 26 (quoting FAR 37.101).)  This interpretation is reinforced, the plaintiff argues, by the provision of the PWS specifying that the contractor "chooses the precise labor mix" necessary to complete the assignment. (ECF 17-3 at 62.)  As an example, the plaintiff supposes that NAVFAC SE assigns ASG a project exclusively seeking architectural services.  In that case, it reasons, ASG would need to "bring in as many architects as necessary to fulfill the tasks." (ECF 17 at 26.)  If the next project assigned by NAVFAC SE requires a team of civil engineers, ASG would then "replace the architects with as many civil engineers as necessary." (*Id.*)  This reading, the plaintiff argues, is the only one that enables ASG to complete the full range of assignments contemplated within the PWS as incorporated into Section C. (*Id.* at 27.)

Under the plaintiff's reading, the task order requires the contractor to assemble rapidly a highly qualified team suited to each assignment once NAVFAC SE assigns a specific project.  Sections like A.2 specifying the makeup of the team that NAVFAC SE "*anticipate*[*d*]" the awardee would need served to put offerors on notice of the types of professionals the Navy could require them to provide. (*Id.* at 33 (discussing Section A.2, ECF 17-3 at 55).)  ASG read this provision as a sensible warning, because under a firm-fixed-price contract, the contractor would need to provide the requested individuals no matter the cost.  Given the structure of a firm-fixed-price contract, the plaintiff explains, it makes sense to establish a "base/minimum level of service" for the contractor to expect to have to provide. (ECF 17 at 34.)  When the language about a team of 20 professionals appeared as an evaluation criterion in Section M of the solicitation, ASG understood it to require offerors to demonstrate they could provide 20 professionals with a variety of skills; this criterion, ASG argues, did not suggest that providing a team of 20 professionals was an obligation under the task order and a prerequisite to completing any assignments under the task order. (*See id.* at 37.)

ASG argues that a reading of the task order requiring it to hire and maintain a team of 20 facilities technical experts outside of any specific assignments would render the PWS "meaningless, potentially impossible, and illegal." (*Id.*)  First, it asserts that the PWS would be meaningless because if the task order only obligates ASG to provide a team of 20 professionals, then "the scope of work so carefully detailed in the PWS is superfluous and absurd." (*Id.*)  Second, performing the assignments contemplated by the PWS would be impossible.  If ASG is always bound to maintain the slate of professionals proposed in Attachment 2, it "very likely will not be able to perform" assignments requiring, for example, only architects. (*Id.*)  Third, requiring ASG to maintain and complete assignments with a team of 20 predetermined professionals would strip ASG of "its right to determine the 'how' of performance." (*Id.* at 28.)  As a result, NAVFAC SE would have control over performance of the task order in violation of FAR 37.104(d). (*Id.*)

Under the plaintiff's interpretation, the PWS is central.  That section sets forth ASG's "performance obligations under the [task order]." (ECF 24 at 11.)  Each section of the task order

that references the contractor's performance, the plaintiff notes, points the reader to the PWS. (*Id.*) ASG interprets the deliverables section, F.4, to list "8 types of deliverables of work-product anticipated to be performed based on PWS tasks." (ECF 17 at 28-29.) It argues that the representative team ASG proposed in Attachment 4 of the solicitation, while incorporated into the contract, is not an "irrevocable promise to deliver these personnel in a manner unmoored from the rest of the contract." (ECF 24 at 18.)

## 2.    The defendant's interpretation

In the defendant's interpretation, the task order's central purpose is to provide NAVFAC SE with a team of 20 facilities technical experts to advise on projects at NAS Jacksonville as they arise. Its reading starts from the text of Section A, in which the task order notes that a team of 20 professionals is the "base/minimum level of service." (ECF 23-2 at 3.) This requirement has been clear, the defendant argues, since the solicitation, which noted in its evaluation criteria—Section M—that offerors "shall submit" a team that reflected the requirements specified in Section A.2, *i.e.*, a team of 20 professionals. (*Id.* at 118.)

In addition to these express requirements of the solicitation and task order, the solicitation made clear that the team proposed by each offeror on Attachment 4 of its proposal would be "incorporated into the task order at the time of award." (ECF 23-3 at 118.) ASG confirmed its understanding of this fact when, in reply to the contracting officer's pre-award email, its president acknowledged that ASG was aware that, if awarded the task order, it would be obligated to provide a team whose qualifications matched those it had listed in Attachment 4 of its proposal. (ECF 23-3 at 217.)

Because the purpose of the task order is to provide a team of 20 professionals to advise NAVFAC SE at NAS Jacksonville, the defendant argues that the task order permits NAVFAC SE to review the resumes of prospective team members. (ECF 23 at 47.) The first deliverable due according to the schedule provided in Section F.4 required ASG to submit resumes of the 20 prospective team members within five days of task order award. (*Id.*) The defendant argues that neither this requirement, nor NAVFAC SE's ability to accept the resumes in accordance with Section G.6, violates FAR 37.104's prohibition on personal service contracts. (*Id.* at 49, 14.) During drafting, a contracting officer implemented safeguards to avoid a personal services contract and formally certified this fact before publication of the task order. (*Id.* at 49.) The task order is not a personal services contract, the defendant argues, and NAVFAC SE did not create one by "trying to enforce the contract terms" and reviewing ASG's deliverables. (*Id.*)

## 3.    The defendant's interpretation is the only reasonable one

The fact that the task order is a firm-fixed-price contract is not itself dispositive. A firm-fixed-price contract "is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract." FAR 16.202-1. Such a contract does not, however, necessarily entitle the contractor to the full amount of compensation when it does not perform the contract in full. *See Pacific Coast Community Services v. United States*, 858 Fed. Appx. 346, 349 (Fed. Cir. 2021) ("[A] firm-fixed-price contract requires the contractor to charge the government a fixed price for services but does not provide that the government must pay that

price when the contractor does not deliver the services."). Section H.8 provides for a price reduction if the contractor's team membership falls below 20 people. (ECF 17-3 at 84.) Here, the monthly rate NAVFAC SE was to pay ASG was the total cost of employing each of the 20 professionals, $218,870.00. (ECF 17-3 at 89 (showing the monthly cost of each employee); ECF 17 at 30 (stating the monthly cost, which reflects the sum of each employee's monthly rate).) Following the structure of a firm-fixed-price contract, ASG requested this monthly amount in each of its certified claims to the contracting officer. (ECF 17-3 at 1509-12, 1743, 2239-41.)

ASG argues, however, that the provisions of the task order specifying a team of 20 reflect the Navy's best estimate of how many employees, and their respective qualifications, would be required to fulfill the requirements of the task order. ASG relies on the word "anticipates" in Section A. (ECF 23-2 at 3 (emphasis added) ("at the time of initial contract award, the [g]overnment *anticipates*" a staff of 20 experts).) ASG explains that the provisions reflecting a team of 20 were designed to allow offerors, and the eventual awardee, to price their offers appropriately, because under a firm-fixed-price contract, the awardee would bear the financial risk if it ultimately required more resources to fulfill the assignments NAVFAC SE gave it. The parties have provided conflicting readings of the task order, but no party has suggested that provisions of the task order itself are internally inconsistent such that the Seaport NxG contract's order of precedence clause would apply to resolve the conflict. Overall, the defendant's interpretation best harmonizes all the task order's provisions and is most consistent with its purpose. The first section of the task order makes a team of 20 technical experts a requirement from the outset. Section A.2 opens with the proviso, relied on by ASG, that "at the time of initial contract award, the [g]overnment anticipate[d]" that a staff of 20 experts across specified disciplines would be required, and that the team would be "subject to change." (*Id.*) In the next sentence, however, Section A.2 specified that "the staff of twenty (20) professionals is the *base/minimum* level of service." (*Id.* (emphasis added).)

Later sections comport with or do not conflict with Section A's language. Section B supports the defendant's reading. Under Section B, the Navy retained the option to increase the number of employees working for the contractor on the task order. If the contractor retained the full discretion to determine appropriate staffing for any assignment, there would be no need for the Navy to have retained the option of awarding the contractor additional funds to increase the size of the team.

The PWS, Section C, "requires the contractor to provide, manage, and supervise a multidisciplinary team of facilities technical experts." (*Id.* at 10.) The PWS provides that the contractor chooses "the precise labor and staffing mix" to fulfill assignments. (*Id.*) The PWS is silent on the size or composition of the "staffing mix." The PWS is the heart of the task order. A contractor would expect this central part of the contract to specify in detail what tasks will be performed; other provisions often reflect boilerplate language to guide the parties' execution of those tasks. In this case, however, it is the PWS that is almost perfunctory, and the surrounding sections more specific. In this regard, the task order is written inside-out.

Although not expressed as clearly as it should have been, the PWS implicitly requires the contractor to provide *a team* ready to advise on any projects NAVFAC SE assigns to it. As part of its supervisory role over its employees under the task order, ASG had to provide NAVFAC

14

**Appx16**

SE with a weekly report setting out, among other items, "active projects for each [facilities technical expert]"; ASG was not required to report each week on the progress of each assigned project. (*Id.* at 12.) This requirement contemplates a standing team ready to take on projects as they are assigned so that the Navy can track the work of the team members, rather than track the staffing of discrete assignments.

In Section F.4, the calendar of deliverables assumes a team of 20 professionals.[5] The calendar required that, "[w]ithin five days of award of task order," the awardee was required to submit a "resume for each position proposed in accordance with the [c]ontractor's proposal and the PWS." (*Id.* at 19.) The parties dispute what "task order" means in this context. The plaintiff contends that the term refers to individual project assignments issued under the Jacksonville task order. (ECF 17 at 35.) Only after NAVFAC SE issues an assignment (which the plaintiff refers to as a "task"), would ASG be obligated to submit resumes for that assignment within five days. (*Id.*) The defendant interprets "task order" to refer to the Jacksonville task order. (ECF 23 at 47.) This interpretation requires that the 20 resumes of the members of ASG's prospective team would have been due by October 3, 2022, five days after award of the Jacksonville task order. (*See* ECF 23-2 at 19.)

The defendant's interpretation of the table of deliverables is the better reading of the task order. The term "task order" is singular and does not contemplate multiple submissions. On the other hand, other deliverables listed on the table contemplate multiple submissions, with various due dates "at project milestones" or "weekly." (*Id.*) These plural "project milestones" contrast with the singular reference to "task order," suggesting that deliverables regarding assignments under the Jacksonville task order would occur repeatedly. In this context, the one-time, singular reference to "task order" most logically refers to the Jacksonville task order, and not the recurring assignments within it. If ASG were required to submit resumes at the outset of each assignment under the Jacksonville task order, the deliverable table would use language reflecting those repeated submissions, just like the project milestones and weekly report deliverables. Unless context requires otherwise, a term should be read consistently throughout at least the

---

[5] Section F.4 contains the following deliverables:

1. Design Drawings & Specifications. Date of Submission: At project milestones (ex: 35%, 65%, 100%).
2. Requests for Proposals (RFP). Date of Submission: 100% Pre-Final.
3. Design Review Comments. Date of Submission: At project milestones (ex: 35%, 65%, 100%).
4. Quantity Takeoffs for Cost Estimates. Date of Submission: At project milestones (ex: 35%, 65%, 100%).
5. Construction Cost Estimates. Date of Submission: At project milestones (ex: 35%, 65%, 100%).
6. Project Status Report for Assigned Projects. Date of Submission: Weekly.
7. Work Schedule. Date of Submission: Monthly (due by the 5th working day of the month).
8. Resume for each position proposed in accordance with the Contractor's proposal and the PWS. Date of Submission: Within five days of award of task order. (ECF 23-2 at 19.)

15

same provision of a contract. *See Imation Corp. v. Koninklijke Philips Elecs. N.V.*, 586 F.3d 980, 990 (Fed. Cir. 2009) (cleaned up) ("A proper interpretation of a contract generally assumes consistent usage of terms throughout the [a]greement.").

Further, a "task order" is defined as "an order for services placed against an established contract or with government sources." FAR 2.101. Interpreting "task order" to mean the Jacksonville task order comports with this definition in the FAR, because the Jacksonville task order was issued pursuant to an established government contract: the Seaport NxG Contract. The Jacksonville task order also expressly identifies itself as a task order in Section A.1. Section A.1 notes that the Jacksonville task order is a "Firm Fixed Price (FFP) task order." (ECF 17-3 at 55.)

The singular word "award" in Section F.4 also suggests the full slate of resumes was due on October 2, 2022, and not five days after NAVFAC SE issues each assignment. Assignments given to ASG under the task order would not be "awarded" to it; once ASG was awarded the Jacksonville task order, there would be no competition for further assignments under that task order. Therefore, it is implausible to interpret the phrase "award of the task order" as referring to the order of each assignment given to ASG by NAVFAC SE under the Jacksonville task order.

Section G of the task order provides further support for the defendant's interpretation that the task order requires a fulltime team of 20 professionals as the baseline of performance under the contract. Section G contains a section titled "Submission and Substitutions of Key Personnel." (ECF 23-2 at 25.) In explaining the resume requirement, Section G.6 notes that "all resumes for proposed individuals will be submitted after award in accordance with Section F.4." (*Id.* 25.) Again, the term "award" in the singular is best read refer to the award of the Jacksonville task order, because assignments given to the contractor under that task order would not be "awarded." In addition, the term appears again in the singular. Under the contract, the Navy expected to make multiple assignments to the contractor; use of the singular "award" is best construed as applying to the one award of the governing Jacksonville task order.

Upon submitting resumes for its 20 team members, the contractor had to certify that the proposed individuals had "agreed to accept the position upon acceptance by the [g]overnment." (*Id.*) This language again suggests that the Navy's goal under the contract was to hire a vetted team of professionals.[6]

---

[6] In his first submission of resumes to the Navy, ASG's president seemed to share this interpretation. As noted in Section I.B, above at 5-6, he wrote to the contracting officer's representative on October 3, 2022, that he had "been able to obtain 2 of the 20" and would continue to submit resumes "until all 20 [were] filled." (ECF 23-2 at 223.) This interpretation changed gradually, beginning with an October 6, 2022, email in which ASG's president pushed back against NAVFAC SE's request that future resumes comply with the labor mix ASG had provided in Attachment 2 of the task order. He noted there that it was "up to ASG to [ ] hire who

16

Finally, interpreting Section A.2's language according to its ordinary usage gives meaning to Section H.8, which describes what would happen when the contractor's team experiences a labor shortage. Section H.8 provides that "[i]f at any time there is a vacancy within the [c]ontractor's team (i.e. all twenty (20) positions are not filled)," the contractor must fill the vacancy within five days, or the Navy would reduce payments to the contractor otherwise due for that vacant position until another professional joins the team. (*Id.* at 32.) This clause is meaningless if the contract does not require ASG to provide and maintain a team of 20 professionals.

Essentially, the plaintiff treats the PWS as the central and governing portion of the contract. Under ASG's reading, the other sections of the task order are important in providing the obligations and limits of the parties' contractual relationship, but only the PWS establishes the contractor's obligations under the task order. A PWS is the "statement of work . . . that describes the required results in clear, specific and objective terms with measurable outcomes." FAR 2.101. As previously noted, it is hard to conceive or explain why the PWS does not include any reference to what the defendant now insists is the contract's central purpose, *i.e.*, to provide the Navy with a team of 20 professionals. Perhaps the Navy thought that by placing the requirement for a team of 20 professionals in Section A.2, it was highlighting the primary purpose of the task order for offerors; if that is what the Navy thought it was doing, its effort was ineffective. Contractors generally look to the PWS to ascertain exactly what goods or services they will be obligated to provide or perform under a contract. The provisions that surround the PWS typically support it by providing boilerplate mechanisms to guide the parties' execution of the contract. Here, however, it is the PWS that describes the advisory work of the contractor's team in broad, generic language, while the surrounding provisions more clearly require a team of 20. A simple reference to the hiring of 20 professionals when the PWS already mentions the contractor's "team" could have avoided this entire dispute, both preserving ASG's standing as a reputable government contractor and the Navy's progress on its essential projects.

A court must read all provisions of a contract together and give effect to each of them. The provisions of the Jacksonville task order are best harmonized if Section A.2 is taken at face value: while the Navy could only anticipate its precise needs, the awardee-supplied team of 20 interdisciplinary professionals was the "base/minimum level of service." Section C describes the assignments the contractor's "interdisciplinary team" will be given to accomplish; Section F requires the contractor to submit resumes of its prospective team members "within five days of award of task order"; Section G describes the required content of the resumes and explains that the prospective employees must agree to work "upon acceptance by the government"; and Section H mandates that the contractor maintain its staff of 20 at all times or face a payment reduction. The plaintiff's interpretation requiring only a to-be-determined team of an

---

it has reasons to believe in good faith can deliver services per Section C." (*Id.* at 230.) He began to protest the Navy's interpretation of the number of professionals required under the task order in an October 13, 2022, email, writing that ASG has "the prerogative to change the labor mix and quantity as [ASG] deem[s] fit to execute the work." (*Id.* at 269.)

unspecified makeup corresponding to specific assignments is inconsistent with the language of Section A.2 and requires strained interpretations of the other provisions of the contract.

The logistical processes involved in performance of the task order also support the defendant's interpretation that a team of 20 professionals was a central requirement of the task order. The contractor's authority to choose a staffing mix in the PWS does not mean that the Navy expected the contractor to overhaul the makeup of its team in response to each individual assignment. Both parties address the onboarding process all the professionals had to undergo before they could report to work. The defendant explained that the security and background screenings for each proposed ASG employee could take up to two months before that employee could access NAS Jacksonville to perform the assignment. (ECF 23 at 13.) Emails submitted by the plaintiff convey ASG's frustration that the onboarding process was moving more slowly than expected. (*See, e.g.,* ECF 17-3 at 361, 374.) The existence of these administrative hurdles further strains ASG's reading of what the task order required. These mandatory processes are also antithetical to the one-year term of the task order. NAVFAC SE would need to have ASG assemble a team as soon as it awarded the task order so that the team could "provide advice and technical assistance" to the Navy's projects at NAS Jacksonville, as the task order required. (ECF 23-2 at 10.) A workflow in which NAVFAC SE assigns a project to ASG, ASG then recruits and hires qualified personnel, the personnel then undergo screening and onboarding for two months, and only then can provide the services needed by the Navy is impracticable. A reading that requires this result, as the plaintiff's does, is therefore implausible and should be avoided.

The defendant's reading of the task order is consistent with the plain meaning of the task order language, best harmonizes all provisions of the task order, and is the reasonable interpretation, given the task order's purpose. The plaintiff's interpretation does not produce a reading of the task order that gives meaning to all of its parts to effect the Navy's purpose: to have ASG provide a team of 20 professionals who satisfied the qualifications described in ASG's proposal.

### B.    Personal Services Contract

Given that the defendant's interpretation of the task order is the only reasonable one, the next step is to analyze whether, under that interpretation, the task order becomes a personal services contract that would violate FAR 37.104 or an improperly executed time and materials contract under FAR 16.601.

The plaintiff's primary argument in advocating for its interpretation of the task order is that under the government's reading the task order is an illegal personal services contract. An interpretation that renders a contract illegal cannot be a reasonable interpretation. *See Bay Co., FL v. United States*, 112 Fed. Cl. 195, 202 (2015); *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327, 333 (1999) (quoting *Hobbs v. McLean*, 117 U.S. 567, 576 (1886)) ("'where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted'"). Here, the defendant's interpretation of the task order is the reasonable construction, so it must be determined whether that interpretation renders the contract

18

illegal.  The "difference between a de facto 'personal services contract' and a nonpersonal services contract often means the difference between an unlawful and a lawful services contract." *Off. of Fed. Contract Compliance Progs. v. Florida Hosp. of Orlando,* 2013 WL 3981196, at *17 (U.S. Dep't of Labor Adm. Rev. Bd. Jul. 22, 2013) (en banc).

FAR 37.104(a) defines a personal services contract as one "characterized by the employer-employee relationship it creates between the [g]overnment and the contractor's personnel."  Such a contract is illegal because it "circumvents" laws that govern the procedures for hiring federal employees.  *Id.*  In assessing a contract, the "key question" is whether the government will "exercise relatively continuous supervision and control over the contractor personnel performing the contract."  FAR 37.104(c).  The FAR lists six factors that guide an assessment of whether a personal services contract exists:

> 1. Performance on site.
>
> 2. Principal tools and equipment furnished by the Government.
>
> 3. Services are applied directly to the integral effort of agencies or an organizational subpart in furtherance of assigned function or mission.
>
> 4. Comparable services, meeting comparable needs, are performed in the same or similar agencies using civil service personnel.
>
> 5. The need for the type of service provided can reasonably be expected to last beyond 1 year.
>
> 6. The inherent nature of the service, or the manner in which it is provided, reasonably requires directly or indirectly, Government direction or supervision of contractor employees.

FAR 37.104(d).

Of these factors, the last one aligns most closely with the FAR's "key question" underlying whether an employer-employee relationship between a contractor's staff and the government has been created.

Caselaw closely adheres to the FAR's designation of the government's degree of supervision over contractor personnel as the "key question" in determining whether a contract is impermissibly for personal services.  As the Federal Circuit has noted, "the principal ground on which a contract will be found to be a personal services contract . . . is the degree of supervision to which the contracting employees were subject under the contract."  *Seh Ahn Lee v. United States*, 895 F.3d 1363, 1371 (Fed. Cir. 2018).  The fact that some of the factors listed in FAR 37.104(d) are met under a contract does not "'per se render[ ] the contract a personal services contract'"; instead, such factors "are merely 'to be used as indicia of continuous supervision and control of contractor personnel by the government.'"  *John Douglas Burke v. Dept. Health & Human Services,* CBCA 7492, 23-1 B.C.A. ¶ 38304 (Mar. 10, 2023) (quoting *W.B. Jolley*, B-234146, 89-1 CPD ¶ 339 (Comp. Gen. Mar. 31, 1989)).

19

Before issuing the solicitation, the Navy analyzed whether the task order would constitute an illegal personal services contract. The contracting officer determined that five of the six factors listed in FAR 37.104(d) would be met under the contract. After this finding, the Navy implemented additional safeguards in the task order. It added language to clarify that "the contractor [would] choose[ ] the precise labor and staffing mix" and to require "the contractor to provide, manage, and supervise" the team. (ECF 23-2 at 10.) With these provisions, even though ASG's employees were working onsite and with government-provided tools, ASG would assign and control the daily activities of its employees performing work under the task order. The lack of Navy control over ASG's employees would prevent the creation of an employer-employee relationship between the government and ASG personnel. (ECF 23 at 49; *see also* ECF 23-2 at 10.)

The fact that several of the factors of FAR 37.104(d) would be met does not necessarily mean that the task order violates the FAR. In *Seh Ahn Lee v. United States*, the Federal Circuit explained that the FAR 37.104(d) factors are "far from definitive." 895 F.3d at 1371. Indeed, meeting several of FAR 37.104(d)'s analysis criteria "does not dictate that an executed contract will be deemed void." *Id.* at 1372. Instead, the controlling question, which assumes greater importance as more of the other factors listed in 37.104(d) are met, is whether the language of the task order or the manner of its administration gives the agency control over the work of the contractor's employees.

The task order specifically left the control of ASG's employees to ASG. The Navy would assign work to ASG. ASG would then select which members of the 20-person team were appropriate to execute the work; ASG would control the daily activities of the team. The Navy was allowed to inspect the completed work to ensure it was satisfactory. Otherwise, from the assignment of the work to its completion and review by the Navy, ASG was in control of its team. Because ASG, not the Navy, assigned work to its employees and managed their daily activities, the Navy's determination that the task order would not create a personal services contract was correct.

Although the task order did not create a personal services contract, the inquiry is not ended. A personal services contract may arise either by the contract's terms or the "manner of its administration during performance." FAR 37.104(c)(1). ASG argues that NAVFAC SE's insistence on reviewing and retaining approval rights over the hiring of ASG's employees created a personal services contract. The defendant's interpretation of Section G.6 as allowing NAVFAC SE to approve resumes would lead, the plaintiff argues, to "an absurd result of NAVFAC SE controlling the labor mix as if this were a personal services contract." (ECF 24 at 15.) By reviewing resumes to ensure they meet the qualifications promised by ASG in Attachment 4 of its proposal (and incorporated into the task order as Attachment 2), the plaintiff argues, NAVFAC SE "stripped [ASG] of its right to determine the 'how' of performance." (*Id.* at 27.) Beyond violating the FAR, the plaintiff contends that the Navy's actions also violated the PWS, which grants the contractor the right to choose the labor mix needed to complete an assignment. (*Id.* at 39-40.) It does not argue why this "labor mix" could not refer to a selection of professionals drawn from the contractor's existing team of 20. Once the Navy approves the contractor's team, the task order gives the contractor freedom to select which individuals to use on any given assignment.

When examining performance, "an order for a specific article or services, with the right to reject the finished product or result, is not the type of supervision or control that converts . . . an independent contractor (such as a contractor employee) into a [g]overnment employee." FAR 37.104(c).

While no federal court has addressed FAR 37.104(d) in a factually similar case, decisions of the Comptroller General have found that agencies may review contractor personnel without creating a personal services contract. *See The Endmark Corp.*, B-278139 (Comp. Gen. Dec. 31, 1997) (quoting FAR 37.104(c)(1)) ("an agency's evaluation of a key employee's performance . . . does not establish or evidence an employer-employee relationship marked by 'relatively continuous supervision and control [of the non-government employee] by a [g]overnment officer or employee,' as required to constitute an improper personal services contract"). Agencies have "discretion to determine [their] needs and the best method to accommodate them," and a party's disagreement with the agency's determination about its needs "does not establish that the agency's judgment is unreasonable." *Matter of: Ronald L. Glass*, B-417855 (Comp. Gen. Nov. 21, 2019).

The plaintiff's argument that NAVFAC SE's administration of the task order created an illegal personal services contract rests on the Navy's insistence on reviewing the resumes and approving the hiring of ASG's prospective employees. The plaintiff neither alleges nor argues that other statements or actions by NAVFAC SE resulted in an employer-employee relationship between ASG's personnel and the Navy. The plaintiff also does not allege that NAVFAC SE attempted to supervise or interfere with ASG's employees' performance of their jobs at all; its argument pertains only to allegations that NAVFAC SE attempted to supervise ASG's recruitment of those employees. Once on site, neither the task order nor NAVFAC SE's actions reflect that the agency had any supervisory involvement with ASG's team members.

The Navy's insistence on reviewing and approving resumes, on its own, is not sufficient to demonstrate that NAVFAC SE administered the task order in a manner that created a personal services contract. The delivery by ASG of resumes matching the qualifications of the contractor's proposal was a specific deliverable under Section F.4 of the task order. The right of NAVFAC SE to review and accept the resumes of proposed ASG team members before the team member could work at NAS Jacksonville is "not the type of supervision or control that converts" a contractor into a government employee. FAR 37.104(c)(1). Once it is established that the task order calls for an interdisciplinary team of 20 professionals, it is within NAVFAC SE's discretion to screen resumes of prospective contractor employees. Agencies have discretion to determine their needs and the best way to meet them. *See Ronald L. Glass*, B-417855. This limited involvement by the Navy of reviewing resumes to ensure they met the qualifications proposed by ASG in its response to the solicitation does not create a personal services contract; rather the submission of the resumes of its prospective employees was a deliverable under the contract. The Navy's review and approval of resumes did not involve any governmental supervision of ASG's employees, and none of these actions interfered with ASG's performance of the task order in violation of the covenant of good faith and fair dealing.

Following the defendant's reasonable interpretation of the task order does not render the task order an illegal personal services contract in violation of FAR 37.104.

21

The plaintiff has not shown that the defendant's interpretation of the task order could render it an improperly executed time and materials contract. The FAR mandates that time and materials contracts be used "only when it is not possible . . . to estimate accurately the extent or duration of the work or to anticipate costs with any reasonable degree of confidence." FAR 16.601(c). In such a case, the contracting officer must prepare and submit for agency approval "a determination and findings that no other contract type is suitable." FAR 16.601(d)(1). The defendant's interpretation of the task order is the most reasonable, and under that reading the task order is a one-year contract which requires the contractor to provide a team of 20 advisory professionals. The duration is established and undisputed by the plaintiff. Moreover, the firm-fixed-price structure of the task order means that the costs are established beyond "a reasonable degree of certainty." ASG provided the cost of employing each team member in its proposal, and those rates added together became the contract price. Nothing in the record indicates that these variables were ever in doubt by ASG or NAVFAC SE, and no evidence suggests that NAVFAC SE ever contemplated implementing a time and materials pricing structure.

### C.    Termination for Default

The defendant correctly interprets the task order to require the contractor to provide a multidisciplinary team of 20 professionals, and such an interpretation does not create a personal services contract in violation of FAR 37.104. Even so, the evidence must also demonstrate that NAVFAC SE correctly effected the termination in accordance with the requirements of FAR 52.249-8 and FAR 49.402-3.

#### 1.    FAR 52.249-8

Pursuant to FAR 49.504(a)(1), the provisions of FAR 52.249-8 were included in the contract. Under FAR 52.249-8(a)(1), an agency may terminate a contract for default if the contractor fails to "(i) [d]eliver the supplies or to perform the services within the time specified in th[e] contract or any extension; (ii) [m]ake progress, so as to endanger performance of th[e] contract . . . ; or (iii) [p]erform any of the other provisions of th[e] contract." An agency's right to terminate a contract for default pursuant to subparagraphs (ii) and (iii) requires that it first provide the contractor notice and offer the contractor a 10-day window to cure the failure. FAR 52.249-8(a)(2).

The Federal Circuit provided the standard for evaluating an agency's decision to terminate a contract for default in *Lisbon Contractors, Inc. v. United States.* 828 F.2d 759 (Fed. Cir. 1987). A termination for default "require[s] a reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance." *Id.* at 765 (cleaned up).

The plaintiff argues that "there is no allegation and no evidence of any failure to perform services requested by NAVFAC SE." (ECF 24 at 23.) It explains that ASG performed every task NAVFAC SE assigned it. Despite ASG's successful performance of each assigned task, the Navy insisted that ASG's performance was inadequate because ASG did not hire or provide

22

resumes for the number of facilities technical experts required under the task order. (*Id.*) As a result, the plaintiff argues, NAVFAC SE wrongly claimed that it could not assign ASG all the projects it anticipated accomplishing through the task order. (*Id.*)

The plaintiff's argument turns on its reading, already rejected, of what the task order required. Under the plaintiff's reading of the task order, the Navy assigns projects to ASG, and only then does ASG assemble the appropriate team; because ASG performed each sub-task the Navy assigned, it did not fail to perform any work required by the task order. (*Id.* at 23-24.) The defendant argues that because the point of the task order was to appoint a team of 20 facilities technical experts, the plaintiff's failure to do so clearly justifies a termination for default. (ECF 25 at 23.) The defendant has offered the better reading of the contract. Under this reading, ASG failed to perform.

Given that the defendant's reading of the task order is the better one, the plaintiff's argument (ECF 24 at 25) that it did not fail to perform as required under the task order is rejected. *See* 52.249-8(a)(1)(i). ASG had to submit 20 resumes to the Navy within five days of the award of the task order, which was October 3, 2022. ASG did not do so by that date. Indeed, ASG never did so.

The plaintiff's analyses of the termination according to FAR 52.249-8(a)(1) factors (ii) and (iii) follow the same logic and must be rejected for the same reason: they rest on ASG's flawed reading of the requirements of the task order.

ASG materially failed to perform. It did not provide the required services of assembling a fully staffed team. This failure in turn limited the projects that NAVFAC SE could assign. ASG never made sufficient progress toward assembling the team. As of March 2023, halfway through the contract period, ASG had retained only four employees who reported to work at NAS Jacksonville. (ECF 25-1 at 71-72 (decl. of the contracting officer).) Given ASG's performance halfway through the contract term, it was reasonable for the contracting officer to determine that insufficient time remained both for ASG to assemble the required team and for that team to carry out the tasks NAVFAC SE sought to assign to the team.[7]

_____

[7] The contracting officer also supported the default termination decision by asserting that ASG had repudiated the task order. According to the defendant, repudiation occurred during a meeting on January 5, 2023. (ECF 23-2 at 672.) During that meeting ASG's president allegedly stated that ASG "cannot meet Attachment 4" (referring to Attachment 2 of the task order). (*Id.*) NAVFAC SE viewed this statement as anticipatory repudiation. (*Id.*) ASG has repeatedly denied that it repudiated the task order. In an email to a NAVFAC SE representative, ASG's president wrote, "at no time did I repudiate [ ]or state for the record that I 'cannot meet Attachment 4' but did articulate the challenges as I have consistently done." (ECF 23-2 at 1520.) On the evidence provided by the parties, ASG's alleged repudiation of the task order is a factual dispute unfit for resolution on summary judgment. Because the termination for default was

23

While meeting any one factor of FAR 52.249-8(a)(1) can justify termination for default, ASG's performance met all three of them.

ASG also argues that even if its performance provided proper grounds to terminate the task order pursuant to FAR 52.249-8, the termination is nevertheless invalid because ASG did not receive a notice to cure as required by FAR 52.249-8(a)(2). (ECF 24 at 26.) ASG argues that although it received a cure notice letter and a show cause notice on December 5, 2022, January 20, 2023, respectively, these notices did not provide ASG with the opportunity to cure. It could only cure, the plaintiff reasons, by performing assignments. ASG "repeatedly requested information on projects to perform and was denied that information." (*Id.*) This alleged denial prevented ASG from having a meaningful opportunity to cure. (*Id.*)

The plaintiff's argument, again, relies on its faulty reading of the task order, already rejected. It received and responded to the December 5, 2022 and January 20, 2023 notices. (ECF 23-2 at 532-34, 674-86.) Rather than hire a team of 20 in response to either notice, ASG continued to insist that it was not required to do so. On their face, the notices provided to ASG reflect that the Navy had advised ASG of its failures to perform and gave ASG the opportunity to comply with the terms of the task order. ASG never did. The Navy effected the termination in compliance with FAR 52.249-8.

## 2.   NAVFAC SE's Consideration of the FAR 49.402-3(f) factors

When an agency is contemplating a termination for default, FAR 49.402-3(f) outlines seven factors that the contracting officer "shall consider":

> (1) The terms of the contract and applicable laws and regulations.
>
> (2) The specific failure of the contractor and the excuses for the failure.
>
> (3) The availability of the supplies or services from other sources.
>
> (4) The urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor.
>
> (5) The degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts.

---

appropriate regardless of whether repudiation occurred, the factual dispute over this issue does not preclude summary judgment.

(6) The effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments.

(7) Any other pertinent facts and circumstances.

The plaintiff argues that NAVFAC SE failed to satisfy the requirements of FAR 49.402-3(f) when terminating ASG for default.  The plaintiff asserts that consideration of the seven factors found in FAR 49.402-3(f) is mandatory, and that the contracting officer failed to consider any of them.  (ECF 17 at 47-48; ECF 24 at 30-33.)  As a result, the plaintiff contends, the contracting officer failed to exercise his discretion as required to terminate ASG for default, thereby undercutting the validity of the termination.  (ECF 24 at 30-31.)  The defendant argues that the seven factors identified in FAR 49.402-3(f) are irrelevant because ASG failed to perform under the task order and repudiated.  (ECF 23 at 55.)

Although FAR 49.402-3(f) requires contracting officers to consider the seven factors in deciding to terminate a contract for default, the evaluation of these factors is not a prerequisite to a valid termination.  *DCX, Inc. v. Perry*, 79 F.3d 132, 135 (Fed. Cir. 1996).  The provision of the FAR setting out these factors does not confer any enforcement rights on a defaulting contractor.  *Id*.; *see also Minelli v. United States*, 1995 WL 424858, at *4 (Fed. Cir. July 18, 1995).  Accordingly, a contracting officer's failure to consider one or more of the factors does not require that a termination for default be converted into a termination for convenience.  *DCX, Inc.*, 79 F.3d at 135.

While the factors outlined in FAR 49.402-3(f) are not mandatory, an agency's compliance or noncompliance with them may aid a court in determining whether a particular termination for default reflects an abuse of the contracting officer's discretion.  *See Darwin Constr. Co. v. United States*, 811 F.2d 593, 598-599 (Fed.Cir.1987); *DCX, Inc.*, 79 F.3d at 135; *PCL Const. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 781 (2000) (contracting officer's decision to terminate contract for default was reasonable despite no written analysis of enumerated consideration of FAR 49.402-3(f) factors when the contractor had repudiated the contract); *Alutiiq Mfg. Contractors, LLC v. United States*, 143 Fed. Cl. 689, 698 (2019) (termination for default was improper when contracting officer only considered the first two FAR 49.402-3(f) factors).

The record reflects that the contracting officer considered all seven factors.  In a document titled "Request to Terminate for Default," signed by the contracting officer on March 17, 2023, the contracting officer outlined and discussed each factor in detail.[8]  (ECF 25-1 at 62-

---

[8] At oral argument, the plaintiff objected to the admission of this document, which was made part of the record only with the defendant's reply brief filed five days before the argument.  Because caselaw reflects that the plaintiff does not have an affirmative right to receive an agency's analysis of each factor, the time at which the plaintiff became aware of this document does not affect the validity of the termination analysis.  *See DCX, Inc.*, 79 F.3d at 135.  The date

25

63.)  The evidence is sufficient to demonstrate that the contracting officer considered the factors required by the FAR, and the contracting officer's analysis of those factors does not reflect an abuse of discretion.  Indeed, given the correct reading of the task order, even without the Navy's analysis of the FAR 49.403-3(f) factors, the termination for default would not be an abuse of the Navy's discretion because ASG failed to perform the contract.

## VI.    CONCLUSION

The plaintiff is not entitled to judgment on the pleadings or summary judgment.  Although ASG has presented a possible reading of the task order, the defendant's reading is the reasonable one.  The defendant's reading of the task order does not convert it into an illegal contract for personal services or an improperly executed time and materials contract.  ASG was properly notified of the deficiencies in its performance and received an opportunity to cure.  It did not cure, and the contracting officer's decision to terminate the task order for default complied with the FAR and was not an abuse of discretion.

The plaintiff's motions for judgment on the pleadings and summary judgment are denied.  The defendant's motion for summary judgment is granted.  A separate order will be filed concurrently with this opinion directing the Clerk to enter judgment.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

---

of the contracting officer's signature on the request, March 17, 2023, reflects that the contracting officer considered the relevant factors before NAVFAC SE made the decision to terminate for default.  The document is relied on for that point only, and not for the substance of its analysis.  Regardless, a court retains discretion to consider untimely submissions when there is no undue prejudice to the opposing party.  *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1333 (Fed. Cir. 2012) (finding that the district court did not abuse its discretion in allowing a party to make late amendments to its pleadings in part because the non-moving party was not unduly prejudiced by the amendment).  Considering the timing and limited use of this document in resolving its claims, ASG has not been unduly prejudiced by its introduction.

26

## <u>STATUTES</u>

**10 U.S.C. § 3401 Task and Delivery Order Contracts: Definitions**

In this chapter:

**(1) Delivery order contract**.—The term "delivery order contract" means a contract for property—

>**(A)** that does not procure or specify a firm quantity of property (other than a minimum or maximum quantity); and

>**(B)** that provides for the issuance of orders for the delivery of property during the period of the contract.

**(2) Task order contract**.—The term "task order contract" means a contract for services—

>**(A)** that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity); and

>**(B)** that provides for the issuance of orders for the performance of tasks during the period of the contract.

**10 U.S.C. § 3403 Task and Delivery Order Contracts: General Authority.**

>**(a) Authority to award.**   Subject to the requirements of this section, section 3406 of this title [10 USCS § 3406], and other applicable law, the head of an agency may enter into a task or delivery order contract (as defined in section 3401 of this title [10 USCS § 3401]) for procurement of services or property.

>**(b) Solicitation.**   The solicitation for a task or delivery order contract shall include the following:

>>**(1)**  The period of the contract, including the number of options to extend the contract and the period for which the contract may be extended under each option, if any.

>>**(2)**  The maximum quantity or dollar value of the services or property to be procured under the contract.

**Add1**

**(3)** A statement of work, specifications, or other description that reasonably describes the general scope, nature, complexity, and purposes of the services or property to be procured under the contract.

**(c) Applicability of restriction on use of noncompetitive procedures.** The head of an agency may use procedures other than competitive procedures to enter into a task or delivery order contract under this section only if—

**(1)** an exception in subsection (a) of section 3204 of this title [10 USCS § 3204] applies to the contract; and

**(2)** the use of such procedures is approved in accordance with subsection (e) of such section.

**(d) Single and multiple contract awards.**

**(1)** Exercise of authority. The head of an agency may exercise the authority provided in this section—

**(A)** to award a single task or delivery order contract; or

**(B)** if the solicitation states that the head of the agency has the option to do so, to award separate task or delivery order contracts for the same or similar services or property to two or more sources.

**(2)** Determination not required. No determination under section 3203 of this title [10 USCS § 3203] is required for award of multiple task or delivery order contracts under paragraph (1)(B).

**(3)** When single source awards for task or delivery order contracts exceeding $100,000,000 are allowed.

**(A)** Except as provided under subparagraph (B), no task or delivery order contract in an amount estimated to exceed $100,000,000 (including all options) may be awarded to a single source unless the head of the agency determines in writing that—

**(i)** the task or delivery orders expected under the contract are so integrally related that only a single source can efficiently perform the work;

**(ii)** the contract provides only for firm, fixed price task orders or delivery orders for—

**(I)** products for which unit prices are established in the contract; or

**Add2**

**(II)** services for which prices are established in the contract for the specific tasks to be performed;

**(iii)** only one source is qualified and capable of performing the work at a reasonable price to the government; or

**(iv)** because of exceptional circumstances, it is necessary in the public interest to award the contract to a single source.

**(B)** A task or delivery order contract in an amount estimated to exceed $100,000,000 (including all options) may be awarded to a single source without the written determination otherwise required under subparagraph (A) if the head of the agency has made a written determination pursuant to section 3204(a) of this title [10 USCS § 3204(a)] that procedures other than competitive procedures may be used for the awarding of such contract.

**(4)** Regulations. The regulations implementing this subsection shall—

**(A)** establish a preference for awarding, to the maximum extent practicable, multiple task or delivery order contracts for the same or similar services or property under the authority of paragraph (1)(B); and

**(B)** establish criteria for determining when award of multiple task or delivery order contracts would not be in the best interest of the Federal Government.

**(e) Contract modifications.**   A task or delivery order may not increase the scope, period, or maximum value of the task or delivery order contract under which the order is issued. The scope, period, or maximum value of the contract may be increased only by modification of the contract.

**(f) Contract period.**   The head of an agency entering into a task or delivery order contract under this section may provide for the contract to cover any period up to five years and may extend the contract period for one or more successive periods pursuant to an option provided in the contract or a modification of the contract. The total contract period as extended may not exceed 10 years unless such head of an agency determines in writing that exceptional circumstances necessitate a longer contract period.

**(g) Inapplicability to contracts for advisory and assistance services.** Except as otherwise specifically provided in section 3405 of this title [10 USCS § 3405], this section does not apply to a task or delivery order

**Add3**

contract for the procurement of advisory and assistance services (as defined in section 1105(g) of title 31 [31 USCS § 1105(g)]).

**(h) Relationship to other contracting authority.**   Nothing in this section may be construed to limit or expand any authority of the head of an agency or the Administrator of General Services to enter into schedule, multiple award, or task or delivery order contracts under any other provision of law.

## 10 U.S.C. § 3405 Task order contracts: advisory and assistance services

**(a) Advisory and assistance services defined.**   In this section, the term "advisory and assistance services" has the meaning given such term in section 1105(g) of title 31 [31 USCS § 1105(g)].

**(b) Authority to award.**

**(1)**   Subject to the requirements of this section, section 3406 of this title [10 USCS § 3406], and other applicable law, the head of an agency may enter into a task order contract (as defined in section 3401 of this title [10 USCS § 3401]) for procurement of advisory and assistance services.

**(2)**   The head of an agency may enter into a task order contract for procurement of advisory and assistance services only under the authority of this section.

**(c) Limitation on contract period.**   The period of a task order contract entered into under this section, including all periods of extensions of the contract under options, modifications, or otherwise, may not exceed five years unless a longer period is specifically authorized in a law that is applicable to such contract.

**(d) Content of notice.**   The notice required by section 1708 of title 41 [41 USCS § 1708] and section 8(e) of the Small Business Act (15 U.S.C. 637(e)) shall reasonably and fairly describe the general scope, magnitude, and duration of the proposed task order contract in a manner that would reasonably enable a potential offeror to decide whether to request the solicitation and consider submitting an offer.

**(e) Required content of solicitation and contract.**

**(1)**   Solicitation. The solicitation for the proposed task order contract shall include the information (regarding services) described in section 3403(b) of this title [10 USCS § 3403(b)].

**Add4**

**(2)** Contract. A task order contract entered into under this section shall contain the same information that is required by paragraph (1) to be included in the solicitation of offers for that contract.

**(f) Multiple awards.**

**(1)** Authority to make multiple awards. The head of an agency may, on the basis of one solicitation, award separate task order contracts under this section for the same or similar services to two or more sources if the solicitation states that the head of the agency has the option to do so.

**(2)** Content of solicitation. If, in the case of a task order contract for advisory and assistance services to be entered into under this section, the contract period is to exceed three years and the contract amount is estimated to exceed $10,000,000 (including all options), the solicitation shall—

**(A)** provide for a multiple award authorized under paragraph (1); and

**(B)** include a statement that the head of the agency may also elect to award only one task order contract if the head of the agency determines in writing that only one of the offerers is capable of providing the services required at the level of quality required.

**(3)** Nonapplication. Paragraph (2) does not apply in the case of a solicitation for which the head of the agency concerned determines in writing that, because the services required under the task order contract are unique or highly specialized, it is not practicable to award more than one contract.

**(g) Contract modifications.**

**(1)** Increase in scope, period, or maximum value of contract only by modification of contract. A task order may not increase the scope, period, or maximum value of the task order contract under which the order is issued. The scope, period, or maximum value of the contract may be increased only by modification of the contract.

**(2)** Use of competitive procedures. Unless use of procedures other than competitive procedures is authorized by an exception in subsection (a) of section 3204 of this title [10 USCS § 3204] and approved in accordance with subsection (e) of such section, competitive procedures shall be used for making such a modification.

**(3)** Notice. Notice regarding the modification shall be provided in accordance with section 1708 of title 41 [41 USCS § 1708] and section 8(e) of the Small Business Act (15 U.S.C. 637(e)).

**(h) Contract extensions.**

**(1)** When contract may be extended. Notwithstanding the limitation on the contract period set forth in subsection (c) or in a solicitation or contract pursuant to subsection (f), a task order contract entered into by the head of an agency under this section may be extended on a sole-source basis for a period not exceeding six months if the head of such agency determines that—

**(A)** the award of a follow-on contract has been delayed by circumstances that were not reasonably foreseeable at the time the initial contract was entered into; and

**(B)** the extension is necessary in order to ensure continuity of the receipt of services pending the award of, and commencement of performance under, the follow-on contract.

**(2)** Limit of one extension. A task order contract may be extended under the authority of paragraph (1) only once and only in accordance with the limitations and requirements of this subsection.

**(i) Inapplicability to certain contracts.**   This section does not apply to a contract for the acquisition of property or services that includes acquisition of advisory and assistance services if the head of an agency entering into such contract determines that, under the contract, advisory and assistance services are necessarily incident to, and not a significant component of, the contract.

## 10 U.S.C. § 3406 Task and Delivery Order Contracts: Orders.

**(a) Applicability.**   This section applies to task and delivery order contracts entered into under sections 3403 and 3405 of this title [10 USCS §§ 3403 and 3405].

**(b) Issuance of orders.**   The following actions are not required for issuance of a task or delivery order under a task or delivery order contract:

**Add6**

**(1)** A separate notice for such order under section 1708 of title 41 [41 USCS § 1708] or section 8(e) of the Small Business Act (15 U.S.C. 637(e)).

**(2)** Except as provided in subsection (c), a competition (or a waiver of competition approved in accordance with section 3204(e) of this title [10 USCS § 3204(e)]) that is separate from that used for entering into the contract.

**(c) Multiple award contracts.**   When multiple task or delivery order contracts are awarded under section 3403(d)(1)(B) or 3405(f) of this title [10 USCS § 3403(d)(1)(B) or 3405(f)], all contractors awarded such contracts shall be provided a fair opportunity to be considered, pursuant to procedures set forth in the contracts, for each task or delivery order in excess of $2,500 that is to be issued under any of the contracts unless—

**(1)** the agency's need for the services or property ordered is of such unusual urgency that providing such opportunity to all such contractors would result in unacceptable delays in fulfilling that need;

**(2)** only one such contractor is capable of providing the services or property required at the level of quality required because the services or property ordered are unique or highly specialized;

**(3)** the task or delivery order should be issued on a sole-source basis in the interest of economy and efficiency because it is a logical follow-on to a task or delivery order already issued on a competitive basis;

**(4)** it is necessary to place the order with a particular contractor in order to satisfy a minimum guarantee; or

**(5)** the task or delivery order satisfies one of the exceptions in section 3204(a) of this title [10 USCS § 3204(a)] to the requirement to use competitive procedures.

**(d) Enhanced competition for orders in excess of $5,000,000.**   In the case of a task or delivery order in excess of $5,000,000, the requirement to provide all contractors a fair opportunity to be considered under subsection (c) is not met unless all such contractors are provided, at a minimum—

**(1)** a notice of the task or delivery order that includes a clear statement of the agency's requirements;

**(2)** a reasonable period of time to provide a proposal in response to the notice;

**Add7**

**(3)** disclosure of the significant factors and subfactors, including cost or price, that the agency expects to consider in evaluating such proposals, and their relative importance;

**(4)** in the case of an award that is to be made on a best value basis, a written statement documenting the basis for the award and the relative importance of quality and price or cost factors; and

**(5)** an opportunity for a post-award debriefing consistent with the requirements of section 3304 of this title [10 USCS § 3304].

**(e) Statement of work.**   A task or delivery order shall include a statement of work that clearly specifies all tasks to be performed or property to be delivered under the order.

**(f) Protests.**

**(1)**  A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for—

**(A)**  a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or

**(B)**  a protest of an order valued in excess of $25,000,000.

**(2)**  Notwithstanding section 3556 of title 31 [31 USCS § 3556], the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).

**(g) Task and delivery order ombudsman.**

**(1)**  Appointment or designation and responsibilities. Each head of an agency who awards multiple task or delivery order contracts pursuant to section 3403(d)(1)(B) or 3405(f) of this title [10 USCS § 3403(d)(1)(B) or 3405(f)] shall appoint or designate a task and delivery order ombudsman who shall be responsible for reviewing complaints from the contractors on such contracts and ensuring that all of the contractors are afforded a fair opportunity to be considered for task or delivery orders when required under subsection (c).

**(2)**  Who is eligible. The task and delivery order ombudsman shall be a senior agency official who is independent of the contracting officer for the contracts and may be the agency's competition advocate.

**Add8**

**(h) Architectural and engineering services.**

**(1)** Qualification-based selections required. Task or delivery orders for architectural and engineering services issued under section 3403 or 3405 of this title [10 USCS § 3403 or 3405] shall be qualification-based selections executed in accordance with chapter 11 of title 40 [40 USCS §§ 1101 et seq.].

**(2)** Multiple award contracts. When issuing a task or delivery order for architectural and engineering services under a multiple award contract, the head of an agency may not routinely request additional information relating to qualifications from the contractor for such multiple award contract.

## 10 U.S.C. § 3801

. . .

**(b) Payment Dates for Contractors That Are Small Business Concerns**.—

**(1)** Prime contractors.—

For a prime contractor (as defined in section 8701 of title 41) that is a small business concern (as defined in section 3 of the Small Business Act (15 U.S.C. 632)), the Secretary of Defense shall, to the fullest extent permitted by law, establish an accelerated payment date with a goal of 15 days after receipt of a proper invoice for the amount due.

**(2)** Subcontractors.—

For a prime contractor that subcontracts with a small business concern, the Secretary of Defense shall, to the fullest extent permitted by law, establish an accelerated payment date with a goal of 15 days after receipt of a proper invoice for the amount due if the prime contractor agrees to make payments to the subcontractor in accordance with the accelerated payment date, to the maximum extent practicable, without any further consideration from or fees charged to the subcontractor.

**31 U.S.C. § 1105 Budget contents and submission to Congress.**

. . .

**(g)**

> **(1)** The Director of the Office of Management and Budget shall establish the funding for advisory and assistance services for each department and agency as a separate object class in each budget annually submitted to the Congress under this section.

> **(2)**
>
>> **(A)** In paragraph (1), except as provided in subparagraph (B), the term "advisory and assistance services" means the following services when provided by nongovernmental sources:
>>> **(i)** Management and professional support services.
>>>
>>> **(ii)** Studies, analyses, and evaluations.
>>>
>>> **(iii)** Engineering and technical services.
>>
>> **(B)** In paragraph (1), the term "advisory and assistance services" does not include the following services:
>>
>>> **(i)** Routine automated data processing and telecommunications services unless such services are an integral part of a contract for the procurement of advisory and assistance services.
>>> **(ii)** Architectural and engineering services, as defined in section 1102 of title 40.
>>>
>>> **(iii)** Research on basic mathematics or medical, biological, physical, social,
>>> psychological, or other phenomena.

. . .

**40 U.S.C. § 1102 Definitions.**

In this chapter, the following definitions apply:

**(1) Agency head**.—

The term "agency head" means the head of a department, agency, or bureau of the Federal Government.

**(2) Architectural and engineering services**.—The term "architectural and engineering services" means—

> **(A)** professional services of an architectural or engineering nature, as defined by state law, if applicable, that are required to be performed or approved by a person licensed, registered, or certified to provide the services described in this paragraph;

> **(B)** professional services of an architectural or engineering nature performed by contract that are associated with research, planning, development, design, construction, alteration, or repair of real property; and

> **(C)** other professional services of an architectural or engineering nature, or incidental services, which members of the architectural and engineering professions (and individuals in their employ) may logically or justifiably perform, including studies, investigations, surveying and mapping, tests, evaluations, consultations, comprehensive planning, program management, conceptual designs, plans and specifications, value engineering, construction phase services, soils engineering, drawing reviews, preparation of operating and maintenance manuals, and other related services.

**(3) Firm**.—

The term "firm" means an individual, firm, partnership, corporation, association, or other legal entity permitted by law to practice the profession of architecture or engineering.

**Add11**

# FAR REGULATIONS

**2.101 Definitions**.

(a) . . . Advisory and assistance services means those **services** provided under contract by nongovernmental sources to support or improve: organizational policy development; decision-making; management and administration; program and/or project management and administration; or R&D activities...In rendering the foregoing services, outputs may take the form of information, advice, opinions, alternatives, analyses, evaluations, recommendations, training and the day-to-day aid of support personnel needed for the successful performance of ongoing Federal operations. All advisory and assistance services are classified in one of the following definitional subdivisions:

> (1) Management and professional support services, i.e., contractual services that provide assistance, advice or training for the efficient and effective management and operation of organizations, activities (including management and support services for R&D activities), or systems. These services are normally closely related to the basic responsibilities and mission of the agency originating the requirement for the acquisition of services by contract. Included are efforts that support or contribute to improved organization of program management, logistics management, project monitoring and reporting, data collection, budgeting, accounting, performance auditing, and administrative technical support for conferences and training programs.

> . . .

. . .

# 15.204-1 Uniform Contract Format.

**(a)** Contracting officers shall prepare solicitations and resulting contracts using the uniform contract format outlined in Table 15-1 of this subsection.

**(b)** Solicitations using the uniform contract format shall include Parts I, II, III, and IV (see 15.204-2 through 15.204-5). Upon award, contracting officers shall not physically include Part IV in the resulting contract, but shall retain it in the contract file. (See 4.1201(c).) The representations and certifications are incorporated by

reference in the contract by using 52.204-19 (see 4.1202(b)) or for acquisitions of commercial products and commercial services see 52.212-4(v).

**Table 15-1. — UNIFORM CONTRACT FORMAT**

| Section | Title |
|---|---|
| Part I — The Schedule | |
| A | Solicitation/contract form. |
| B | Supplies or services and prices/costs. |
| C | Description/ specifications/statement of work. |
| D | Packaging and marking. |
| E | Inspection and acceptance. |
| F | Deliveries or performance. |
| G | Contract administration data. |
| H | Special contract requirements. |
| Part II — Contract Clauses | |
| I | Contract clauses. |
| Part III — List of Documents, Exhibits, and Other Attachments | |
| J | List of attachments. |
| Part IV — Representations and Instructions. | |
| K | Representations, |

**Add13**

**Table 15-1. — UNIFORM CONTRACT FORMAT**

| Section | Title |
|---|---|
| | certifications, and other statements of offerors or respondents. |
| L | Instructions, conditions, and notices to offerors or respondents. |
| M | Evaluation factors for award. |

## 16.0 Scope of Part.

This part describes types of contracts that may be used in acquisitions.  It prescribes policies and procedures and provides guidance for selecting a contract type appropriate to the circumstances of the acquisition.

## 16.2 Fixed-Price Contracts.

## 16.201 General

**(a)** Fixed-price types of contracts provide for a firm price or, in appropriate cases, an adjustable price. Fixed-price contracts providing for an adjustable price may include a ceiling price, a target price (including target cost), or both. Unless otherwise specified in the contract, the ceiling price or target price is subject to adjustment only by operation of contract clauses providing for equitable adjustment or other revision of the contract price under stated circumstances. The contracting officer shall use firm-fixed-price or fixed-price with economic price adjustment contracts when acquiring commercial products and commercial services, except as provided in 12.207(b).

**(b)** Time-and-materials contracts and labor-hour contracts are not fixed-price contracts.

**Add14**

**16.202 Firm-Fixed-Price Contracts.**

**16.202-1 Description.**

A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties. The contracting officer may use a firm-fixed-price contract in conjunction with an award-fee incentive (see 16.404) and performance or delivery incentives (see 16.402-2 and 16.402-3) when the award fee or incentive is based solely on factors other than cost. The contract type remains firm-fixed-price when used with these incentives.

**16.202-2 Application.**

A firm-fixed-price contract is suitable for acquiring commercial products or commercial services (see parts  2 and 12) or for acquiring other supplies or services on the basis of reasonably definite functional or detailed specifications (see part  11) when the contracting officer can establish fair and reasonable prices at the outset, such as when-

**(a)** There is adequate price competition;

**(b)** There are reasonable price comparisons with prior purchases of the same or similar supplies or services made on a competitive basis or supported by valid certified cost or pricing data;

**(c)** Available cost or pricing information permits realistic estimates of the probable costs of performance; or

**(d)** Performance uncertainties can be identified and reasonable estimates of their cost impact can be made, and the contractor is willing to accept a firm fixed price representing assumption of the risks involved.

**Add15**

**16.203-1 Description**

**(a)** A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:

**(1)** Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.

**(2)** Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.

**(3)** Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

**(b)** The contracting officer may use a fixed-price contract with economic price adjustment in conjunction with an award-fee incentive (see 16.404) and performance or delivery incentives (see 16.402-2 and 16.402-3) when the award fee or incentive is based solely on factors other than cost. The contract type remains fixed-price with economic price adjustment when used with these incentives.

**16.203-2 Application**

A fixed-price contract with economic price adjustment may be used when (i) there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance, and (ii) contingencies that would otherwise be included in the contract price can be identified and covered separately in the contract. Price adjustments based on established prices should normally be restricted to industry-wide contingencies. Price adjustments based on labor and material costs should be limited to contingencies beyond the contractor's control. For use of economic price adjustment in sealed bid contracts, see 14.408-4.

**(a)** In establishing the base level from which adjustment will be made, the contracting officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause.

**Add16**

**(b)** In contracts that do not require submission of certified cost or pricing data, the contracting officer shall obtain adequate data to establish the base level from which adjustment will be made and may require verification of data submitted.

## 16.203-3 Limitations

A fixed-price contract with economic price adjustment shall not be used unless the contracting officer determines that it is necessary either to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices.

## 16.203-4 Contract Clauses

**(a)** Adjustment based on established prices — standard supplies.

**(1)** The contracting officer shall, when contracting by negotiation, insert the clause at 52.216-2, Economic Price Adjustment — Standard Supplies, or an agency-prescribed clause as authorized in subparagraph (2) below, in solicitations and contracts when all of the following conditions apply:

> **(i)** A fixed-price contract is contemplated.

> **(ii)** The requirement is for standard supplies that have an established catalog or market price.

> **(iii)** The contracting officer has made the determination specified in 16.203-3.

**(2)** If all the conditions in subparagraph (a)(1) above apply and the contracting officer determines that the use of the clause at 52.216-2 is inappropriate, the contracting officer may use an agency-prescribed clause instead of the clause at 52.216-2.

**(3)** If the negotiated unit price reflects a net price after applying a trade discount from a catalog or list price, the contracting officer shall document in the contract file both the catalog or list price and the discount. (This does not apply to prompt payment or cash discounts.)

**(4)** The contracting officer may modify the clause by increasing the 10 percent limit on aggregate increases specified in 52.216-2(c)(1), upon approval by the chief of the contracting office.

**(b)** Adjustment based on established prices — semistandard supplies.

**Add17**

**(1)** The contracting officer shall, when contracting by negotiation, insert the clause at 52.216-3, Economic Price Adjustment — Semistandard Supplies, or an agency-prescribed clause as authorized in subparagraph (2) below, in solicitations and contracts when all of the following conditions apply:

    **(i)** A fixed price contract is contemplated.

    **(ii)** The requirement is for semistandard supplies for which the prices can be reasonably related to the prices of nearly equivalent standard supplies that have an established catalog or market price.

    **(iii)** The contracting officer has made the determination specified in 16.203-3.

**(2)** If all conditions in subparagraph (b)(1) above apply and the contracting officer determines that the use of the clause at 52.216-3 is inappropriate, the contracting officer may use an agency-prescribed clause instead of the clause at 52.216-3.

**(3)** If the negotiated unit price reflects a net price after applying a trade discount from a catalog or list price, the contracting officer shall document in the contract file both the catalog or list price and the discount. (This does not apply to prompt payment or cash discounts.)

**(4)** Before entering into the contract, the contracting officer and contractor must agree in writing on the identity of the standard supplies and the corresponding line items to which the clause applies.

**(5)** If the supplies are standard, except for preservation, packaging, and packing requirements, the clause prescribed in 16.203-4(a), shall be used rather than this clause.

**(6)** The contracting officer may modify the clause by increasing the 10 percent limit on aggregate increases specified in 52.216-3(c)(1), upon approval by the chief of the contracting office.

**(c)** Adjustments based on actual cost of labor or material.

**(1)** The contracting officer shall, when contracting by negotiation, insert a clause that is substantially the same as the clause at 52.216-4, Economic Price Adjustment — Labor and Material, or an agency-prescribed clause as authorized in subparagraph (2) below, in solicitation and contracts when all of the following conditions apply:

    **(i)** A fixed-price contract is contemplated.

**Add18**

**(ii)** There is no major element of design engineering or development work involved.

**(iii)** One or more identifiable labor or material cost factors are subject to change.

**(iv)** The contracting officer has made the determination specified in 16.203-3.

**(2)** If all conditions in subparagraph (c)(1) above apply and the contracting officer determines that the use of the clause at 52.216-4 is inappropriate, the contracting officer may use an agency-prescribed clause instead of the clause at 52.216-4.

**(3)** The contracting officer shall describe in detail in the contract Schedule —

**(i)** The types of labor and materials subject to adjustment under the clause;

**(ii)** The labor rates, including fringe benefits (if any) and unit prices of materials that may be increased or decreased; and

**(iii)** The quantities of the specified labor and materials allocable to each unit to be delivered under the contract.

**(4)** In negotiating adjustments under the clause, the contracting officer shall —

**(i)** Consider work in process and materials on hand at the time of changes in labor rates, including fringe benefits (if any) or material prices;

**(ii)** Not include in adjustments any indirect cost (except fringe benefits as defined in 31.205-6(m)) or profit; and

**(iii)** Consider only those fringe benefits specified in the contract Schedule.

**(5)** The contracting officer may modify the clause by increasing the 10 percent limit on aggregate increases specified in 52.216-4(c)(4), upon approval by the chief of the contracting office.

**(d)** Adjustments based on cost indexes of labor or material. The contracting officer should consider using an economic price adjustment clause based on cost indexes of labor or material under the circumstances and subject to approval as described in subparagraphs (1) and (2) below.

**(1)** A clause providing adjustment based on cost indexes of labor or materials may be appropriate when —

**Add19**

**(i)** The contract involves an extended period of performance with significant costs to be incurred beyond 1 year after performance begins;

**(ii)** The contract amount subject to adjustment is substantial; and

**(iii)** The economic variables for labor and materials are too unstable to permit a reasonable division of risk between the Government and the contractor, without this type of clause.

**(2)** Any clause using this method shall be prepared and approved under agency procedures. Because of the variations in circumstances and clause wording that may arise, no standard clause is prescribed.

## 16.204 Fixed-price incentive contracts

A fixed-price incentive contract is a fixed-price contract that provides for adjusting profit and establishing the final contract price by a formula based on the relationship of final negotiated total cost to total target cost. Fixed-price incentive contracts are covered in subpart 16.4, Incentive Contracts. See 16.403 for more complete descriptions, application, and limitations for these contracts. Prescribed clauses are found at 16.406.

## 16.205-1 Description

A fixed-price contract with prospective price redetermination provides for (a) a firm fixed price for an initial period of contract deliveries or performance and (b) prospective redetermination, at a stated time or times during performance, of the price for subsequent periods of performance.
16.207 Firm-Fixed-Price, Level-of-Effort Term Contracts.

## 16.205-2 Application

A fixed-price contract with prospective price redetermination may be used in acquisitions of quantity production or services for which it is possible to negotiate a fair and reasonable firm fixed price for an initial period, but not for subsequent periods of contract performance.

**(a)** The initial period should be the longest period for which it is possible to negotiate a fair and reasonable firm fixed price. Each subsequent pricing period should be at least 12 months.

**Add20**

**(b)** The contract may provide for a ceiling price based on evaluation of the uncertainties involved in performance and their possible cost impact. This ceiling price should provide for assumption of a reasonable proportion of the risk by the contractor and, once established, may be adjusted only by operation of contract clauses providing for equitable adjustment or other revision of the contract price under stated circumstances.

### 16.205-3 Limitations

This contract type shall not be used unless—

**(a)** Negotiations have established that (1) the conditions for use of a firm-fixed-price contract are not present (see 16.202-2), and (2) a fixed-price incentive contract would not be more appropriate;

**(b)** The contractor's accounting system is adequate for price redetermination;

**(c)** The prospective pricing periods can be made to conform with operation of the contractor's accounting system; and

**(d)** There is reasonable assurance that price redetermination actions will take place promptly at the specified times.

### 16.205-4 Contract clause

The contracting officer shall, when contracting by negotiation, insert the clause at 52.216-5, Price Redetermination — Prospective, in solicitations and contracts when a fixed-price contract is contemplated and the conditions specified in 16.205-2 and 16.205-3(a) through (d) apply.

### 16.206-1 Description

A fixed-ceiling-price contract with retroactive price redetermination provides for (a) a fixed ceiling price and (b) retroactive price redetermination within the ceiling after completion of the contract.

### 16.206-2 Application

A fixed-ceiling-price contract with retroactive price redetermination is appropriate for research and development contracts estimated at the simplified acquisition threshold or less when it is established at the outset that a fair and reasonable firm fixed price cannot be negotiated and that the amount involved and short performance period make the use of any other fixed-price contract type impracticable.

**(a)** A ceiling price shall be negotiated for the contract at a level that reflects a reasonable sharing of risk by the contractor. The established ceiling price may be

adjusted only if required by the operation of contract clauses providing for equitable adjustment or other revision of the contract price under stated circumstances.

**(b)** The contract should be awarded only after negotiation of a billing price that is as fair and reasonable as the circumstances permit.

**(c)** Since this contract type provides the contractor no cost control incentive except the ceiling price, the contracting officer should make clear to the contractor during discussion before award that the contractor's management effectiveness and ingenuity will be considered in retroactively redetermining the price.

### 16.206-3 Limitations

This contract type shall not be used unless—

**(a)** The contract is for research and development and the estimated cost is the simplified acquisition threshold or less;

**(b)** The contractor's accounting system is adequate for price redetermination;

**(c)** There is reasonable assurance that the price redetermination will take place promptly at the specified time; and

**(d)** The head of the contracting activity (or a higher-level official, if required by agency procedures) approves its use in writing.

### 16.206-4 Contract clause

The contracting officer shall, when contracting by negotiation, insert the clause at 52.216-6, Price Redetermination — Retroactive, in solicitations and contracts when a fixed-price contract is contemplated and the conditions in 16.206-2 and 16.206-3(a) through (d) apply.

### 16.207-1 Description.

A firm-fixed-price, level-of-effort term contract requires-

**(a)** The contractor to provide a specified level of effort, over a stated period of time, on work that can be stated only in general terms; and

**(b)** The Government to pay the contractor a fixed dollar amount.

## 16.207-2 Application.

A firm-fixed-price, level-of-effort term contract is suitable for investigation or study in a specific research and development area. The product of the contract is usually a report showing the results achieved through application of the required level of effort. However, payment is based on the effort expended rather than on the results achieved.

## 16.207-3 Limitations.

This contract type may be used only when-

**(a)** The work required cannot otherwise be clearly defined;
**(b)** The required level of effort is identified and agreed upon in advance;
**(c)** There is reasonable assurance that the intended result cannot be achieved by expending less than the stipulated effort; and
**(d)** The contract price is the simplified acquisition threshold or less, unless approved by the chief of the contracting office.

## 16.3 Cost-Reimbursement Contracts.

## 16.304 Cost-Plus-Incentive-Fee Contracts.

A cost-plus-incentive-fee contract is a cost-reimbursement contract that provides for an initially negotiated fee to be adjusted later by a formula based on the relationship of total allowable costs to total target costs. Cost-plus-incentive-fee contracts are covered in subpart 16.4, Incentive Contracts. See 16.405-1 for a more complete description and discussion of application of these contracts. See 16.301-3 for limitations.

## 16.305 Cost-Plus-Award-Fee Contracts.

A cost-plus-award-fee contract is a cost-reimbursement contract that provides for a fee consisting of (a)a base amount (which may be zero) fixed at inception of the contract and (b)an award amount, based upon a judgmental evaluation by the Government, sufficient to provide motivation for excellence in contract performance. cost-plus-award-fee contracts are covered in subpart 16.4, Incentive Contracts. See 16.401(e) for a more complete description and discussion of the application of these contracts. See 16.301-3 and 16.401(e)(5) for limitations.

**16.306 Cost-Plus-Fixed-Fee Contracts.**

**(a) Description.**

A cost-plus-fixed-fee contract is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract. The fixed fee does not vary with actual cost, but may be adjusted as a result of changes in the work to be performed under the contract. This contract type permits contracting for efforts that might otherwise present too great a risk to contractors, but it provides the contractor only a minimum incentive to control costs.

**(b) Application.**

> **(1)** A cost-plus-fixed-fee contract is suitable for use when the conditions of 16.301-2 are present and, for example-
>
>> **(i)** The contract is for the performance of research or preliminary exploration or study, and the level of effort required is unknown; or
>>
>> **(ii)** The contract is for development and test, and using a cost-plus-incentive-fee contract is not practical.
>
> **(2)** A cost-plus-fixed-fee contract normally should not be used in development of major systems (see part  34) once preliminary exploration, studies, and risk reduction have indicated a high degree of probability that the development is achievable and the Government has established reasonably firm performance objectives and schedules.

**(c) Limitations.**

No cost-plus-fixed-fee contract shall be awarded unless the contracting officer complies with all limitations in 15.404-4(c)(4)(i) and 16.301-3.

**(d) Completion and Term Forms.**

A cost-plus-fixed-fee contract may take one of two basic forms-completion or term**.**

**Add24**

**(1)** The completion form describes the scope of work by stating a definite goal or target and specifying an end product. This form of contract normally requires the contractor to complete and deliver the specified end product (e.g., a final report of research accomplishing the goal or target) within the estimated cost, if possible, as a condition for payment of the entire fixed fee. However, in the event the work cannot be completed within the estimated cost, the Government may require more effort without increase in fee, provided the Government increases the estimated cost.

**(2)** The term form describes the scope of work in general terms and obligates the contractor to devote a specified level of effort for a stated time period. Under this form, if the performance is considered satisfactory by the Government, the fixed fee is payable at the expiration of the agreed-upon period, upon contractor statement that the level of effort specified in the contract has been expended in performing the contract work. Renewal for further periods of performance is a new acquisition that involves new cost and fee arrangements.

**(3)** Because of the differences in obligation assumed by the contractor, the completion form is preferred over the term form whenever the work, or specific milestones for the work, can be defined well enough to permit development of estimates within which the contractor can be expected to complete the work.

**(4)** The term form shall not be used unless the contractor is obligated by the contract to provide a specific level of effort within a definite time period.

## 16.600 Scope.

Time-and-materials contracts and labor-hour contracts are not fixed-price contracts.

## 32.009-1 General.

**(a)(1)** Pursuant to 31 U.S.C. 3903(a), agencies other than the Department of Defense (DoD) shall provide accelerated payments, to the fullest extent permitted by law, with a goal of 15 days after receipt of a proper invoice and all other required documentation, if a specific payment date is not established by contract, to—

**Add25**

**(i)** Small business contractors; and

**(ii)** Prime contractors that subcontract with a small business concern, if the prime contractor agrees to make payments to the small business subcontractor within 15 days of receiving the accelerated payment from the Government, after receipt of a proper invoice and all other required documentation from the small business subcontractor, to the maximum extent practicable, without any further consideration from or fees charged to the subcontractor.

**(2)** Pursuant to 10 U.S.C. 3801(b), DoD shall provide accelerated payments, to the fullest extent permitted by law, with a goal of 15 days after receipt of a proper invoice and all other required documentation, to—

**(i)** Small business contractors; and

**(ii)** Prime contractors that subcontract with a small business concern, if the prime contractor agrees to make payments to the small business subcontractor within 15 days of receiving the accelerated payment from the Government, after receipt of a proper invoice and all other required documentation from the small business subcontractor, to the maximum extent practicable, without any further consideration from or fees charged to the subcontractor.

**(b)** This acceleration does not provide any new rights under the Prompt Payment Act and does not affect the application of the Prompt Payment Act late payment interest provisions.

**(c)** Agencies may use the Governmentwide commercial purchase card as a method of payment (see 32.1108) to facilitate accelerated payment, to earn refunds, and to reduce invoice processing costs.

## 36.000 Scope of Part.

This part prescribes policies and procedures peculiar to contracting for construction and architect-engineer services. It includes requirements for using certain clauses and standard forms that apply also to contracts for dismantling, demolition, or removal of improvements.

**37.000 Scope of Part.**

This part prescribes policy and procedures that are specific to the acquisition and management of services by contract. This part applies to all contracts and orders for services regardless of the contract type or kind of service being acquired. This part requires the use of performance-based acquisitions for services to the maximum extent practicable and prescribes policies and procedures for use of performance-based acquisition methods (see subpart 37.6). Additional guidance for research and development services is in part 35; architect-engineering services is in part 36; information technology is in part 39; and transportation services is in part 47. parts 35, 36, 39, and 47 take precedence over this part in the event of inconsistencies. This part includes, but is not limited to, contracts for services to which 41 U.S.C. chapter 67, Service Contract Labor Standards, applies (see subpart 22.10).

**37.1 Service Contracts-General.**

**37.101 Definitions.**

As used in this part-

**Adjusted hourly rate** (including uncompensated overtime) is the rate that results from multiplying the hourly rate for a 40-hour work week by 40, and then dividing by the proposed hours per week which includes uncompensated overtime hours over and above the standard 40-hour work week. For example, 45 hours proposed on a 40-hour work week basis at $20 per hour would be converted to an uncompensated overtime rate of $17.78 per hour ($20.00 x 40 / 45 = $17.78).

**Child care services** means child protective services (including the investigation of child abuse and neglect reports), social services, health and mental health care, child (day) care, education (whether or not directly involved in teaching), foster care, residential care, recreational or rehabilitative programs, and detention, correctional, or treatment services.

**Nonpersonal services** contract means a contract under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the Government and its employees.

**Service contract** means a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply. A service contract may be either a nonpersonal or personal contract. It can also cover services performed by either professional or nonprofessional personnel whether on an individual or organizational basis. Some of the areas in which service contracts are found include the following:

**(1)** Maintenance, overhaul, repair, servicing, rehabilitation, salvage, modernization, or modification of supplies, systems, or equipment.

**(2)** Routine recurring maintenance of real property.

**(3)** Housekeeping and base services.

**(4)** Advisory and assistance services.

**(5)** Operation of Government-owned equipment, real property, and systems.

**(6)** Communications services.

**(7)** Architect-Engineering (see subpart 36.6).

**(8)** Transportation and related services (see part 47).

**(9)** Research and development (see part 35).

Uncompensated overtime means the hours worked without additional compensation in excess of an average of 40 hours per week by direct charge employees who are exempt from the Fair Labor Standards Act. Compensated personal absences such as holidays, vacations, and sick leave shall be included in the normal work week for purposes of computing uncompensated overtime hours.

## 37.102 Policy

**(a)** Performance-based acquisition (see subpart 37.6) is the preferred method for acquiring services (Public Law 106-398, section 821). When acquiring services, including those acquired under supply contracts or orders, agencies must-

**Add28**

**(1)** Use performance-based acquisition methods to the maximum extent practicable, except for-

 **(i)** Architect-engineer services acquired in accordance with 40 U.S.C.1101 et seq.;

 **(ii)** Construction (see part 36);

 **(iii)** Utility services (see part 41); or

 **(iv)** Services that are incidental to supply purchases; and

**(2)** Use the following order of precedence (Public Law106-398, section 821(a));

 **(i)** A firm-fixed price performance-based contract or task order.

 **(ii)** A performance-based contract or task order that is not firm-fixed price.

 **(iii)** A contract or task order that is not performance-based.

**(b)** Agencies shall generally rely on the private sector for commercial services (see OMB Circular No. A-76, Performance of Commercial Activities and subpart 7.3).

**(c)** Agencies shall not award a contract for the performance of an inherently governmental function (see subpart 7.5).

**(d)** Non-personal service contracts are proper under general contracting authority.

**(e)** Agency program officials are responsible for accurately describing the need to be filled, or problem to be resolved, through service contracting in a manner that ensures full understanding and responsive performance by contractors and, in so doing, should obtain assistance from contracting officials, as needed. To the maximum extent practicable, the program officials shall describe the need to be filled using performance-based acquisition methods.

**(f)** Agencies shall establish effective management practices in accordance with Office of Federal Procurement Policy (OFPP) Policy Letter 93-1, Management Oversight of Service Contracting, to prevent fraud, waste, and abuse in service contracting.

**Add29**

**(g)** Services are to be obtained in the most cost-effective manner, without barriers to full and open competition, and free of any potential conflicts of interest.

**(h)** Agencies shall ensure that sufficiently trained and experienced officials are available within the agency to manage and oversee the contract administration function.

**(i)** Agencies shall ensure that service contracts that require the delivery, use, or furnishing of products are consistent with subpart 23.1 (see 23.103(c)).

**(j)** Except for DoD, see 15.101–2(d) for limitations on the use of the lowest price technically acceptable source selection process to acquire certain services.

## 37.103 Contracting Officer Responsibility.

**(a)** The contracting officer is responsible for ensuring that a proposed contract for services is proper. For this purpose the contracting officer shall-

    **(1)** Determine whether the proposed service is for a personal or nonpersonal services contract using the definitions at 2.101 and 37.101 and the guidelines in 37.104;

    **(2)** In doubtful cases, obtain the review of legal counsel; and

    **(3)** Document the file (except as provided in paragraph (b) of this section) with-

        **(i)** The opinion of legal counsel, if any,

        **(ii)** A memorandum of the facts and rationale supporting the conclusion that the contract does not violate the provisions in 37.104(b), and

        **(iii)** Any further documentation that the contracting agency may require.

**(b)** Nonpersonal services contracts are exempt from the requirements of subparagraph (a)(3) above.

**(c)** Ensure that performance-based acquisition methods are used to the maximum extent practicable when acquiring services.

**Add30**

**(d)** Ensure that contracts for child care services include requirements for criminal history background checks on employees who will perform child care services under the contract in accordance with 34 U.S.C. 20351, as amended, and agency procedures.

**(e)** Ensure that service contractor reporting requirements are met in accordance with subpart 4.17, Service Contracts Inventory.

**37.104 Personal Services Contracts**.

**(a)** A personal services contract is characterized by the employer-employee relationship it creates between the Government and the contractor's personnel. The Government is normally required to obtain its employees by direct hire under competitive appointment or other procedures required by the civil service laws. Obtaining personal services by contract, rather than by direct hire, circumvents those laws unless Congress has specifically authorized acquisition of the services by contract.

**(b)** Agencies shall not award personal services contracts unless specifically authorized by statute (e.g., 5 U.S.C. 3109) to do so.

**(c) (1)** An employer-employee relationship under a service contract occurs when, as a result of (i) the contract's terms or (ii) the manner of its administration during performance, contractor personnel are subject to the relatively continuous supervision and control of a Government officer or employee. However, giving an order for a specific article or service, with the right to reject the finished product or result, is not the type of supervision or control that converts an individual who is an independent contractor (such as a contractor employee) into a Government employee.

   **(2)** Each contract arrangement must be judged in the light of its own facts and circumstances, the key question always being: Will the Government exercise relatively continuous supervision and control over the contractor personnel performing the contract. The sporadic, unauthorized supervision of only one of a large number of contractor employees might reasonably be considered not relevant, while relatively continuous Government supervision of a substantial number of contractor employees would have to be taken strongly into account (see (d) of this section).

**Add31**

**(d)** The following descriptive elements should be used as a guide in assessing whether or not a proposed contract is personal in nature:

**(1)** Performance on site.

**(2)** Principal tools and equipment furnished by the Government.

**(3)** Services are applied directly to the integral effort of agencies or an organizational subpart in furtherance of assigned function or mission.

**(4)** Comparable services, meeting comparable needs, are performed in the same or similar agencies using civil service personnel.

**(5)** The need for the type of service provided can reasonably be expected to last beyond 1 year.

**(6)** The inherent nature of the service, or the manner in which it is provided, reasonably requires directly or indirectly, Government direction or supervision of contractor employees in order to-

>**(i)** Adequately protect the Government's interest;

>**(ii)** Retain control of the function involved; or

>**(iii)** Retain full personal responsibility for the function supported in a duly authorized Federal officer or employee.

**(e)** When specific statutory authority for a personal service contract is cited, obtain the review and opinion of legal counsel.

**(f)** Personal services contracts for the services of individual experts or consultants are limited by the Classification Act. In addition, the Office of Personnel Management has established requirements which apply in acquiring the personal services of experts or consultants in this manner (e.g., benefits, taxes, conflicts of interest). Therefore, the contracting officer shall effect necessary coordination with the cognizant civilian personnel office.

**Add32**

## 37.105 Competition in service contracting

**(a)** Unless otherwise provided by statute, contracts for services shall be awarded through sealed bidding whenever the conditions in 6.401(a) are met (except see 6.401(b)).

**(b)** The provisions of statute and part 6 of this regulation requiring competition apply fully to service contracts. The method of contracting used to provide for competition may vary with the type of service being acquired and may not necessarily be limited to price competition.

## 37.106 Funding and term of service contracts

**(a)** When contracts for services are funded by annual appropriations, the term of contracts so funded shall not extend beyond the end of the fiscal year of the appropriation except when authorized by law (see paragraph (b) of this section for certain service contracts, 32.703-2 for contracts conditioned upon availability of funds, and 32.703-3 for contracts crossing fiscal years).

**(b)** The head of an executive agency, except NASA, may enter into a contract, exercise an option, or place an order under a contract for severable services for a period that begins in one fiscal year and ends in the next fiscal year if the period of the contract awarded, option exercised, or order placed does not exceed one year (10 U.S.C. 3133 and 41 U.S.C. 3902). Funds made available for a fiscal year may be obligated for the total amount of an action entered into under this authority.

**(c)** Agencies with statutory multiyear authority shall consider the use of this authority to encourage and promote economical business operations when acquiring services.

## 37.107 Service Contract Labor Standards

41 U.S.C. chapter 67, Service Contract Labor Standards, provides for minimum wages and fringe benefits as well as other conditions of work under certain types of service contracts. Whether or not the Service Contract Labor Standards statute applies to a specific service contract will be determined by the definitions and exceptions given in the Service Contract Labor Standards statute, or implementing regulations.

**37.504 Contracting Officials' Responsibilities.**

Contracting officials should ensure that "best practices" techniques are used when contracting for services and in contract management and administration (see OFPP Policy Letter93-1).

**37.600 Scope of Subpart.**

This subpart prescribes policies and procedures for acquiring services using performance-based acquisition methods.

**37.601 General**

**(a)** Solicitations may use either a performance work statement or a statement of objectives (see 37.602).

**(b)** Performance-based contracts for services shall include —

   **(1)** A performance work statement (PWS);

   **(2)** Measurable performance standards (i.e., in terms of quality, timeliness, quantity, etc.) and the method of assessing contractor performance against performance standards; and

   **(3)** Performance incentives where appropriate. When used, the performance incentives shall correspond to the performance standards set forth in the contract (see 16.402-2).

**37.602 Performance Work Statement.**

**(a)** A Performance work statement (PWS) may be prepared by the Government or result from a Statement of objectives (SOO) prepared by the Government where the offeror proposes the PWS.

**(b)** Agencies shall, to the maximum extent practicable-

   **(1)** Describe the work in terms of the required results rather than either "how" the work is to be accomplished or the number of hours to be provided (see 11.002(a)(2) and 11.101);

**Add34**

**(2)** Enable assessment of work performance against measurable performance standards;

**(3)** Rely on the use of measurable performance standards and financial incentives in a competitive environment to encourage competitors to develop and institute innovative and cost-effective methods of performing the work.

**(c)** Offerors use the SOO to develop the PWS; however, the SOO does not become part of the contract. The SOO shall, at a minimum, include-

**(1)** Purpose;

**(2)** Scope or mission;

**(3)** Period and place of performance;

**(4)** Background;

**(5)** Performance objectives, i.e., required results; and

**(6)** Any operating constraints.

## 37.603 Performance standards

**(a)** Performance standards establish the performance level required by the Government to meet the contract requirements. The standards shall be measurable and structured to permit an assessment of the contractor's performance.

**(b)** When offerors propose performance standards in response to a SOO, agencies shall evaluate the proposed standards to determine if they meet agency needs.

## 37.604 Quality assurance surveillance plans

Requirements for quality assurance and quality assurance surveillance plans are in Subpart 46.4. The Government may either prepare the quality assurance surveillance plan or require the offerors to submit a proposed quality assurance surveillance plan for the Government's consideration in development of the Government's plan.

**Add35**

**49.402-3 Procedure for Default**

. . .

**(d)** Subdivisions (a)(1)(ii) and (a)(1)(iii) of the Default clause cover situations when the contractor fails to perform some of the other provisions of the contract (such as not furnishing a required performance bond) or so fails to make progress as to endanger performance of the contract. If the termination is predicated upon this type of failure, the contracting officer shall give the contractor written notice specifying the failure and providing a period of 10 days (or longer period as necessary) in which to cure the failure. When appropriate, this notice may be made a part of the notice described in subparagraph (e)(1) below. Upon expiration of the 10 days (or longer period), the contracting officer may issue a notice of termination for default unless it is determined that the failure to perform has been cured. A format for a cure notice is in 49.607.

**(e) (1)** If termination for default appears appropriate, the contracting officer should, if practicable, notify the contractor in writing of the possibility of the termination. This notice shall call the contractor's attention to the contractual liabilities if the contract is terminated for default, and request the contractor to show cause why the contract should not be terminated for default. The notice may further state that failure of the contractor to present an explanation may be taken as an admission that no valid explanation exists. When appropriate, the notice may invite the contractor to discuss the matter at a conference. A format for a show cause notice is in 49.607.

**(2)** When a termination for default appears imminent, the contracting officer shall provide a written notification to the surety. If the contractor is subsequently terminated for default, a copy of the notice of default shall be sent to the surety.

**(3)** If requested by the surety, and agreed to by the contractor and any assignees, arrangements may be made to have future checks mailed to the contractor in care of the surety. In this case, the contractor must forward a written request to the designated disbursing officer specifically directing a change in address for mailing checks.

**(4)** If the contractor is a small business firm, the contracting officer shall immediately provide a copy of any cure notice or show cause notice to the

contracting office's small business specialist and the Small Business Administration Area Office nearest the contractor. The contracting officer should, whenever practicable, consult with the small business specialist before proceeding with a default termination (see also 49.402-4).

**(f)** The contracting officer shall consider the following factors in determining whether to terminate a contract for default:

> **(1)** The terms of the contract and applicable laws and regulations.

> **(2)** The specific failure of the contractor and the excuses for the failure.

> **(3)** The availability of the supplies or services from other sources.

> **(4)** The urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor.

> **(5)** The degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts.

> **(6)** The effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments.

> **(7)** Any other pertinent facts and circumstances.

. . .

**(j)** If the contracting officer determines before issuing the termination notice that the failure to perform is excusable, the contract shall not be terminated for default. If termination is in the Government's interest, the contracting officer may terminate the contract for the convenience of the Government.

## 52.215-8 Order of Precedence-Uniform Contract Format.

As prescribed in 15.209(h), insert the following clause:

**Add37**

Order of Precedence-uniform Contract Format (Oct 1997)

Any inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order:

**(a)** The Schedule (excluding the specifications).

**(b)** Representations and other instructions.

**(c)** Contract clauses.

**(d)** Other documents, exhibits, and attachments.

**(e)** The specifications.

## 52.232-1 Payments.

As prescribed in 32.111(a)(1), insert the following clause, appropriately modified with respect to payment due date in accordance with agency regulations, in solicitations and contracts when a fixed-price supply contract, a fixed-price service contract, or a contract for nonregulated communication services is contemplated:

Payments (Apr 1984)

The Government shall pay the Contractor, upon the submission of proper invoices or vouchers, the prices stipulated in this contract for supplies delivered and accepted or services rendered and accepted, less any deductions provided in this contract. Unless otherwise specified in this contract, payment shall be made on partial deliveries accepted by the Government if-
**(a)** The amount due on the deliveries warrants it; or

**(b)** The Contractor requests it and the amount due on the deliveries is at least $1,000 or 50 percent of the total contract price.

## 52.232-25 Prompt Payment.

As prescribed in 32.908(c), insert the following clause:

Prompt Payment (Jan 2017)

**Add38**

Notwithstanding any other payment clause in this contract, the Government will make invoice payments under the terms and conditions specified in this clause. The Government considers payment as being made on the day a check is dated or the date of an electronic funds transfer (EFT). Definitions of pertinent terms are set forth in sections 2.101, 32.001, and 32.902 of the Federal Acquisition Regulation. All days referred to in this clause are calendar days, unless otherwise specified. (However, see paragraph (a)(4) of this clause concerning payments due on Saturdays, Sundays, and legal holidays.)

   **(a) Invoice payments**- **(1) Due date**. **(i)** Except as indicated in paragraphs (a)(2) and (c) of this clause, the due date for making invoice payments by the designated payment office is the later of the following two events:

> **(A)** The 30th day after the designated billing office receives a proper invoice from the Contractor (except as provided in paragraph (a)(1)(ii) of this clause).

> **(B)** The 30th day after Government acceptance of supplies delivered or services performed. For a final invoice, when the payment amount is subject to contract settlement actions, acceptance is deemed to occur on the effective date of the contract settlement.

> **(ii)** If the designated billing office fails to annotate the invoice with the actual date of receipt at the time of receipt, the invoice payment due date is the 30th day after the date of the Contractor's invoice, provided the designated billing office receives a proper invoice and there is no disagreement over quantity, quality, or Contractor compliance with contract requirements.

   **(2) Certain food products and other payments**. **(i)** Due dates on Contractor invoices for meat, meat food products, or fish; perishable agricultural commodities; and dairy products, edible fats or oils, and food products prepared from edible fats or oils are-

> **(A)** For meat or meat food products, as defined in section 2(a)(3) of the Packers and Stockyard Act of 1921 ( 7 U.S.C.182(3)), and as further defined in Pub.L.98-181, including any edible fresh or frozen poultry meat, any perishable poultry meat food product, fresh eggs,

**Add39**

and any perishable egg product, as close as possible to, but not later than, the 7th day after product delivery.

**(B)** For fresh or frozen fish, as defined in section 204(3) of the Fish and Seafood Promotion Act of 1986 ( 16 U.S.C. 4003(3)), as close as possible to, but not later than, the 7th day after product delivery.

**(C)** For perishable agricultural commodities, as defined in section 1(4) of the Perishable Agricultural Commodities Act of 1930 ( 7 U.S.C. 499a(4)), as close as possible to, but not later than, the 10th day after product delivery, unless another date is specified in the contract.

**(D)** For dairy products, as defined in section 111(e) of the Dairy Production Stabilization Act of 1983 ( 7 U.S.C. 4502(e)), edible fats or oils, and food products prepared from edible fats or oils, as close as possible to, but not later than, the 10th day after the date on which a proper invoice has been received. Liquid milk, cheese, certain processed cheese products, butter, yogurt, ice cream, mayonnaise, salad dressings, and other similar products, fall within this classification. Nothing in the Act limits this classification to refrigerated products. When questions arise regarding the proper classification of a specific product, prevailing industry practices will be followed in specifying a contract payment due date. The burden of proof that a classification of a specific product is, in fact, prevailing industry practice is upon the Contractor making the representation.

**(ii)** If the contract does not require submission of an invoice for payment (e.g., periodic lease payments), the due date will be as specified in the contract.

**(3) Contractor's invoice.** The Contractor shall prepare and submit invoices to the designated billing office specified in the contract. A proper invoice must include the items listed in paragraphs (a)(3)(i) through (a)(3)(x) of this clause. If the invoice does not comply with these requirements, the designated billing office will return it within 7 days after receipt (3 days for meat, meat food products, or fish; 5 days for perishable agricultural commodities, dairy products, edible fats or oils, and food products prepared from edible fats or oils), with the reasons why it is not a proper invoice. The Government will take into account untimely notification when computing any interest penalty owed the Contractor.

**Add40**

**(i)** Name and address of the Contractor.

**(ii)** Invoice date and invoice number. (The Contractor should date invoices as close as possible to the date of the mailing or transmission.)

**(iii)** Contract number or other authorization for supplies delivered or services performed (including order number and line item number).

**(iv)** Description, quantity, unit of measure, unit price, and extended price of supplies delivered or services performed.

**(v)** Shipping and payment terms (e.g., shipment number and date of shipment, discount for prompt payment terms). Bill of lading number and weight of shipment will be shown for shipments on Government bills of lading.

**(vi)** Name and address of Contractor official to whom payment is to be sent (must be the same as that in the contract or in a proper notice of assignment).

**(vii)** Name (where practicable), title, phone number, and mailing address of person to notify in the event of a defective invoice.

**(viii)** Taxpayer Identification Number (TIN). The Contractor shall include its TIN on the invoice only if required elsewhere in this contract.

**(ix)** Electronic funds transfer (EFT) banking information.

> **(A)** The Contractor shall include EFT banking information on the invoice only if required elsewhere in this contract.

> **(B)** If EFT banking information is not required to be on the invoice, in order for the invoice to be a proper invoice, the Contractor shall have submitted correct EFT banking information in accordance with the applicable solicitation provision (e.g., 52.232-38, Submission of Electronic Funds Transfer Information with Offer), contract clause (e.g., 52.232-33, Payment by Electronic Funds Transfer-System for Award Management, or 52.232-34, Payment by Electronic Funds

**Add41**

Transfer-Other Than System for Award Management), or applicable agency procedures.

(C) EFT banking information is not required if the Government waived the requirement to pay by EFT.

(x) Any other information or documentation required by the contract (e.g., evidence of shipment).

(4) **Interest penalty.** The designated payment office will pay an interest penalty automatically, without request from the Contractor, if payment is not made by the due date and the conditions listed in paragraphs (a)(4)(i) through (a)(4)(iii) of this clause are met, if applicable. However, when the due date falls on a Saturday, Sunday, or legal holiday, the designated payment office may make payment on the following working day without incurring a late payment interest penalty.

(i) The designated billing office received a proper invoice.

(ii) The Government processed a receiving report or other Government documentation authorizing payment, and there was no disagreement over quantity, quality, or Contractor compliance with any contract term or condition.

(iii) In the case of a final invoice for any balance of funds due the Contractor for supplies delivered or services performed, the amount was not subject to further contract settlement actions between the Government and the Contractor.

(5) **Computing penalty amount.** The Government will compute the interest penalty in accordance with the Office of Management and Budget prompt payment regulations at 5 CFR Part 1315.

(i) For the sole purpose of computing an interest penalty that might be due the Contractor, Government acceptance is deemed to occur constructively on the 7th day (unless otherwise specified in this contract) after the Contractor delivers the supplies or performs the services in accordance with the terms and conditions of the contract, unless there is a disagreement over quantity, quality, or Contractor compliance with a contract provision. If actual acceptance occurs within the constructive acceptance period, the

**Add42**

Government will base the determination of an interest penalty on the actual date of acceptance. The constructive acceptance requirement does not, however, compel Government officials to accept supplies or services, perform contract administration functions, or make payment prior to fulfilling their responsibilities.

**(ii)** The prompt payment regulations at 5 CFR1315.10(c) do not require the Government to pay interest penalties if payment delays are due to disagreement between the Government and the Contractor over the payment amount or other issues involving contract compliance, or on amounts temporarily withheld or retained in accordance with the terms of the contract. The Government and the Contractor shall resolve claims involving disputes and any interest that may be payable in accordance with the clause at FAR 52.233-1, Disputes.

**(6) Discounts for prompt payment.** The designated payment office will pay an interest penalty automatically, without request from the Contractor, if the Government takes a discount for prompt payment improperly. The Government will calculate the interest penalty in accordance with the prompt payment regulations at 5 CFR Part 1315.

**(7) Additional interest penalty. (i)** The designated payment office will pay a penalty amount, calculated in accordance with the prompt payment regulations at 5 CFR Part 1315 in addition to the interest penalty amount only if-

**(A)** The Government owes an interest penalty of $1 or more;

**(B)** The designated payment office does not pay the interest penalty within 10 days after the date the invoice amount is paid; and

**(C)** The Contractor makes a written demand to the designated payment office for additional penalty payment, in accordance with paragraph (a)(7)(ii) of this clause, postmarked not later than 40 days after the invoice amount is paid.

**(ii)(A)** The Contractor shall support written demands for additional penalty payments with the following data. The Government will not request any additional data. The Contractor shall-

**Add43**

**(1)** Specifically assert that late payment interest is due under a specific invoice, and request payment of all overdue late payment interest penalty and such additional penalty as may be required;

**(2)** Attach a copy of the invoice on which the unpaid late payment interest is due; and

**(3)** State that payment of the principal has been received, including the date of receipt.

**(ii)(B)** If there is no postmark or the postmark is illegible-

**(1)** The designated payment office that receives the demand will annotate it with the date of receipt, provided the demand is received on or before the 40th day after payment was made; or

**(2)** If the designated payment office fails to make the required annotation, the Government will determine the demand's validity based on the date the Contractor has placed on the demand, provided such date is no later than the 40th day after payment was made.

**(iii)** The additional penalty does not apply to payments regulated by other Government regulations (e.g., payments under utility contracts subject to tariffs and regulation).

**(b) Contract financing payment**. If this contract provides for contract financing, the Government will make contract financing payments in accordance with the applicable contract financing clause.

**(c) Fast payment procedure due dates.** If this contract contains the clause at 52.213-1, Fast Payment Procedure, payments will be made within 15 days after the date of receipt of the invoice.

**(d) Overpayments.** If the Contractor becomes aware of a duplicate contract financing or invoice payment or that the Government has otherwise overpaid on a contract financing or invoice payment, the Contractor shall-

**(1)** Remit the overpayment amount to the payment office cited in the contract along with a description of the overpayment including the-

**Add44**

**(i)** Circumstances of the overpayment (e.g., duplicate payment, erroneous payment, liquidation errors, date(s) of overpayment);

**(ii)** Affected contract number and delivery order number if applicable;

**(iii)** Affected line item or subline item, if applicable; and
**(iv)** Contractor point of contact.

**(2)** Provide a copy of the remittance and supporting documentation to the Contracting Officer.

Alternate I (Feb 2002). As prescribed in 32.908 (c)(3), add the following paragraph (e) to the basic clause:

**(e) Invoices for interim payments.** For interim payments under this cost-reimbursement contract for services-

**(1)** Paragraphs (a)(2), (a)(3), (a)(4)(ii), (a)(4)(iii), and (a)(5)(i) do not apply;

**(2)** For purposes of computing late payment interest penalties that may apply, the due date for payment is the 30th day after the designated billing office receives a proper invoice; and

**(3)** The contractor shall submit invoices for interim payments in accordance with paragraph (a) of FAR 52.216-7, Allowable Cost and Payment. If the invoice does not comply with contract requirements, it will be returned within 7 days after the date the designated billing office received the invoice.

## 52.246-4 Inspection of Services-Fixed-Price.

As prescribed in 46.304 , insert the following clause:

Inspection of Services-Fixed-Price (Aug 1996)

**(a)** Definition. "Services," as used in this clause, includes services performed, workmanship, and material furnished or utilized in the performance of services.

**(b)** The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all

**Add45**

inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires.

**(c)** The Government has the right to inspect and test all services called for by the contract, to the extent practicable at all times and places during the term of the contract. The Government shall perform inspections and tests in a manner that will not unduly delay the work.

**(d)** If the Government performs inspections or tests on the premises of the Contractor or a subcontractor, the Contractor shall furnish, and shall require subcontractors to furnish, at no increase in contract price, all reasonable facilities and assistance for the safe and convenient performance of these duties.

**(e)** If any of the services do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by reperformance, the Government may-

   **(1)** Require the Contractor to take necessary action to ensure that future performance conforms to contract requirements; and

   **(2)** Reduce the contract price to reflect the reduced value of the services performed.

**(f)** If the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with contract requirements, the Government may-
   **(1)** By contract or otherwise, perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such service; or

   **(2)** Terminate the contract for default.

**Add46**

**52.249-8 Default (Fixed-Price Supply and Service).**

As prescribed in 49.504(a)(1), insert the following clause:

Default (Fixed-Price Supply and Service) (Apr 1984)

**(a) (1)** The Government may, subject to paragraphs (c) and (d) of this clause, by written notice of default to the Contractor, terminate this contract in whole or in part if the Contractor fails to-

> **(i)** Deliver the supplies or to perform the services within the time specified in this contract or any extension;
>
> **(ii)** Make progress, so as to endanger performance of this contract (but see paragraph (a)(2) of this clause); or
>
> **(iii)** Perform any of the other provisions of this contract (but see paragraph (a)(2) of this clause).

. . .

**(f)** The Government shall pay contract price for completed supplies delivered and accepted. The Contractor and Contracting Officer shall agree on the amount of payment for manufacturing materials delivered and accepted and for the protection and preservation of the property. Failure to agree will be a dispute under the Disputes clause. The Government may withhold from these amounts any sum the Contracting Officer determines to be necessary to protect the Government against loss because of outstanding liens or claims of former lien holders.

**(g)** If, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

. . .

**Add47**

# RULES OF THE COURT OF FEDERAL CLAIMS

**Rule 56. Summary Judgment**

**(a)** Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

…

**(c)** Procedures.

   (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

   (2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

   (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

   (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

**Add48**

**(d)** When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

    (1) defer considering the motion or deny it;

    (2) allow time to obtain affidavits or declarations or to take discovery; or

    (3) issue any other appropriate order.

**(e)** Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by RCFC 56(c), the court may:

    (1) give an opportunity to properly support or address the fact;

    (2) consider the fact undisputed for purposes of the motion;

    (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or

    (4) issue any other appropriate order.

**(f)** Judgment Independent of the Motion. After giving notice and a reasonable time to respond, the court may:

    (1) grant summary judgment for anonmovant;

    (2) grant the motion on grounds not raised by a party; or

    (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

…

**Add49**

**FORM 30. Certificate of Service**

Form 30
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF SERVICE</u>

**Case Number**  2024-1755

**Short Case Caption**  ASG Solutions Corp. v. US

> **NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system.  See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e).  Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on  06/26/2024

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐ Facsimile
☐ Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Sheryl L. Floyd, Esq.<br>Department of Justice<br>Attorney for Defendant The United States | P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044<br>Facsimile: (202) 353-0461; Email:  Sheryl.floyd@usdoj.gov |
|  |  |
|  |  |
|  |  |
|  |  |

☐    Additional pages attached.

Date: 06/26/2024

Signature:  /s/ Alexandria M. Quindt

Name:  Alexandria M. Quindt

**FORM 19.** Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  2024-1755

**Short Case Caption:**  ASG Solutions Corp. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes  13,901  words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/26/2024          Signature:   /s/ David S. Demian

                          Name:        David S. Demian